# REPORT OF THE KENOSHA COUNTY DISTRICT ATTORNEY CONCERNING THE OFFICER INVOLVED SHOOTING DEATH OF MICHAEL BELL

## INTRODUCTION

On November 9, 2004 at approximately 2:40 a.m., I was notified by Kenosha Police Department Captain Randy Berner that there had been an officer involved shooting at 8310 14th Avenue, in the City of Kenosha. I arrived at the scene of this incident just after 3:15 a.m. After a brief examination of the scene, I drove to Kenosha Hospital Medical Center Emergency Room where I briefly interviewed Kimberly and Shantae Bell, the mother and sister of Michael Bell. I then requested that hospital staff perform drug/alcohol screens of Michael Bell's blood and urine. I then proceeded to the Kenosha Police Department headquarters before returning home.

The Kenosha Police Department has provided me copies of all reports and statements in this matter along with autopsy and scene photos and a video compact disc recorded from Officer Strausbaugh's squad. I have examined physical evidence as I deem it necessary to prepare this report.

The purpose of my investigation is to determine whether or not a crime has been committed in connection with the death of Michael Bell or whether additional evidence or investigation is necessary to make that determination or whether a Coroner's Inquest should be ordered pursuant to Section 979.05, Wis. Stats., to assist in determining whether or not a crime has been committed in connection with the death of Michael Bell.

For the reasons set forth in the ensuing report, I conclude that the death of Michael Bell was a justifiable homicide. Since there is sufficient evidence available to reach this conclusion and since there is no reason to believe that sworn testimony of witnesses would alter this finding, I see no need for a Coroner's Inquest.

1

## FINDINGS OF FACT

At approximately 2:10 a.m. on Tuesday, November 9, 2004 after completing a routine traffic stop, Police Officers Erich Strausbaugh and Erich Weidner were engaged in casual conversation when they observed a green Ford Explorer drive southbound past their marked squad cars and then suddenly accelerate rapidly away. Officer Strausbaugh returned to his squad, executed a Y-turnaround and commenced pursuit, pulling up behind the green Ford Explorer as it came to a stop on the side of the road in front of 8310 14th Avenue at approximately 2:11:05 a.m.

Michael Bell is seen on the CD from Officer Strausbaugh's squad car video camera to immediately exit the Ford Explorer from the driver's door and proceed toward Officer Strausbaugh, despite Officer Strausbaugh's commands to "get back in the car." Officer Strausbaugh was seen to physically escort Michael Bell back to the driver's door. Officer Strausbaugh opened the driver's door with his left hand while holding Bell's left shoulder or upper arm with his right hand. Officer Strausbaugh was seen to be trying to put Bell in the driver's seat while Bell is seen to be apparently resisting Officer Strausbaugh's efforts to get Bell into the SUV. Officer Strausbaugh is then seen to physically escort Bell toward the passenger side of Officer Strausbaugh's vehicle. Bell appears to be somewhat resistive and off balance while Officer Strausbaugh was seen to be trying to control Bell's arms, keeping them away from Bell's body.

As Officer Strausbaugh and Bell pass in front of Strausbaugh's squad, they both go off camera at 2:11:33 a.m. Although they are off camera and outside Officer Strausbaugh's squad, some of the verbal exchange between Officer Strausbaugh, Bell and ultimately Officer Weidner was faintly recovered by the video camera microphone. Furthermore, while Officer Strausbaugh's squad light is illuminating the driver's side rear of the SUV, either Officer Weidner's squad headlights or a spotlight faintly illuminate the tailgate of the SUV. Therefore, the shadows of the officers and Bell are seen to be moving on the back of the SUV as the officers and Bell are struggling against the side of Officer Strausbaugh's squad.

The following verbal exchanges can be faintly heard in this CD video:

All times are a.m.
2:11:05: Squad door opens.
2:11:06: Officer Strausbaugh: Get back in the car, get back in the car.
Inaudible at car – then moving back to squad
2:11:30: Michael Bell: I didn't do nothing wrong.
Unidentified Officer: inaudible
2:11:36: Michael Bell: I didn't
2:11:38: Officer Strausbaugh: Listen stand here (unintelligible)
2:11:40: Michael Bell: I didn't do nothing wrong.

