1

1  UNITED STATES DISTRICT COURT
2  EASTERN DISTRICT OF WISCONSIN
3  * * * * * * * * * * * * * *
4  ESTATE OF MICHAEL EDWARD BELL, by Special
   Administrator Michael Martin Bell, KIM MARIE
5  BELL, MICHAEL MARTIN BELL, and SHANTAE BELL,
6             Plaintiffs,
7    vs.              Case No. 05-C-1176
8  OFFICER ERICH R. STRAUSBAUGH, OFFICER ERICH S.
   WEIDNER, LIEUTENANT DAVID H. KRUEGER, OFFICER
9  ALBERT B. GONZALES, KENOSHA POLICE DEPARTMENT,
   CITY OF KENOSHA,
10
            Defendants.
11
   * * * * * * * * * * * * * * *
12
13
         VIDEOTAPED DEPOSITION OF TODD THORNE
14
         TAKEN AT: Kenosha City Hall
15       LOCATED AT: 625 52nd Street
                     Kenosha, WI
16
                     May 31, 2007
17              1:24 p.m. to 3:05 p.m.
18            REPORTED BY ANITA K. FOSS
           REGISTERED PROFESSIONAL REPORTER
19
20
   * * * * * * * * * * * * * * *
21
                RAY REPORTING, INC.
22              Voice (414) 347-5599
                 Fax (414) 347-1166
23            Toll Free (800) 472-0445
                www.rayreporting.com
24              Depos2Bdone@aol.com
                RayReporting@aol.com
25

```
 1              A P P E A R A N C E S
 2    CANNON & DUNPHY, S.C., by
      Mr. Patrick O. Dunphy
 3    and Mr. Brett Eckstein
      595 North Barker Road
 4    Brookfield, WI  53008-1750
      Appearing on behalf of the Plaintiffs.
 5
 6    GUNTA & REAK, SC, by
      Mr. Kevin P. Reak
 7    219 North Milwaukee Street, 5th Floor
      Milwaukee, WI  53202-5818
 8    Appearing on behalf of the Defendants.
 9    ALSO PRESENT:  Captain Randy Berner
10
                      I N D E X
11
12    Examination by                        Page
13    Mr. Dunphy. . . . . . . . . . . . . . . 5
      Mr. Reak. . . . . . . . . . . . . . . .89
14
15                    E X H I B I T S
16                                           Page
      Exhibit No.  Description           Identified
17
         82       Supplementary report dated
18                November 12th of 2004. . . . . 12
19       83       Report dated 12/6/04 . . . . . 13
20    84 - 89     Photo logs and attached
                  photos. . . . . . . . . . . . .13
21
         90       Autopsy photos. . . . . . . . .13
22
         91       Photo taken by Officer Beller..36
23
24    (Original Exhibits attached to original
      transcript.  Copies provided to all counsel.)
25
```

```
 1
 2                    R E Q U E S T S
 3   By           Description                    Page
 4   Mr. Dunphy   Officer Thorne's resumT. . .8
 5                E-mail two missing autopsy
                  photos to Mr. Reak. . . . . 9
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1        patterns that you've seen, the accumulation of
2        blood that you've seen and that has been
3        documented in the various photographs. I
4        assume that what you were doing while you were
5        there was documenting all the forensic evidence
6        that was available to you that would give an
7        indication, from a forensic standpoint, of
8        where Michael Bell was when he was shot?
9   A   If possible.
10 Q   And you diligently searched for all of the
11        evidence you could find of blood, body tissue,
12        skull, brain tissue, anything that would help
13        you as a forensic specialist in making that
14        determination?
15 A   That's one of the reasons why I ask that we
16        hold and wait till daylight, so we can see
17        better.
18 Q   And when you came back during the daylight, you
19        again examined that scene as diligently as you
20        possibly could for all evidence of blood, brain
21        tissue, skull, anything at all that would help
22        you determine what happened that evening?
23 A   Yes.
24 Q   At any time, in any of your reports or any of
25        your photographs, is there any documentation of

1   blood, bone, or brain tissue on the windshield
2   of the Nissan?
3 A Is there any?
4 Q Yes.
5 A None that I seen.
6 Q If you had seen it, you obviously would have
7   recorded it?
8 A Yes.
9 Q That would have been one of the things you
10  would have been diligently searching for;
11  correct?