2

(Radio over)
2:11:55: Michael Bell: I didn't do nothin wrong.
2:11:58: Michael Bell: I didn't do nothin.
2:12:00: Unidentified officer: Put your hands on the car. I'm not telling you again.
2:12:02: unintelligible "fucking" unintelligible
2:12:05: Michael Bell: Do not tell me what to do (when I have not done anything wrong).
2:12:08: Unidentified Officer: You ran right through a stop sign for one.
2:12:09: Michael Bell: No I did not. Ask (Dave?)
2:12:13: Unidentified Officer: (Is that your friend?)
2:12:15: Michael Bell: Yeah, that's him. Right there. Yeah, yeah.
2:12:16-2:12:48 - unintelligible
2:12:49: Unidentified Officer: (unintelligible) and you're on bond?
2:12:51: Unidentified Officer: You're on bond? [you're on bond]
2:12:52: Michael Bell: Yeah.
2:12:53: Unidentified Officer: What are the conditions of your bond?
2:12:55: Unidentified Officer: What are the conditions of your bond?
2:12:57: Michael Bell: [leave me alone]
2:13:00: Unidentified Officer: (Don't), don't move. (Get your hands on my car)...do not move.
2:13:03: Michael Bell: I didn't (unintelligible) I didn't
2:13:14: Unidentified Officer: Better keep your hands where I told you.
2:13:16: Car door opens.
2:13:16: Michael Bell: I'm not (getting) in your car get off, I know my rights do not force me.
2:13:20: Unidentified Officer: All right, we're going to do some field sobriety tests.
2:13:22: Michael Bell: Do not (unintelligible) get off
2:13:25: Michael Bell: You can't do a sobriety test if I don't want (unintelligible)
2:13:27: Unidentified Officer: Stand right here.
2:13:27: Michael Bell: Fuck you.
2:13:28: Unidentified Officer: Stand right here.
2:13:29: Michael Bell: No.
2:13:30: Michael Bell: Don't you..ooh..ahh (voice sounds raised apparent struggle)
2:13:34: Unidentified Officer: Listen, put your hands behind your back, you're under arrest.
2:13:37: Michael Bell: Get off me.
2:13:38: Unidentified Officer: Put your hands behind your back.
2:13:39: Michael Bell: Quit kicking.
2:13:40: Unidentified Officer: Put your hands behind your back.
2:13:40: Michael Bell: I know my rights, you can't kick me.
2:13:42: Unidentified Officer: Taze him, taze 'em.
2:13:47: Michael Bell: Oh ,come on (unintelligible)

3

2:13:49: Unidentified Officer: (sounds different than first unidentified officer). I'm gonna taze him (radio over).
2:13:50: Michael Bell: Don't taze me. I didn't do...
2:13:52: Unidentified Officer: Put your hands behind your back.
2:13:52: Michael Bell: My (unintelligible) are (unintelligible)
2:13:53: Unidentified Officer: Put your hands behind your back now!
2:13:55: Sound of tazer.
2:13:55: Michael Bell: Ahhhh!
2:13:56: Unidentified Officer: Get your hands behind your back right now.
2:13:59: Unidentified Officer: Get down.
2:14:00: Voices fade.

At 2:14:56 a.m., police dispatcher is heard to announce over the radio, "Any other squads 83rd and 14th." Sirens are then heard over the squad car radio. At 2:15:17 a.m., the second squad arrives and at 2:15:26 a.m., the third squad arrives. At 2:15:29 a.m., Lt. Krueger is seen to run past the front of the squad signaling to Officer Gonzalez, who has also arrived. At 2:15:41 a.m., Officer Gonzalez runs past the front of the squad. At approximately 2:16:12 a.m., there is the faint possible sound of a gunshot.

According to Strausbaugh, Michael Bell immediately exited the SUV and started walking back toward Strausbaugh despite Officer Strausbaugh's commands to get back in his vehicle. Strausbaugh reports that because Michael Bell was ignoring his commands, he placed his hands on Bell's collar area and also grabbed onto one of his arms to take him back to his vehicle. Officer Strausbaugh reports that he could feel the muscle tension in Bell's arm at this point. He reported that he wanted Bell back in the vehicle for Officer Strausbaugh's own safety. Strausbaugh reports that as he escorted Bell back to the front door of the SUV, Bell stated that he was not getting back into the car. At that point, Strausbaugh could detect an odor of an alcoholic beverage on Bell's breath. After noticing that there was a white male passenger in the vehicle, Strausbaugh decided that it would not be a good idea to put the driver back into the vehicle. At that point, Strausbaugh heard the passenger say something like, "Michael, just chill out."