12 A Yes.
13 Q Thank you.  All right.  Going back to Exhibit
14  82, which is your supplementary report dated
15  November 12, 2004, after your initial
16  examination of the scene as we've discussed
17  earlier, you then went back to the PSB?  Is
18  that public safety building?
19 A That would be.
20 Q Is that the building within which the Kenosha
21  police department is located?
22 A It would be.
23 Q There you went to the detective bureau and you
24  met with the assigned detectives; correct?  Or
25  at least you went there in order to meet with

1  Q   Then when all the officers had completed their
2      individual descriptions, you placed a number
3      ten on the hood of the Nissan to represent the
4      suspect's approximate location; correct?
5  A   Correct.
6  Q   Then you used a placard number one to represent
7      Strausbaugh's location -- approximate location
8      at the time of the shoot?
9  A   Correct.
10 Q   Number two represented Weidner's approximate
11     location at the -- excuse me, Weidner's
12     approximate location at the time of the shoot?
13 A   Correct.
14 Q   Number three was for Krueger's location?
15 A   Correct.
16 Q   And four represented Gonzales's approximate
17     location?
18 A   Correct.
19 Q   Now, when you say you placed number ten on the
20     hood of the Nissan, is that as good an
21     approximation as you can make of Michael Bell's
22     location at the time of the shoot?
23 A   Where that number ten placard is?
24 Q   Yeah.
25 A   That was simply setting it down where there was

1     a clear spot to set it down.
2  Q  So just to show that he was on the hood?
3  A  Yes. That he was near the hood or on the hood. Couldn't put everything on the ground, so we tried to keep it up in the air where it could be seen. Can I say something?
7  Q  Yeah, go right ahead.
8  A  I just want to make it clear that these officers did not -- they were not speaking to me when they told -- when they had -- when they said, this is where I was. I was at a distance; they were speaking with the detective, and the detective said, mark this spot.
15 Q  I was just about to go back. Now I want to cover the mechanics of what was done. I just want to make sure we got this clearly on the record.
19 A  Okay.
20 Q  Did you assign the officers their numbers in the sequence in which they described where they were at the time of the shoot, or is it just random?
24 A  Just random. Wait a minute. Wait a minute. I picked a number and put it down on the hood

1   building, you did some evidence tagging, turned
2   over control of some of the evidence to
3   individuals at the department, and then that
4   was the end of it until November 11th at about
5   6:45 in the morning?
6 A Correct.
7 Q You went to the Waukesha County medical
8   examiner's office, where you arrived at
9   approximately eight o'clock in the morning?
10 A Correct.
11 Q During the course of your time at the Waukesha
12   County medical examiner's you witnessed an
13   autopsy that was performed by Dr. Doug Kelley?
14 A Correct.
15 Q Autopsy began approximately 8:30 that morning?
16 A Correct.
17 Q You were in the room during the entire length
18   of the autopsy?
19 A Correct.
20 Q And again, from a forensic standpoint, it was
21   important for you to document as much as you
22   possibly could that might help with an
23   evaluation of the crime scene and the crime and
24   what may have gone on that night during the
25   course of the shooting?

1   A   Correct.

2   Q   This is something that you were trained to do?

3   A   Correct.

4   Q   About halfway down the second paragraph is a

5        sentence that starts with, "Dr. Kelley

6        proceeded."

7   A   "With an extremely thorough" --

8   Q   Yes.

9   A   Yes.

10  Q   I'll read that to you. "Dr. Kelley proceeded

11       with an extremely thorough exam of the body.

12       This included collecting head hair samples as

13       well as fingernail clippings. I photographed a

14       variety of abrasions and contusions in various

15       locations of Bell's body. These were taken

16       both with and without scale." Now, we've been

17       able to identify those photographs --

18  A   Correct.

19  Q   -- in our predeposition session here. Then you

20       go on to say, "An external examination of the

21       head showed a contact gunshot entrance wound to

22       the right side of Bell's head. This injury was

23       just above his right ear." Had you been

24       trained in identification of contact gunshot

25       wounds as part of your forensic background?

1 A Yes.

2 Q I have seen the photographs of the right side
3    of Michael Bell's head, called the right temple
4    area; would that be --

5 A Temporal region.

6 Q Just a little bit above and in front of the
7    right ear; is that correct?