As Officer Strausbaugh turned Michael Bell toward his squad car, he again felt tension in Michael Bell's arm, and it was at that point that Officer Strausbaugh also recognized that the driver was Michael Bell. Officer Strausbaugh realized that he had arrested Michael Bell on a felony drug offense in September of 2004 and that Bell had resisted and fought with officers at that time. Officer Strausbaugh also knew that he had a court date scheduled for Bell's drug charge on November 10, 2004. He recognized that Bell had to be out on bond and that he was no doubt violating conditions of bond by consuming alcoholic beverages and driving while intoxicated.

4

Strausbaugh reports that as he took Bell back to his squad car, he attempted to have Bell place his hands on the rear of the squad so that Officer Strausbaugh could pat him down. Bell kept removing his hands from the rear of the squad as Strausbaugh tried to pat him down. At that point, Strausbaugh asked Bell if he had a no alcohol restriction as part of his bond, and Bell replied, "Hey, man, you don't have to do this." Strausbaugh attempted to complete the pat down and told Bell that he was going to take a seat in Strausbaugh's squad. Bell replied, "No, I don't," and tried to walk away. Officer Strausbaugh then told Bell that they would be conducting field sobriety tests on the sidewalk.

At that point, Bell stated, "You're not doing this to me again," and started to walk westbound through the front yard of the house near the traffic stop. Officer Strausbaugh then came up behind Michael Bell and grabbed his left arm while Officer Weidner grabbed Bell's right arm. Officer Strausbaugh told Bell he was under arrest and Bell struggled to get away from both Weidner and Strausbaugh. Officer Strausbaugh tripped Bell to take him to the ground in order to gain control. Bell continued to struggle with his muscles tensed up and his hands balled up into fists. The officers were unable to get Bell's hand in a position to cuff him or gain control over him. Officer Strausbaugh attempted two or three knee strikes to Bell's legs but they were ineffective. Strausbaugh then told Weidner to clear Bell because he was going to use his tazer. The tazer prongs stuck in Bell's jacket and Bell yelled, jumped up and ran toward the back of the house. Officers Weidner and Strausbaugh gave pursuit. Strausbaugh reports that when he grabbed Bell from behind, he felt a surge of electric shock from the Tazer through the jacket. The shock was not sufficient to incapacitate Strausbaugh, which is probably why it was not sufficient to incapacitate Bell either.

Strausbaugh reports that it was a very confined area where they struggled in the back of the house. He reported that Bell punched him in the back of the head, in the right cheek and also grabbed a hold of Strausbaugh and shoved him into the side of the house. By this point, Strausbaugh had struck Bell in the head with his tazer and also stunned Bell with the tazer in the midsection.

At that point, Weidner told Strausbaugh to drop the tazer so that Weidner and Strausbaugh could seek to subdue Bell. At that point, it was both Weidner and Strausbaugh who were now fighting with Bell. At this point, they were able to get out of the confined area of the driveway between the house and the vehicle and able to get Bell to the ground in the driveway. Weidner and Strausbaugh continued to struggle with Bell in the driveway as Kimberly Bell and Shantae Bell came out and attempted to intervene. Officer Strausbaugh ordered them back out of the way.

At that point, Strausbaugh heard sirens and shortly thereafter, Lt. Krueger arrived on the scene. Lt. Krueger applied a stun drive to Bell's back with his tazer. At that point, Bell jumped off the ground and came at Officer Strausbaugh, grabbed

5

Officer Strausbaugh around the midsection and pushed him up against the car that was parked close to the garage and the driveway. Strausbaugh reports that Bell had his arms around Strausbaugh and was on the right side of Strausbaugh's body.

Strausbaugh then felt Bell's hands on his gun. Bell had a hold of Strausbaugh's gun in the holster, and Bell had twisted the holster and gun belt around to the front of Strausbaugh's body. Strausbaugh felt the safety thumb strap on the holster open. He could feel Bell's hand on the grip portion of Strausbaugh's gun while it was still in the holster. Officer Strausbaugh had his hand on the rear side of the gun, applying pressure to keep the weapon in the holster and to keep Bell from pulling the gun out of the holster. Strausbaugh could feel Bell pulling up on the gun as Strausbaugh was pushing down on the gun. Strausbaugh shouted out that Bell had his gun. Strausbaugh heard another officer repeat what Strausbaugh had said and the next thing Strausbaugh heard was a loud shot.