8 A Correct.

9 Q Have you ever heard of something called a
10   muzzle stamp?

11 A I have.

12 Q What's a muzzle stamp?

13 A Muzzle stamp is what is made when, if you're
14   talking about a full muzzle stamp, when the
15   entire muzzle is pressed against an object. It
16   basically is the heat creating that pattern of
17   the muzzle.

18 Q Was there a pattern of the muzzle on the right
19   side of Michael Bell's head that you were able
20   to identify during the course of that autopsy?

21 A I believe that there was, correct.

22 Q You did take photographs to document that;
23   correct?

24 A Yes.

25 Q Now, you also understand the difference between

| | | |
|---|---|---|
| 1 | | an entrance wound and an exit wound based upon |
| 2 | | your forensic background? |
| 3 | A | Correct. |
| 4 | Q | Understanding you're not a pathologist, but you |
| 5 | | still have a basic understanding of the |
| 6 | | differences and appearance between the two; |
| 7 | | correct? |
| 8 | A | Correct. |
| 9 | Q | It was clear to you that the entrance wound was |
| 10 | | the right side of Michael Bell's head? |
| 11 | A | Correct. |
| 12 | Q | I mean, there's just no doubt about that, is |
| 13 | | there? |
| 14 | A | None in my mind. |
| 15 | Q | Then on the left side of Michael Bell's head |
| 16 | | you were able to visualize and photograph a |
| 17 | | wound that was consistent with what an exit |
| 18 | | wound would look like? |
| 19 | A | Correct. Could look like. |
| 20 | Q | And there wasn't anything about the appearance |
| 21 | | of it that led you to conclude that it was |
| 22 | | anything other than an exit wound in Michael |
| 23 | | Bell's case? |
| 24 | A | Correct. |
| 25 | Q | All right. The pattern that you saw above |

| | | |
|---|---|---|
| 1 | | Michael Bell's right ear after it had been |
| 2 | | shaved you described as a "distinct pattern." |
| 3 | | Did I read that correctly? |
| 4 | A | Where are you? |
| 5 | Q | "After the area above Bell's right ear was |
| 6 | | shaved, a distinct pattern became visible." |
| 7 | A | All right, I'm not finding it. |
| 8 | Q | It's just a couple lines below where you have, |
| 9 | | in parentheses, "See Dr. Kelley's report for |
| 10 | | further pathology results." |
| 11 | A | That's where I'm looking. |
| 12 | Q | It starts the fourth line below that. |
| 13 | A | "The pattern was consistent"? |
| 14 | Q | Yes. But, "After the area above Bell's right |
| 15 | | ear was shaved, a distinct pattern became |
| 16 | | visible. The pattern was consistent with the |
| 17 | | muzzle area of the Smith & Wesson model 4506, |
| 18 | | .45 caliber, semi-auto." Did I read that |
| 19 | | correctly? |
| 20 | A | I don't -- I'm not seeing quotes. |
| 21 | Q | No, I'm putting in quotes just for the record. |
| 22 | A | Okay. |
| 23 | Q | To indicate that I'm reading verbatim what you |
| 24 | | have there. |
| 25 | A | Got you. Yep, that's a statement put in the |

```
 1       report based on Dr. Kelley and my conversation
 2       about the weapon and the pattern injury there,
 3       and his measurements and his diagram and so on,
 4       so forth.
 5   Q   I understand that you made your weapon safe and
 6       had Detective Niccolai, who was there at the
 7       autopsy, verify that your weapon was safe?
 8   A   Correct.
 9   Q   Then you allowed Dr. Kelley to photograph and
10       measure the muzzle area of your .45 caliber
11       model 4506 Smith & Wesson; correct?
12   A   Correct.
13   Q   And then you also photographed the muzzle area
14       of the weapon as well as the contact injury to
15       Bell's head?
16   A   That's correct, sir.
17   Q   So when we look at the photographs, we're
18       looking at your gun, not the actual gun used to
19       shoot Michael Bell?
20   A   Correct.
21   Q   Before you went to the autopsy, had you
22       discussed with any of the involved officers
23       what their account was of the shooting of
24       Michael Bell?
25   A   No.
```