It was after the gunshot and after Strausbaugh observed Bell laying on the hood of the car bleeding he then observed for the first time that Gonzalez was on the scene. Strausbaugh reported that as his gun was being taken away from him by Bell, he was in fear for his own life as well as the lives of other KPD officers at the scene. He reported that Bell had pulled his gun with enough force to twist his gun belt around to the point where the holster was now in the front of Strausbaugh's body, pointing down to the front of Strausbaugh's right leg.

Officer Weidner reported that while he was engaged in this struggle, after Lt. Krueger had arrived, he observed Lt. Krueger "drive stun" Bell. He reported that Bell jumped out and that when Weidner got up, he observed Lt. Krueger, Officers Gonzalez and Strausbaugh had Bell up against the hood of the vehicle in front of the minivan and they were still fighting with Bell. As Officer Weidner started toward them, Mrs. Bell came running toward them again, and he again told her to stay back.

Officer Weidner then turned toward the fight and he heard Strausbaugh yelling in a terrified voice, "He's got my gun." Weidner heard Strausbaugh yell this several times, and he looked toward Officer Strausbaugh's gun and he could see a hand on the top of the gun, which was still in the holster. He observed Strausbaugh twist his hip area to try and direct his holster away and his holster moved toward the center of his hip area. At that point, he heard a gunshot and everything stopped.

The tazer logs reflect that Officer Strausbaugh's tazer was fired at 2:08:59 a.m. for a period of 11 seconds. Then again at 2:09:10 a.m. for a period of six seconds. Then again at 2:09:16 for five seconds. The log reflects that Lt. Krueger's tazer was fired at 2:16:30 for a period of five seconds. It should be noted that the time downloaded from the tazers are from two different tazers and thus, the times may not be coordinated between themselves. Furthermore, the

time recorded on the tazers may not correlate with the times reflected on the CD video camera. The time differential between Strausbaugh's and Lt. Krueger's employed tazers exceed the likely time period that actually elapsed between the firing of Strausbaugh's tazer and Krueger's tazer. The time lapse on the video camera reflects this incident took less than five minutes and thus, there was very likely less than one or two minutes time lapse between the last firing of Strausbaugh's tazer and the first firing of Krueger's tazer.

At 2:21:57 a.m., the first fire department vehicle arrived on scene. Paramedics describe finding Michael Bell face down on his knees with his arms and hands on the pavement on either side of his head.

A Kenosha Fire Department Emergency Medical Technician Med Unit transported Michael Bell to the Kenosha Hospital Medical Center Emergency Room. Michael Bell had sustained a gunshot wound to the head. A blood sample drawn at 3:15 a.m. and tested at 4:14 a.m. revealed that Michael Bell had a blood alcohol concentration of .165 mg/dl of blood, a level that is more than twice the level which creates a presumption of being under the influence of an intoxicant in Wisconsin. Michael Bell was then airlifted via Flight for Life helicopter to Froedtert Memorial Hospital where he was pronounced dead at 4:49 a.m. (See United Hospital certified medical records and Captain Berner's report.)

## WITNESS STATEMENTS

According to Sean Roberts, a bartender at Harborside Inn, 719 50th Street, Michael Bell and Brian M. Rocco had arrived at that tavern together at approximately 10 or 11:00 p.m. Bell was drinking beer (it was "dollar beer night") and "Jaeger bombs," which is a drink comprised of a shot of Jaegermeister in an energy drink. At about 1:00 a.m., Roberts cut Bell off because he was intoxicated. (See Detective Ollila's report and Sean Roberts signed statement.)

According to Brian Rocco, he met Michael Bell at Harborside Inn at approximately 10:00 p.m. Michael and Brian were drinking beer and "Jaeger bombs." They left at about 2:00 a.m. with Michael Bell driving Rocco's 1997 Ford Explorer. Rocco explained that Michael Bell was driving because Rocco "was a little more messed up" than Bell. Rocco remained in the vehicle after they were stopped by the police. Rocco could hear Bell arguing with the police. ("What the fuck did I do wrong? I didn't do anything wrong.") Rocco reported, "I heard Michael repeat those comments, but I didn't look at what was happening. I just figured Mike would probably be getting rowdy with the officers because that's the way Mike is..."

Craig D. El reports that he had driven to Michael Bell's home and parked his white Hyundai on the road just north of Bell's home. El observed the green SUV stop just to the south of Bell's home on the street and two squads stopped just behind the SUV. El reports a third squad stopped in front of the SUV. El then

7

reported he saw two officers struggling with Michael Bell alongside the SUV. (Note, the video camera in Strausbaugh's squad reveals that El is mistaken on these two points. First, the officers and Bell were actually struggling alongside Strausbaugh's squad, not the SUV. Second, the third squad did not arrive until after this struggle had moved away from the squad car.)

El reported that he was growing upset with Bell because Bell would not comply with the officer's repeated commands to keep his hands on the car. Specifically, El stated, "The officers had him facing the SUV and every time Mike tried to turn around and talk face to face, the officers would shove him back so he was facing the SUV. This happened three or four times. I remembered thinking I was getting mad at Mike for turning around all those times, but I felt like the officers were antagonizing him."

El reported that the struggle moved toward Mike's house and away from the squad car and that Mike and the officers were struggling with each other. El reported that he could hear Mike repeatedly yelling, "Get off me. You can't do this to me. I know my rights." He reported that he saw Mike pulling his arms away from the officers who were yelling things like "calm down, relax." He reported that he observed the officers attempt to handcuff Mike and heard the officers continue yelling at Mike to "relax." "Stop resisting." At that point, he observed the officers fire a tazer into Mike's back. He reported that he then observed Mike jump to his feet and take off running with his hands behind him, ran up the driveway and out of El's sight. He reported that he observed the officers chasing after him. He subsequently heard some female voices saying, "Don't hurt him. Get off of him." And then a short while later, he heard a gun shot.

## LEGAL PRINCIPLES REGARDING USE OF FORCE

Claims that law enforcement officials have used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen are most popularly characterized as invoking the protections of the 4th Amendment, which guarantee citizens the right "to be secure in their persons...against unreasonable seizures," and must be judged by reference to the 4th Amendment's "reasonableness" standard.

The 4th Amendment "reasonableness" inquiry is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and this calculus must embody an allowance for the fact that police officers are often forced to make split second

8

decisions about the amount of force necessary in a particular situation.

Graham v. Connor, 490 US 386, 104 L. Ed. 2d 443, 449, 109 S. Ct. 1865 (1989).

Officer Gonzalez arrived on the scene responding to urgent calls for backup from officers. He rushed around the back of the building after hearing screams. As he came upon the scene, he observed Lt. Krueger "drive stun" Michael Bell in the back. Gonzalez could see that Lt. Krueger made direct contact with the tazer to Bell's back because Bell's shirt was pulled up. He then observed Bell raise up to a crouched position on his feet, totally ignoring the effects of the tazer stuns. Gonzalez describes Bell as "bull rushing" Strausbaugh directly into a silver car that was parked on the north side of the driveway. At that point, he observed Lt. Krueger grab Bell, grabbing him around the chest.

Gonzalez then heard Strausbaugh yelling, "He's got my gun," several times. Gonzalez then heard Strausbaugh yell again, "Oh my God, he's got my gun." Gonzalez not only heard what Strausbaugh was yelling but also the sound of Strausbaugh's voice. He reported, "I will never forget the sound of Strausbaugh's voice. It was almost as if he (Strausbaugh) was crying." Gonzalez then ran around the front of the silver car in order to get an angle on the suspect. As he was running around the front of the car, Gonzalez yelled, "Straus, does he still have your gun?" He then heard Strausbaugh yelling, as though terrified and exhausted, and again saying, "Oh, God, he's got my gun." Gonzalez got around the front of the car and put his gun to the suspect's head. He grabbed Bell's head and put the gun next to Bell's head and pulled the trigger and nothing happened. He then pulled the gun back to reposition and as he pulled the gun back, he heard Lt. Krueger yell, "Shoot." As he pulled the gun back, he fired simultaneously to hearing Lt. Krueger order "shoot" shooting Bell in the head.

Lt. Krueger confirms that he ordered Gonzalez to shoot. Lt. Krueger reported that he had drive stunned Michael Bell but that Bell jumped up anyway. At that point, Krueger grabbed Bell from behind in a bear hug. Lt. Krueger could hear Officer Strausbaugh screaming something like, "He has my gun" or "He's got his hand on my gun." Lt. Krueger reports that he pinned Bell against the left front fender of the car but that his arms were still free. Strausbaugh was to Lt. Krueger's right and screamed in a high-pitched desperate voice, "He's got my gun, he's got my gun." Lt. Krueger reported that he had Bell in a bear hug with his head turned to the left, and he knew that Strausbaugh was on his right but he couldn't see what Strausbaugh was doing.

While fighting with Bell, Lt. Krueger looked up and observed Gonzalez standing at the front of the car. When Strausbaugh screamed that the guy had his gun, Lt. Krueger yelled, "If he's got your gun, we're going to have to shoot him." While Lt. Krueger was yelling this, Gonzalez drew his gun from his holster and put it to the

side of Bell's head. Gonzalez yelled, "Does he have your gun?" And Strausbaugh yelled in a high-pitched voice, "He's got my gun." Lt. Krueger reported that while this was going on, he expected to hear a gunshot and that one of them was going to get shot. Hearing Strausbaugh yelling, "He's got my gun," Krueger thought that Bell was going to shoot one of them so he told Gonzalez to shoot. Krueger reports that Gonzalez had his gun pressing against the side of the head and he observed Gonzalez pull the trigger but the gun did not fire. He then saw Gonzalez back the gun away slightly from Bell's head and the gun immediately went off.

At the time that Gonzalez fired his weapon, he could not see Bell's hands. Neither could Lt. Krueger. However, both Lt. Krueger and Officer Gonzalez knew that Bell was struggling, that he had been fighting with these police officers for several minutes, that he had been insensitive or insensible to the tazer weapons that had been utilized at least by Lt. Krueger, that he had his hand on Strausbaugh's gun and that Strausbaugh thought he was going to shoot them. Both Lt. Krueger and Officer Gonzalez had a reasonable basis for believing that their lives and the lives of Officers Strausbaugh and Weidner were all in danger. Thus, Lt. Krueger was legally justified in issuing the order to shoot, and Gonzalez was legally justified in utilizing lethal force.

Michael Bell has been described by his family and his friends as a very warmhearted, generous and loving person. I am sure that is very true. However, that is not the side of his personality that Michael Bell displayed to law enforcement officers.

Officers Strausbaugh and DeMario had been required to resort to pepper spray in order to arrest Michael Bell on September 15, 2004. Friends and family confirm that Michael Bell had a very significant problem with authority figures – particularly authority figures wearing uniforms.

Within 90 seconds of being stopped, both the arresting officers and Michael Bell knew that this was going to be a felony arrest. Thus, Officers Strausbaugh and Weidner were attempting to arrest a very powerfully built young man who did not like authority, who did not like people wearing uniforms, who was intoxicated and who, apparently, had no intention of going to jail. He had tried to take Officer Strausbaugh's weapon in the driveway and then again around the back of the house. Officer Strausbaugh, Lt. Krueger, Officer Gonzalez and Officer Weidner were all justified in their belief that Michael Bell was trying to take this weapon in order to shoot any law enforcement officer who was trying to take him into custody.

The statement of Craig El in conjunction with the statement of Michael Bell's mother, Kimberly Bell, may cause some to suspect that Michael Bell's hands were cuffed at the time that he was shot. I have concluded that Michael Bell's hands were not cuffed. I come to this conclusion for a number of reasons.

10

First of all, neither Kimberly Bell nor Shantae Bell indicated to me that Michael Bell's hands were cuffed when I interviewed them less than 90 minutes after this incident had occurred on November 9, 2004. I do not believe they would have excluded such a very significant fact when describing to me this incident.

Furthermore, Craig El did not say that Michael Bell's hands were cuffed behind his back. However, Craig El indicated that as Michael Bell was running toward the back of the house, it appeared as though his hands were behind his back. It is possible that Michael Bell's hands were behind his back as he was seeking to pull the tazer wires or the jacket away from his back. However, there is no way that Michael Bell's hands were cuffed behind his back.

- First, he would not have been able to punch Officer Strausbaugh in the head and face if his hands were cuffed behind his back.
- Second, that's what the officers were attempting to do was handcuff him. That's why they were struggling with him.
- Third, there are absolutely no marks on either of Michael Bell's wrists.
- Fourth, Officer Weidner reports that he did attempt to handcuff Michael Bell and that, in fact, he had the handcuff out and was just about to put it on Bell's wrist when Bell apparently heard the ratcheting sound of the handcuff and yanked his hand away. Weidner's handcuff then fell to the ground where he left them.
- Fifth, Lt. Krueger was holding Bell from behind, around Bell's chest. Lt. Krueger's arms were between Bell's chest and arms. Thus, Lt. Krueger had no control of Bell's arms. There is no way Bell could have been reaching for Strausbaugh's gun if Bell's hands had been cuffed. Furthermore, it would have been difficult for Lt. Krueger to grab Bell's chest without also grabbing Bell's arms if Bell had been cuffed from behind.
- Sixth, photos taken immediately after the shooting show Bell's arms over his head.
- Seventh, paramedics responded within minutes of the shooting and did not see any handcuffs. Seventh, paramedics who appeared within minutes describe Bell as on his knees, face down with his arms and hands on the pavement to either side off his head.

## THE LAW OF HOMICIDE

If it were to be assumed that a law enforcement officer shot and killed an arrestee without adequate legal justification, the offenses with which he could be charged include:
1. First Degree Intentional Homicide While Armed With a Dangerous Weapon, contrary to Section 940.01 and 939.63, Wis. Stats., a Class A Felony punishable by life imprisonment plus five years

11

2. Second Degree Intentional Homicide While Armed With a Dangerous Weapon, contrary to Section 940.05, 940.01(2) and 939.63, a Class B Felony punishable by up to 65 years imprisonment.
3. First Degree Reckless Homicide While Armed With a Dangerous Weapon, contrary to Section 940.02(1) and 939.63, Wis. Stats., a Class B Felony punishable by up to 65 years imprisonment.
4. Second Degree Reckless Homicide While Armed With a Dangerous Weapon, contrary to Section 940.02(2) and 939.63, Wis. Stats., a Class C Felony punishable by up to 45 years imprisonment and a $100,000 fine.
5. Homicide by Negligent Handling of a Dangerous Weapon contrary to Section 940.08(2), a Class G Felony punishable by up to 10 years imprisonment and a $25,000 fine.

In this instance, since it is undisputed that Officer Gonzalez intentionally shot Michael Bell in the head, recklessness and negligence are not at issue. Thus, the only potentially available offenses would be First Degree or Second Degree Intentional Homicide.

As the enclosed jury instruction show, both First Degree and Second Degree Intentional Homicide require that the State prove beyond a reasonable doubt that the suspect caused the death of another with intent to kill. The evidence in this case would show that Officer Gonzalez intentionally shot Michael Bell in the head at point blank range with a .45 caliber semi-automatic handgun. However, in order to prove this charge, the prosecutor must also prove beyond a reasonable doubt that Officer Gonzalez did not actually and reasonably believe that the force used was necessary to prevent imminent death or great bodily harm to himself or another.

The facts in this case strongly support the finding that Officer Gonzalez actually and reasonably believed the force used was necessary to prevent imminent death or great bodily harm to himself, Officer Strausbaugh, Officer Weidner and/or Lt. Krueger. At the time he fired his weapon, Officer Gonzalez knew the following:

1. He was responding to an urgent call for assistance from another officer.
2. He heard screams coming from the scene before he actually arrived at the scene.
3. The suspect had been "drive stunned" by Lt. Krueger with little discernible effect on the suspect.
4. The suspect had slammed one officer against a car and was not being effectively controlled by another officer who was on the suspect's back. Thus, the suspect appeared to be very strong and out of control.
5. Officer Strausbaugh was shouting, "He's got my gun," in a high-pitched panicked tone of voice.
6. Lt. Krueger had ordered him to shoot.

12

7. That in response to Officer Gonzalez's request for confirmation ("Straus, does he have your gun?") Officer Strausbaugh confirmed that the suspect had his gun.
8. That despite the fact that Officer Gonzalez put his gun directly to the head of the suspect, he continued to struggle.

Under these circumstances, I am satisfied that no reasonable jury could possibly conclude that Officer Gonzalez did not actually and reasonably believe that he and his fellow officers were in imminent danger of death or great bodily harm and that lethal force was necessary.

Robert J. Jambois
Kenosha County District Attorney