UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF MICHAEL EDWARD BELL, by
Special Administrator Michael Martin Bell,
et al.,

                              Plaintiffs,

         vs.                                Case No. 05-C-1176

OFFICER ERICH R. STRAUSBAUGH,
et al,

                              Defendants.

---

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Defendants, by their attorneys, Gunta & Reak, S.C., submit the following Memorandum in

Support of their Motion for Summary Judgment.

### INTRODUCTION

This case arises out of the tragic death of Michael Bell during his arrest by four City of

Kenosha police officers. What started as a stop for speeding ended up in an extremely physical

struggle between Bell and three Kenosha police officers as they tried to arrest and handcuff him.

During the struggle, Bell tried twice to grab Defendant Officer Erich Strausbaugh's holstered

weapon. Ultimately Defendant Officer Albert Gonzales was forced to shoot Bell in order to ensure

Bell did not shoot any of the officers or bystanders with Officer Strausbaugh's gun.

The Plaintiffs, Bell's estate, his father, mother and sister, brought this lawsuit against the four

Defendant police officers involved in the encounter, Erich Strausbaugh, Erich Weidner, David

1

Krueger and Albert Gonzales, alleging 4th Amendment claims for unlawful arrest and use of excessive force. Plaintiffs also allege claims against the City based on Chief Wade's alleged ratification of the defendant officers' conduct. Plaintiffs have also brought state law claims against the individual officers for negligence and wrongful death.

On October 28, 2008, the parties entered into a Stipulation agreeing to dismiss the following claims alleged in the Complaint:

(1)    Plaintiffs' claim for excessive force attributable to the alleged kicking of plaintiff at the front of the Bell home. (Complaint, ¶ 35)

(2)    Plaintiffs' claim for excessive force attributable to Lieutenant Krueger's use of his Taser. (Complaint, ¶¶ 50-57)

(3)    Plaintiffs' claim that defendants have a custom of condoning excessive force and/or violating a person's equal protection rights, including plaintiffs' claims that defendants failed to adequately train, supervise and/or discipline its officers. (Complaint, ¶ 80, et seq.)

On November 3, 2008, this Court entered an Order dismissing the above referenced claims. The parties have also agreed to the dismissal the City of Kenosha Police Department as a party, and will be executing a stipulation to that effect.

Defendants now move for dismissal of all the remaining claims against them. The officers had reasonable suspicion to stop and question Bell about his speeding. They did not use excessive force with Bell when Bell refused to follow officer commands, acted in manner that caused concern to the officers for their safety, and fought violently with them when he learned they were going to arrest him. The ultimate use of deadly force was not excessive because Officer Gonzales learned, after observing Bell's combative behavior with the other three officers, that Bell had Officer Strausbaugh's gun.

2

The individual defendants are also entitled to qualified immunity on all claims against them.

There is no evidence that Chief Wade had any control over the Defendant officers' actions that evening, or that he ratified any illegal conduct on their part. There is no evidence to support any kind of claim against the City of Kenosha.

Finally, all of the Plaintiffs' state law claims must be dismissed because the Defendant officers are entitled to state law discretionary act immunity.

## STATEMENT OF FACTS

On November 8, 2004, Defendant Officer Erich Strausbaugh was working as a third shift police officer and was on patrol in a marked squad car. At about 1:30 a.m. on November 9, 2004, Officer Strausbaugh made a traffic stop on 14th Avenue in the 8000 block in the City of Kenosha. Defendant Officer Eric Weidner, who was also on patrol in a marked squad car, backed up Officer Strausbaugh. (Defendants' Proposed Findings of Fact in Support of Motion for Summary Judgment ("DPFF"), ¶¶ 9-10, 16-19)

After issuing the citation and releasing the driver, Officers Strausbaugh and Weidner stayed and talked. They were still on 14th Avenue and their squad emergency lights were still activated and flashing. At around 2:10 a.m. the officers saw a green SUV headed southbound on 14th Avenue raveling at a normal speed. The driver, Michael E. Bell ("Bell") looked over at the officers, and stopped at the stop sign at 81st Street and 14th Avenue. (DPFF 20-24)

Bell then took off from the stop sign at a high rate of speed. The engine revved loudly and the front end of the SUV lifted up as it took off. The vehicle accelerated rapidly and the tail lights dipped down in the back. Based on his training and experience, including his Traffic Radar training, Officer Strausbaugh estimated the SUV reached a speed of approximately 40 miles per hour,

3

exceeding the 25 mile per hour speed limit. (DPFF 25-29)

Officer Strausbaugh thought that it was odd that the driver (he did not yet know it was Michael Bell) would drive in such a fashion after passing two marked squads with lights flashing. It was shortly after the 2:00 a.m Kenosha bar closing time. (DPFF 30-31) Officer Strausbaugh commented to Officer Weidner about the SUV and said he was going to pull over the driver. Officer Strausbaugh got into his squad with emergency lights still activated and turned around to pursue the SUV. (DPFF 32-35) Officer Weidner continued to observe the SUV to make sure it didn't turn off onto a side street. He then turned his squad around and followed Officer Strausbaugh. (DPFF 36-37)

The SUV pulled over in the 8300 block of 14th Avenue. Officer Strausbaugh parked his squad behind the SUV as Bell was getting out. (DPFF 38-40) Officer Strausbaugh got out of his squad and told Bell to get back into his vehicle. He repeated that order at least twice, but Bell ignored him and walked towards Strausbaugh's squad. Officer Strausbaugh's past police experience taught him that when a person exits his vehicle during a traffic stop, they may be trying to flee. As Bell walked toward Officer Strausbaugh he glanced around looking for a way out, which was a clear indication to Officer Strausbaugh that Bell was looking for a place to flee. (DPFF 41- 44)

Bell was wearing a brown leather jacket and put his hands in his pockets, which caused Officer Strausbaugh concern that he might have a weapon in one or both of his pockets. (DPFF 45-46)

Officer Strausbaugh did not know what Bell's intentions were, but his actions caused Strausbaugh concern for his safety. (DPFF 47-50) Officer Strausbaugh decided that he wanted to get some control over the situation by escorting Bell back into his vehicle. By then, Bell was only

4

a few feet away, so Officer Strausbaugh closed the distance and grabbed him by the collar and arm. Officer Strausbaugh did not choke him. He could feel muscle tension in Bell's arm, and Bell was pulling away somewhat from him. (DPFF 51-54)

As he was leading Bell back to his vehicle, Bell said he wasn't getting back into the car. At that point Officer Strausbaugh detected an odor of an alcoholic beverage on Bell's breath. Officer Strausbaugh also saw a white male passenger in the front passenger seat of the SUV. He decided that it would not be a good idea to have Bell get back into the vehicle. (DPFF 55-58)

Officer Strausbaugh heard the passenger say something like, "Michael, just chill out." At this point that Officer Strausbaugh recognized the driver as Michael Bell. He had arrested Bell for a felony drug offense two months prior, and also issued a resisting arrest charge. (DPFF 59-61)

During the earlier arrest, Bell fought with Officer Strausbaugh and Kenosha Police Officer DeMario, and had to be pepper sprayed because he was being highly resistive. At one point during that arrest, Bell pushed Officer Strausbaugh off him and grabbed at Strausbaugh's leg, attempting to trip him. (DPFF 62-63)

After recognizing Bell, Officer Strausbaugh recalled that he had a court date scheduled for Bell's drug charge the next day. Officer Strausbaugh knew that Bell had to be out on bond restrictions from the drug charge, which included a prohibition against consuming alcoholic beverages, and knew that Bell was probably committing a felony by violating the felony bond conditions. Officer Strausbaugh also knew that Bell's driving license had been revoked, so it was illegal for him to drive. (DPFF 64-66)

Officer Strausbaugh knew at this point that Bell was under arrest and was going to be transported to jail. (DPFF 67)

By this time Officer Weidner had arrived and parked behind Officer Strausbaugh's squad. (DPFF 68)

Officer Strausbaugh walked Bell back to his squad. He could still feel resistive tension in Bell's arm, suggesting to him that Bell was contemplating fighting or fleeing. (DPFF 69-70)

As he brought Bell back to the squad car, Officer Strausbaugh attempted to place Bell's hands on the rear of the squad to pat him down. Bell kept removing his hands from the rear of the squad as Officer Strausbaugh tried to pat him down. (DPFF 71-72)

Officer Strausbaugh found Bell's wallet and was looking for an ID. He found a military ID. (DPFF 73-74)

Officer Weidner was holding Bell's left hand on the vehicle while Officer Strausbaugh was running Bell's information with dispatch. Officer Strausbaugh was no longer holding Bell's right hand on the squad, and Bell kept removing his right hand from the squad. Officer Weidner had to tell Bell repeatedly to put his right hand on the squad. (DPFF 75-77)

Officer Weidner asked Bell if he had a Wisconsin ID, and he said no. Officer Weidner detected an odor of intoxicants about Bell. (DPFF 78-79) Officer Strausbaugh then told Bell that he knew him, that he was out on bond, that he shouldn't be driving, and that there was a court hearing coming up. (DPFF 80)

Officer Strausbaugh told Officer Weidner to get an ID from the vehicle's passenger. Officer Weidner started to go towards the passenger, but when he heard Officer Strausbaugh telling Bell again to get his hands back on the car, he went back towards Officer Strausbaugh. (DPFF 81-82)

Officer Strausbaugh tried to complete the pat down as best as he could, and told Bell that he was going to have a seat in the squad. Bell refused and tried to walk away. Officer Strausbaugh

6

attempted to put Bell inside his squad, and they got into a shoving match trying to get him inside. From his past dealings with Bell, Officer Strausbaugh knew that he could become violent when taken into custody. (DPFF 83-86)

Since Bell was resisting getting into the squad, Officer Strausbaugh said that they would conduct field sobriety tests on the sidewalk. Officer Strausbaugh did not have his hands on Bell at this time, and told Bell that he wanted him to go to the sidewalk. Bell stated something like, "You're not doing this to me again." Bell was told to stand in one spot. He said "Fuck you," and started to walk through the front yard. (DPFF 87-92)

Bell was walking in a northwest direction and Officer Strausbaugh ran up to him and grabbed his left arm, while Officer Weidner grabbed Bell's right arm. Officer Strausbaugh told Bell that he was under arrest and Strausbaugh again felt Bell tense his muscles. (DPFF 93-94)

The officers were going to attempt to handcuff Bell, but he was resisting and would not put his hands behind his back as they were directing him to do. Bell struggled to get away from the officers. He was very strong. Officer Strausbaugh tripped him to take him to the ground in order to gain control of him. Bell landed on his stomach and continued to struggle, with his muscles tensed up and his hands balled up into fists. (DPFF 95-98)

When he was able to free one of his hands, Officer Weidner called on the radio for assistance. Defendant Lt. David Krueger was on duty as a road supervisor when he heard Officer Weidner's distressed voice on the radio asking for help. Officer Krueger knew immediately from the sound of Officer Weidner's voice that something was wrong and he needed assistance. Dispatch called over the radio for any squad in the area to respond, and Lt. Krueger stated he was en route. (DPFF 12, 99-104)

Defendant Officer Albert Gonzales, who was on traffic assignment, also heard via radio traffic that assistance was requested in the 8300 block of 14th Avenue. Officer Gonzales responded to the area to assist. (DPFF 11, 105-106)

Officers Strausbaugh and Weidner still struggled with Bell, and were unable to get his hands into a position to handcuff him or gain control over him. The officers continued to yell at Bell to stop resisting, but he continued to resist. Bell was fighting aggressively to get away. Officer Strausbaugh attempted two or three knee strikes to Bell's legs, but the knee strikes were ineffective. (DPFF 107-110)

Because of Bell's strength and the officers' inability to get him under control, Officer Strausbaugh decided to use his Taser gun on him. At this time Bell was on his knees, attempting to get up off of the ground. Officer Weidner was holding Bell down, and he was pulling Weidner off of him by trying to get up. Officer Weidner had his weight on Bell's back and told him, "You're going to get Tased if you don't put your hands behind your back." Bell swore at Officer Weidner. (DPFF 111-116)

Bell had made it clear by this point that he intended to violently resist arrest as he had done in Strausbaugh's previous encounter with him. Bell clearly posed a threat to the officers. He could have harmed one of the officers by punching them, by rolling over and kicking them, by head butting them, or by grabbing one of their weapons, as he ultimately did. (DPFF 117-119)

Officer Strausbaugh knew from his training and experience that utilizing a Taser can often stop a suspect from violently resisting without causing permanent injury to him. Tasers are generally more effective than pepper spray. Usually, a Taser incapacitates a suspect long enough for an officer to handcuff him. Tasers have no lasting effects, while pepper spray can cause discomfort for an hour

8

or more, depending upon the suspect's sensitivity to oleoresin capsicum and the availability of water for decontamination. Officer Strausbaugh knew from his training that the use of a Taser is less likely to cause permanent injury than punching, kicking or using a baton. (DPFF 120-124)

   After Officer Weidner moved away from Bell, Officer Strausbaugh fired the Taser probes into Bell's back from about two feet away. The Taser prongs stuck in Bell's jacket and Bell reacted by tensing up, so it appeared the Taser was functioning. Bell then shot up to his feet and ran full speed away from the officers towards the driveway. (DPFF 125-127)

   The officers pursued Bell on foot, and at one point, as Officer Strausbaugh grabbed onto Bell from behind, he felt a surge of an electric shock from the Taser. (DPFF 128-129)

   Officer Strausbaugh grabbed a hold of Bell as they were facing each other in the driveway, between a vehicle and the house. The area was confined, and Bell was fighting wildly with Officer Strausbaugh. Their momentum pushed them against a white minivan which was also parked in the driveway in front of a black car. Bell punched Officer Strausbaugh in the back of the head and in the right cheek. He grabbed Officer Strausbaugh and shoved him into the side of the house. Officer Strausbaugh pushed Bell back towards the car. (DPFF 130-136)

   Officer Strausbaugh was fighting as hard as he could and was getting tired. He thought Bell was getting the best of him. He still had the Taser in his hand. Officer Strausbaugh hit Bell in the head with the Taser and attempted to use the Taser to drive stun him in his midsection. A drive stun is when one uses the Taser as a stun gun, relying upon two electrodes about two inches apart to shock the subject. The goal is for the pain to cause the suspect to stop resisting. A drive stun causes no permanent injury to the suspect. Neither technique was effective, and Bell continued to fight violently. (DPFF 137-144)

9

Officer Strausbaugh felt Bell's hand on his midsection near his gun and though Bell was going for his gun. He yelled out to Officer Weidner that Bell was going for his gun. Officer Weidner told him to drop the Taser, which he did, and the officers now both fought with Bell. (DPFF 145-149)

Officer Weidner grabbed Bell from behind and had a hold of his arm, but he was still fighting with his free arm. When Officer Weidner grabbed Bell, he pushed back and Weidner hit up against the minivan. The officers and Bell continued to struggle. They ended up in front of the minivan. They were trying to get Bell's hands behind his back to cuff him. (DPFF 150-154)

Officer Weidner called for assistance a second time. Lt. Krueger heard an officer say over the police radio something like, "I need help now," and dispatch asked if Lt. Krueger heard that. Lt. Krueger confirmed he had, and continued to 14th Avenue. (DPFF 155-157)

As he was driving, Officer Gonzales heard an officer yelling excitedly over the police radio that they were behind the house. Officer Gonzales heard another officer yell over the air to dispatch, "Send another squad! Send another squad!" Officer Gonzales radioed dispatch that he was responding. (DPFF 158-161)

Officer Weidner told Officer Strausbaugh that they needed to get Bell back on the ground. The officers were able to get Bell out of the confined area of the driveway between the house and vehicle, and direct Bell to the ground on the driveway. Officer Strausbaugh was getting exhausted and could not find his radio to call for assistance. (DPFF 162-165)

Plaintiffs Kim Bell, Michael Bell's mother and Shantae Bell, Michael Bell's sister, were home at this time. They heard a noise outside and ran out the back door and onto the porch. A flood light came on. Kim Bell was yelling, asking what was going on, yelling that this was her son. She went

10

up on top of the officers. Officer Strausbaugh told Kim Bell that she had to back off, which she initially did. (DPFF 166-171)

The officers continued to fight with Bell. At one point, Officer Weidner had hold of Bell's left hand, which he had on the ground supporting his weight. Officer Weidner took out his handcuffs and was going to place one of the cuffs on Bell's left wrist. The cuff touched his wrist and made a ratcheting sound. Bell quickly pulled his left hand away, and the cuff missed and the cuffs fell on the ground. (DPFF 172-176)

Because the officers still had not gained control over Bell, Officer Strausbaugh again attempted knee strikes. Kim Bell reacted by charging at the officers again. Officer Weidner tried to keep her back. Officer Strausbaugh had to put his hand on her and tell her that she would have to back away or she would be arrested. (DPFF 177-180)

At this point Officer Strausbaugh heard sirens. He was able to locate his radio and get on the air, yelling that they were in the back yard. (DPFF 181-182)

Lt. Krueger pulled up and stopped in the middle of the street right next to one of the officer's cars. He didn't know what side of the street they were on. He grabbed his flashlight and went to the west side. (DPFF 183-185)

Officer Gonzales pulled up behind Lt. Krueger with his squad's siren going. Lt. Krueger motioned to him with his hand that he should check the east side yards. (DPFF 186-187)

Lt. Krueger ran around the south side of the house and ran to the back yard. Officer Gonzales followed him. As he ran up the driveway Officer Gonzales noticed a dark colored SUV sitting in the middle of 14th Avenue with the two front doors open. He saw a person with short spiky hair sitting in the front passenger seat. Officer Gonzales hesitated because he didn't know if he should secure

11

this SUV and its passenger. Officer Gonzales then heard voices coming from the back yard area of the house. (DPFF 188-192)

Lt. Krueger saw Kim and Shantae Bell standing outside the house. They were looking towards the garage in between a parked car and a trailer with wave runners on it. Lt. Krueger couldn't see the officers until he ran up to the women. When he got near the trailer, Lt. Krueger saw Officers Strausbaugh and Weidner wrestling with Bell on the ground. They looked like they were doing all they could just to hold on to Bell, and it looked like they were exhausted. (DPFF 193-197)

Lt. Krueger told the women to stay back because they were hysterical and he feared they would interfere with the officers. (DPFF 198-199)

One of the two officers yelled to Lt. Krueger that they couldn't get Bell cuffed and told Krueger to Tase him. Bell started to stand up while both officers still had their hands on him. Lt. Krueger removed the cartridge from his Taser, which would have fired the barbed probes if he pulled the trigger, and used the Taser as a stun gun, placing the electrodes against Bell's back. The officers backed off, and Lt. Krueger applied a drive stun to Bell's back with the Taser. The Taser is designed to allow officers to utilize it in this way, and it was a trained technique called a drive stun. (DPFF 200-204)

Bell jumped right up off of the ground as Lt. Krueger Tased him. When he got up, the Taser broke contact with him so Lt. Krueger reholstered it. Bell then came barreling right at Officer Strausbaugh, and grabbed him around his midsection. Bell pushed Officer Strausbaugh so hard that he slammed Strausbaugh's back into the left side of a car that was parked in the driveway close to the garage. (DPFF 206-209)

Bell was to the right side of Officer Strausbaugh's body. Lt. Krueger ran up behind Bell and

12

grabbed him in a bear hug. He was unable to close his hands around Bell. He had his arms around Bell's shoulders, but Bell could still move his arms. Lt. Krueger could not feel Bell's arms from his elbows to his hands, which means that Bell's arms were still free. (DPFF 210-214)

Lt. Krueger pinned Bell against the left front fender of the car, and Bell was fighting to get away from him. Officer Strausbaugh was trying to gain control of one of Bell's arms. (DPFF 215-217)

Officer Weidner started to go towards the officers, but he saw Kim or Shantae Bell coming towards them again, and told her to stay back. (DPFF 218)

Things then went from bad to worse. Officer Strausbaugh felt Bell's hand near his gun. This time Bell had hold of the handle of Strausbaugh's gun in the holster. Bell had the entire holster and gun belt twisted on Officer Strausbaugh's body and was forcefully pulling on the gun. As he reached to try to gain control of his gun, Officer Strausbaugh felt that the safety thumb snap on the holster was now open. Officer Strausbaugh could feel Bell's hand on the grip portion of his gun, which was still in the holster. (DPFF 219-225)

The Kenosha Police duty holsters at that time were Level I Retention Holsters, and once the thumb strap was unsnapped, there was no other holster device securing the weapon. (DPFF 226)

Officer Weidner looked towards Officer Strausbaugh's gun and could see Bell's hand on top of the gun which was still in the holster. Bell's hand on the gun was positioned opposite of the direction that an officer would have grabbed his gun. (DPFF 227-228)

Officer Strausbaugh put his hand on the rear sight of the gun and on Bell's hand, applying pressure to attempt to keep Bell from pulling the gun out of the holster. Officer Strausbaugh could feel Bell pulling up on the gun as Strausbaugh pushed down on it. Officer Strausbaugh twisted his

13

hip area to try to direct his holster away from Bell. (DPFF 229-231)

Officer Strausbaugh was exhausted from the fight and felt certain that Bell would yank his gun out of the holster and shoot him, and then his fellow officers. Officer Strausbaugh yelled multiple times that Bell had his gun. Kim Bell heard Officer Strausbaugh say twice, "He's got my gun." (DPFF 232-235)

Lt. Krueger heard Strausbaugh scream something like "he has my gun" or "he has his hand on my gun" in a high pitched, desperate voice. Lt. Krueger also heard Officer Weidner yelling something. Lt. Krueger could not see Officer Strausbaugh or Officer Weidner. Lt. Krueger had Bell in a bear hug around his shoulders, with Lt. Krueger's head turned to the left. (DPFF 236-240)

Lt. Krueger couldn't control Bell's arms, and Krueger had no idea where Bell's arms were or if he had Officer Strausbaugh's gun. Bell was trying to push away from the car and Lt. Krueger was just trying to hold on to him. (DPFF 241-242)

Meanwhile, Officer Gonzales had run up the driveway and around the corner of the house. As he came around the corner he saw Officer Weidner and Officer Strausbaugh struggling with Bell on the ground in the driveway area in front of a garage. The whole area was illuminated by flood lights. Officer Gonzales saw that Bell was trying to get up on his feet. He saw Lt. Krueger drive stun Bell in the back with his Taser. He heard Kim and Shantae Bell yelling, "Oh my God! What are you doing?" He saw Bell raise up to a crouched position on his feet, ignoring the effects of the drive stun. Officer Gonzales then saw Bell charge at Officer Strausbaugh, and drive him backwards into the left front fender of a car that was parked on the north side of the driveway. He saw Lt. Krueger grab onto Bell's back. (DPFF 241-252)

Officer Gonzales then heard Officer Strausbaugh yell, "He's got my gun!" Officer Gonzales

14

saw that Officer Strausbaugh was still pinned against the driver's side of the car. Officer Gonzales started to pull out his gun. He heard Officer Strausbaugh yell again, "Oh my God, he's got my gun!" It sounded to Officer Gonzales as if Officer Strausbaugh was crying. (DPFF 253-257)

Officer Gonzales ran towards the front of the car because he couldn't get an angle on Bell. As he was running, Officer Gonzales yelled, "Straus, does he still have your gun?" Officer Gonzales again heard Officer Strausbaugh say, "Oh God, he's got my gun." (DPFF 258-260)

Lt. Krueger looked up and saw Officer Gonzales standing at the front of the car. When Officer Strausbaugh screamed that Bell had his gun, Lt. Krueger yelled, "If he's got your gun, we're gonna have to shoot him." Lt. Krueger thought Bell was going to shoot one of the officers, so he told Officer Gonzales to shoot him. (DPFF 261-263)

Officer Strausbaugh sounded terrified and exhausted. He sounded like he knew he was done, and Officer Gonzales knew he had to help him. Officer Gonzales believed that Michael Bell posed an imminent threat of causing death or great bodily harm to Officer Strausbaugh. Officer Gonzales had seen how violently Bell had slammed Strausbaugh against the side of the car. He could tell that Strausbaugh was terrified and exhausted. The fact that he yelled out that Bell had his gun three times caused Officer Gonzales to believe that Strausbaugh was about to be shot. (DPFF 264-269)

Officer Gonzales got around the front of the car. He pulled his service weapon out of his holster and put it up to Bell's head. He put his left hand up to guide his weapon toward Bell's head. Officer Gonzales was standing in front of the Nissan in front of the bumper on the driver's side, between the car and the garage when he fired his weapon. Officer Gonzales pressed his gun into Bell's head and pulled the trigger, and nothing happened. He had jammed the gun's slide, preventing the gun from firing. He pulled the gun back to reposition it, and heard Lt. Krueger  yell, "Shoot."

Officer Gonzales fired almost simultaneously and shot into Bell's head. (DPFF 270-278)

Officer Strausbaugh heard a loud bang. He saw a lot of blood and saw Bell laying on the hood of the car. Officer Strausbaugh then saw Officer Gonzales for the first time on the scene, and saw that he had his duty weapon deployed. As soon as Officer Gonzales fired, Bell stopped resisting and slumped over the hood of the car. Officer Gonzales de-cocked and re-holstered his weapon. (DPFF 279-283)

Officer Gonzales has no doubt this force was necessary to protect Officer Strausbaugh, Lt. Krueger, himself, and anyone at the scene. (DPFF 284)

Officer Strausbaugh is confident that Officer Gonzales saved his life. Had he not shot Bell, Officer Strausbaugh believes from Bell's behavior that he would have yanked Strausbaugh's pistol out of his holster, shot him, and then his fellow officers. Bell was totally out of control. (DPFF 291-293)

Lt. Krueger knew from working with Officer Strausbaugh that he was not a coward and more importantly, knew he did not panic or lose control when confronted with danger. When Lt. Krueger heard Officer Strausbaugh yell repeatedly that Bell had his gun, Lt. Krueger expected that one or more of the officers would be shot within seconds. (DPFF 285-287)

Lt. Krueger held Bell up with his right hand and could see he was bleeding profusely from his head. He grabbed his radio with his left hand and called dispatch and said that he needed a rescue squad. He then called operations and informed them to notify Capt. Berner that they had an officer involved shooting. (DPFF 288-290)

Lt. Krueger checked with the other officers and made sure everyone else was OK. He held Bell against the car and then slowly lowered him to the ground. Bell was still breathing, but his

16

breathing was very labored.  (DPFF 298-301)

Bell did not have handcuffs on either wrist.  (DPFF 302)

Officer Weidner heard Kim Bell yelling something to the effect of, "Did you shoot my son, did you kill my son?"  Officer Weidner kept telling her to stay back and at one point she slumped to the ground.  Shantae Bell and Officer Weidner helped her get back up, and Weidner told her that she needed to go into the house and that they were just trying to arrest her son.  Officer Weidner then escorted her onto the porch of the house.  (DPFF 303-306)

Rescue arrived and started attending to Bell.  They placed him on a stretcher and put him in the ambulance.  They worked on Bell for several minutes at the scene and then transported him to the hospital. (DPFF 307-309)

On that evening, Charlene Nejedly, now Charlene Clark, lived next to the Bells, with her current husband, Francis Clark.  Ms. Clark witnessed portions of the encounter with Michael Bell and the officers from both her upstairs bedroom and bathroom windows.  Ms. Clark saw that the officers were not able to handcuff Bell because he was struggling with them.  (DPFF 310-312)

Mr. Clark saw Bell in the driveway with two officers who were trying to pin Bell down, trying to get him to stop fighting.  Bell was fighting aggressively to get away.  While the officer was using knee strikes to Bell, Bell was still aggressively trying to get away.  Mr. Clark saw Bell then get up and away from the officers.  (DPFF 313-316)

Other relevant facts will be referenced in the argument section of this Memorandum.

## DISCUSSION

### Summary Judgment Standard

Summary judgment is appropriate if the record demonstrates "that there is no genuine issue

Case 2:05-cv-01176-CNC   Filed 11/03/08   Page 17 of 46   Document 73

as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment should be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Cengr v. Fusibond Piping Sys., Inc., 135 F.3d 445, 450 (7th Cir. 1998) (quoting Fed.R.Civ.P. 56(c)). The primary purpose of summary judgment is to dispose of claims that have no factual support, and therefore, the nonmovant must respond with affidavits or otherwise, "setting forth specific facts showing that there is a genuine issue for trial." Albiero v. City of Kankakee, 246 F.3d 927, 928 (7th Cir. 2001) (quoting Fed.R.Civ.P. 56(e)). The mere existence of an alleged factual dispute is not sufficient to defeat a summary judgment motion. See Kuchenreuther v. City of Milwaukee, 221 F.3d 967, 973 (7th Cir. 2000). The nonmovant will successfully oppose summary judgment only when it presents "definite, competent evidence to rebut the motion." EEOC v. Sears, Roebuck & Co., 233 F.3d 432, 437 (7th Cir. 2000) (quotation omitted).

To defeat a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in his pleadings, but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." Serfecz v. Jewel Food Stores, 67 F.3d 591, 596 (7th Cir. 1995) (citations omitted). However, neither presenting a scintilla of evidence, see Senner v. Northcentral Tech. College, 113 F.3d 750, 757 (7th Cir. 1997), nor the mere existence of some alleged factual dispute between the parties or some metaphysical doubt as to the material facts, is sufficient to oppose a motion for summary judgment. See Hoffman v. MCA, Inc., 144 F.3d 1117, 1121 (7th Cir. 1998). The non-moving party must supply evidence sufficient to allow a jury to render a verdict in his favor. See Nowak v. St. Rita High School, 142 F.3d 999, 1002

(7th Cir. 1998).

**I.**     **All Claims of the Estate of Michael E. Bell Must Be Dismissed.**

    **A.**     **Plaintiffs' Unlawful Stop Claim Must Be Dismissed.**

The Plaintiffs claim the traffic stop that Officers Strausbaugh conducted of Bell was unlawful, alleging that Bell followed all of the rules of the road, came to a lawful stop and never exceeded the posted speed limit. (Complaint ¶¶ 19-21) Plaintiffs allege that neither Defendant Strausbaugh nor Defendant Weidner had any reasonable suspicion that Bell had engaged in or was about to engage in any criminal activity, and therefore had no right to stop him. (Complaint ¶ 25) Plaintiffs allege that the officers' stop of Bell violated his rights under <u>Terry v. Ohio</u> and the Fourth and Fourteenth Amendments. (Complaint ¶¶ 29-30)

Although Defendants dispute this contention, as discussed below, the Plaintiffs' claim for unlawful stop did not survive Bell's death and must be dismissed for this reason alone.

To determine whether a federal civil rights action based upon incidents which occurred prior to death survive the deceased, a court must examine whether the state survival statute provides for survival of analogous state court causes of action. <u>Bell v. City of Milwaukee</u>, 536 F. Supp. 462, 467 (E.D. Wis. 1982), aff'd in part, vacated in part, rev'd in part, 746 F.2d 1205 (7ᵗʰ Cir. 1984).

In this case, the applicable statute is sec. 895.01, Stats., which stated prior to its amendment in 2007:

    **895.01. What actions survive; actions not to abate.**

    (1) In addition to the causes of action that survive at common law, all of the following also survive:

        (a)    Causes of action to determine paternity.

19

(b)     Causes of action for the recovery of personal property or the unlawful withholding or conversion of personal property.

(c)     Causes of action for the recovery of the possession of real estate and for the unlawful withholding of the possession of real estate.

(d)     Causes of action for assault and battery.

(e)     Causes of action for false imprisonment.

(f)     Causes of action for invasion of privacy.

(g)     Causes of action for a violation of s. 968.31(2m) or other damage to the person.

(h)     Causes of action for all damage done to the property rights or interests of another.

(i)     Causes of action for goods taken and carried away.

(j)     Causes of action for damages done to real or personal estate.

(k)     Equitable actions to set aside conveyances of real estate.

(l)     Equitable actions to compel a reconveyance of real estate.

(m)     Equitable actions to quiet the title to real estate.

(n)     Equitable actions for specific performance of contracts relating to real estate.

(o)     Causes of action for wrongful death, which shall survive the death of the wrongdoer whether or not the death of the wrongdoer occurred before or after the death of the injured person.

(2) An action does not abate by the occurrence of any event if the cause of action survives or continues.

The statute does not provide that a claim for an unjustified traffic stop or a false arrest survives the death of a person wrongfully stopped or arrested. The phrase "or other damage to the person" in sec. 895.01(1)(g) has been held to mean physical damage to the person. Howard v. Lunaberg, 192 Wis.

20

507, 213 N.W. 301, 304 (1927) (the term does not encompass alienation of affection). The phrase "damage done to the property rights or interests of another" in sec. 895.01(1)(h) has been held to require pecuniary loss. Howard, 213 N.W. at 303. Bell suffered no pecuniary loss because of the allegedly wrongful stop.

Finding that no claim for unlawful stop survived Bell's death is consistent with the general rule that Fourth Amendment rights are personal rights which may not be vicariously asserted. Alderman v. United States, 394 U.S. 165, 174, 89 S. Ct. 961, 222 L. Ed. 2d 176 (1969).

On this basis alone, Plaintiffs' claim for unlawful stop must be dismissed. Plaintiffs' claim must also be dismissed because the officers had reasonable suspicion to believe that Bell had violated the speed limit. Officer Strausbaugh initially conducted an investigatory stop of Bell, based on his observations of how Bell had driven his vehicle after stopping at the stop sign on 81st Street. When a police officer suspects that criminal activity (or other unlawful activity) is afoot, "[a] brief stop of a suspicious individual, in order to determine his identity ... may be most reasonable in light of the facts known to [an] officer at the time." Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L. Ed.2d 612 (1972) (citing Terry v. Ohio, 392 U.S. at 21-22, 88 S. Ct. 1868). The Seventh Circuit has held that "[a]n investigatory stop not amounting to an arrest is authorized if the officer making the stop is 'able to point to specific and articulable facts' that give rise to a reasonable suspicion of criminal activity." United States v. Tilmon, 19 F.3d 1221, 1224 (7th Cir. 1994) (quoting Terry, 392 U.S. at 21-22, 88 S.Ct. 1868).

The reasonableness of an investigatory stop is judged by considering: "(1) whether the police were aware of specific and articulable facts giving rise to reasonable suspicion; and (2) whether the degree of intrusion was reasonably related to the known facts." Id.; see also U.S. v. Scheets, 188 F.3d

21

829, 837 (7th Cir. 1999). When evaluating the reasonableness of an investigatory stop, a court considers the totality of the circumstances with which the officers were faced, in terms of both "the experience of the law enforcement agent and the behavior and characteristics of the suspect," and "exclud[ing] any facts learned thereafter." United States v. Odum, 72 F.3d 1279, 1284 (7th Cir. 1995). Because reasonable suspicion is evaluated in light of the totality of the circumstances known to the officer, we have noted that certain "behavior may give rise to reasonable suspicion when viewed in the context of other factors at play." United States v. Lawshea, 461 F.3d 857, 859 (7th Cir. 2006).

At the time Officers Strausbaugh and Weidner pulled up behind Bell's vehicle they knew that the vehicle's driver had sped away from the stop sign and estimated his speed at about 40 miles per hour, in excess of the posted speed limit of 25 miles per hour. This estimate was based on the vehicle's engine sounds, the lift of the front end of the vehicle and the dip of the lights in back, and their experience and training, including Traffic Radar training . (DPFF 25-29)

Officer Strausbaugh also though it was odd that the driver would drive in such a fashion after passing two marked squads with lights flashing. (DPFF 30) He also knew it was 2:10 a.m, shortly after the bars closed for the night in Kenosha. (DPFF 31)

These facts gave the officers reasonable suspicion that Bell had violated the Wisconsin statutes by driving in excess of a posted speed limit (sec. 346.57(4), Wis. Stats.). The officers were authorized under Wisconsin law to stop Bell for the violation. Sec. 345.22, Wis. Stats.

Bell's claim for unlawful stop must be dismissed.

22

### B. The Force Used by Officer Strausbaugh After Bell Exited His Vehicle And By Officers Strausbaugh and Weidner While Taking Him To The Ground Was Not Excessive.

The Parties have stipulated that the Plaintiffs no longer allege a claim based on the allegations in paragraph 35 of their Complaint for excessive force attributable to the alleged kicking of Bell at the front of the Bell home. (Stipulation for Release of Specified Claims, ¶ 1) The remaining allegations relating to this claim are that Officer Strausbaugh grabbed Bell by the throat, then by the arm, and forced him back to the driver's door of his car. The Complaint also alleges that Defendant Officers Strausbaugh and Weidner physically forced Bell to the ground in the yard in front of his home. The Complaint alleges that Bell did not offer any resistance to Officer Strausbaugh, and Strausbaugh had no reasonable suspicion that Bell had engaged in or was about to engage in criminal activity. (Complaint ¶¶ 33-37)

The evidence shows that Bell was uncooperative with Officer Strausbaugh and refused to follow orders. His actions were threatening to Officer Strausbaugh. Although Officer Strausbaugh grabbed Bell's arm and collar, he did not choke him. Shortly after Officer Strausbaugh made contact with Bell, he detected an odor of alcoholic beverages on his breath. Under these circumstances, any force used by Officer Strausbaugh to walk Bell back to his own vehicle was reasonable and therefore not excessive.

Shortly after making contact with Bell, Officer Strausbaugh recognized him. Officer Strausbaugh had arrested Bell for a felony drug offense two months prior. During the September arrest, Bell fought with Officer Strausbaugh and Kenosha Police Officer DeMario, and had to be pepper sprayed because he was being highly resistive. At one point during the September arrest, Bell

23

pushed Officer Strausbaugh off him and grabbed at Strausbaugh's leg, attempting to trip him. After recognizing Bell, Officer Strausbaugh recalled that he had a court date scheduled for Bell's drug charge on Wednesday, November 10, 2004, which was the next day. Officer Strausbaugh knew that Bell had to be out on bond restrictions from the drug charge, which included a prohibition against consuming alcoholic beverages, and knew that Bell was probably committing a felony by violating the felony bond conditions. Officer Strausbaugh also knew that Bell's driving license had been revoked, so it was illegal for him to drive. Officer Strausbaugh knew at this point that Bell was under arrest and was going to be transported to jail. (DPFF 61-67)

A claim that excessive force was used during the course of an arrest is founded on the Fourth Amendment of the Constitution, which reads in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const., Amend. IV. This constitutional guarantee is "enforceable against the States through the Fourteenth [Amendment]." Colorado v. Bannister, 449 U.S. 1, 2, 66 L. Ed. 2d 1, 101 S. Ct. 42 (1980) (per curiam); see also Mapp v. Ohio, 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684 (1961).

Excessive force claims relating to an arrest must be analyzed under the Fourth Amendment's objective reasonableness standard. Graham v. Connor, 490 U.S. 386, 395 (1989). The test is whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him without regard to his underlying intent or motivation. Id. 490 U.S. at 397. Factors relevant to this inquiry include the severity of the crime in issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. Id. 490 U.S. at 396. Courts must allow for the fact that officers are often

forced to make split-second judgments in circumstances that are tense, uncertain and rapidly evolving, about the amount of force that is necessary in a particular situation. Id. 490 U.S. at 397.

The force used to effect an arrest must be objectively "reasonable" under the Fourth Amendment. Abdullahi v. City of Madison, 423 F.3d 763, 768 (7th Cir. 2005). To determine whether the force used to effect an arrest was reasonable the courts must engage in a "careful balanc[ing] of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Morfin v. City of E. Chicago, 349 F.3d 989, 1004 (7th Cir. 2003) (quoting Tennessee v. Garner, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). Proper application of this balancing test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 1004-05 (citing Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). The reasonableness standard also recognizes that "police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In sum, an officer's "use of force is unconstitutional if, 'judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest.' " Payne v. Pauley, 337 F.3d 767, 778 (7th Cir. 2003), (quoting Lester v. City of Chicago, 830 F.2d 706, 713 (7th Cir. 1987)).

The Seventh Circuit has acknowledged that an investigatory stop can involve a measured use of force. It has noted explicitly that a necessary corollary to the power of the police to conduct an

investigatory stop is the ability to "use reasonable means to effectuate that stop." United States v. Felix-Felix, 275 F.3d 627, 636 (7th Cir. 2001), overruled on other grounds by statute; see also Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); United States v. Weaver, 8 F.3d 1240, 1244 (7th Cir. 1993) ("It is well-established that '[a] measured use of force ... appropriate to accomplish the purposes of [the] investigatory stop' does not convert a Terry stop into an arrest." (quoting Tom v. Voida, 963 F.2d 952, 958 (7th Cir. 1992))).

In evaluating whether the force that an officer used to effectuate the investigatory stop reasonable, a court considers whether "the surrounding circumstances g[a]ve rise to a justifiable fear for personal safety" on the part of the officer, U.S. v. Tilmon, 19 F.3d 1220, 1226 (7th Cir. 1994), and "the defendant's own actions in resisting an officer's efforts." U.S. v. Lawshea, 461 F.3d 857, 860 (7th Cir. 2006).

Officer Strausbaugh did not use excessive force when walking Bell back to his vehicle. Bell was exiting the vehicle as Officer Strausbaugh stopped behind him. Officer Strausbaugh got out of his squad and told Bell to get back into his vehicle. He repeated that order at least twice, but Bell ignored him and walked towards Strausbaugh's squad. (DPFF 40-42) Strausbaugh's past experience taught him that when a person exits his vehicle during a traffic stop, they may be trying to flee. As Bell walked toward Officer Strausbaugh he glanced around looking for a way out, which was a clear indication to Officer Strausbaugh that Bell was looking for a place to flee. (DPFF 43-44)

Bell also put his hands in his pockets, which caused Officer Strausbaugh concern that he might have a weapon in his pockets. Officer Strausbaugh did not know what Bell's intentions were, but his actions caused him concern for his safety. (DPFF 45-51)

By then, Bell was only a few feet away, so Officer Strausbaugh closed the distance and

grabbed him by the collar and arm. He did not choke Bell. Officer Strausbaugh could feel Bell's muscle tension in his arm and Bell was pulling away somewhat. As he was leading Bell back to his vehicle Bell said he wasn't getting back into the car. At that point Officer Strausbaugh detected an odor of an alcoholic beverage on the driver's breath. (DPFF 52-56)

Bell's own actions caused Officer Strausbaugh to make physical contact with him and escort him back to his car. Bell's refusal to follow directions and return to his car, his putting his hands into his pockets and his muscle tension and resistance all caused Officer Strausbaugh to exert the reasonable force he had to to get Bell back to his vehicle into a less threatening position.

Bell's actions also caused Officers Strausbaugh and Weidner to take him to the ground. Bell was uncooperative with the officers when they tried to search him, when he continually took his hand off of the squad. (DPFF 71-77) When Officer Strausbaugh told Bell to have a seat in his squad, Bell refused and tried to walk away. (DPFF 83-84) And when Officer Strausbaugh tried to get Bell to get into the squad, Bell and Strausbaugh got into a shoving match. (DPFF 85)

Bell tried to walk away from Officer Strausbaugh when he attempted to conduct field sobriety tests. Bell knew he was going to be arrested and was determined to not let that happen. (DPFF 87-92) When the officers grabbed Bell as he walked away from them and told him he was under arrest, he resisted their efforts at handcuffing him and struggled to get away from the officers. (DPFF 94-96) He was walking away from the officers who were trying to arrest and handcuff him for felony bond violations, and would not put his hands behind his back as they were directing him to do so. He struggled to get away from them. (DPFF 94-98) Under these circumstances, it was reasonable for Officer Strausbaugh to take him to the ground to try to gain control over him and handcuff him.

Since the force used under these circumstances was reasonable, these claims must be

27

dismissed.

### C. Officer Strausbaugh's Use of His Taser on Bell Was Not Excessive Given Bell's Combative Actions And Efforts At Fleeing the Officers.

The Plaintiffs allege that Officer Strausbaugh's use of his Taser on Bell while Bell was restrained by Officers Strausbaugh and Weidner on the ground in the front yard of Bell's house was excessive force. (Complaint ¶ 44) This claim, completely embodied in paragraphs 39-49 of the Complaint, relies on language in the City of Kenosha's use of force policy and alleges that Officer Strausbaugh's failure to follow the terms of the policy resulted in a constitutional violation.

The allegations relating to violation of the City's use of force policy cannot support a constitutional violation. The Seventh Circuit has consistently held that "42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices." Scott v. Edinburg, 346 F.3d 752, 760 (7th Cir. 2003). In other words, the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established. See id.

The caselaw cited in the previous on use of force during arrests is, however, relevant. And caselaw shows that Officer Strausbaugh's use of his Taser while fighting with and trying to handcuff and subdue Bell, who he knew to be a felon and who was desperately trying to escape his grasp and arrest, was not an unreasonable use of force.

When a suspect tries to flee, an officer may escalate the force used to arrest him. In Smith v. Chicago, the Seventh Circuit determined the officers did not use excessive force during the arrest of a motorist who did not stop his car after police followed him with their siren on, in an attempt to stop him for a traffic violation. The Court noted the facts had to be viewed from the officers' vantage

28

point.

> From the officers' vantage point, Smith committed a traffic violation, whereupon they followed him and played their siren (confirmed by the tape) to signal him to pull over, which Smith did not do for twelve blocks. When Smith was finally stopped by marked police cars, the officers pulled Smith out of the car, pinned his arms behind his back, slammed him against the hood of his car, and handcuffed him. A reasonable officer would have thought that Smith was trying to flee, thereby justifying the use of a higher degree of force to protect the community and the officers than that needed for someone who committed only a minor traffic violation. However, the officers' use of force here was not high, let alone excessive.

Smith v. City of Chicago, 242 F.3d 737, 744 (7th Cir. 2001).

Officer Strausbaugh knew from his recent encounter with Bell that he could be combative when arrested (DPFF 60-63) Bell was being highly uncooperative during Officer Strausbaugh and Weidner's attempts at arresting and handcuffing him. (DPFF 71-107)

Even after they had Bell on the ground, he continued to resist the officers and was fighting aggressively to get away. Officer Strausbaugh attempted two or three knee strikes to Bell's legs, but they were ineffective in gaining his compliance. (DPFF 108-110)

Because of Bell's strength and the officers' inability to get him under control, Officer Strausbaugh decided to use his Taser gun on Bell. Bell was on his knees, attempting to get up off of the ground. Officer Weidner was holding Bell down, and he was pulling Weidner off of him by trying to get up. Weidner had his weight on Bell's back and told him, "You're going to get Tased if you don't put your hands behind your back." Bell swore at Officer Weidner. (DPFF 111-116)

Bell had made it clear by this point that he intended to violently resist arrest as he had done in Strausbaugh's previous encounter with him. He clearly posed a threat to the officers. Bell could have harmed one of the officers by punching them, by rolling over and kicking them, by head butting them, or by grabbing one of their weapons, as he ultimately did. (DPFF 117-119)

29

Officer Strausbaugh knew from his training and experience that utilizing a Taser can often stop a suspect from violently resisting without causing permanent injury to him. Tasers are generally more effective than pepper spray. Usually, a Taser incapacitates a suspect long enough for an officer to handcuff him. Tasers have no lasting effects, while pepper spray can cause discomfort for an hour or more, depending upon the suspect's sensitivity to oleoresin capsicum and the availability of water for decontamination. Officer Strausbaugh knew from his training that the use of a Taser is less likely to cause permanent injury than punching, kicking or using a baton. (DPFF 120-124)

Officer Strausbaugh fired the Taser probes into Bell's back from about two feet away. The Taser prongs stuck in Bell's jacket and Bell appeared to react by tensing up. Bell then shot up to his feet and ran full speed away from the officers towards the driveway. (DPFF 125-127)

Bell was not entitled to resist the Defendants' attempts at arresting him, even if he felt the arrest was unlawful. Under Wisconsin law, a person is not entitled to resist an unlawful arrest, absent excessive force by the officer. State v. Hobson, 218 Wis.2d 350,379-80, 577 N.W.2d 825 (1998). This premise was referenced in the recent Seventh Circuit Court case of Abrams v. Walker, Appeal No.01-2447 (7th Cir. October 10, 2002), a case in which Plaintiff claimed his civil rights were violated when he was arrested during a traffic stop. The Seventh Circuit relied on a case from the Illinois Appellate court to enforce the concept that a person may not resist an officer even if that person believes an arrest to be unlawful. "A person may not use force to resist arrest by one whom he knows to be an officer of the law, even if the arrest is unlawful.... He may inquire into its reason; he may point out the officer's mistake; he may protest and argue; but he may not impede the arrest by physical action." Abrams, at 6, citing People v. Crawford, 505 N.E.2d 394, 396 (Ill. App. 1987).

Given Bell's combativeness with the officers, his resistance to their efforts to handcuff him

and his strength, Officer Strausbaugh's use of his Taser was not excessive force, and in fact, did little to help his efforts to restrain and handcuff Bell.

> **D.** **Defendants Strausbaugh and Weidner Deny Kicking Bell, But Even If They Had, Bell's Violent Resistance And Efforts To Grab Strausbaugh's Gun Would Justify That Use Of Force.**

Plaintiffs claim that both Officers Strausbaugh and Weidner unlawfully kicked Bell while he was on the ground immediately east of the garage. (Complaint ¶¶ 59-63) Plaintiffs again cite to the City of Kenosha Police Department use of force policy, claiming that these alleged actions violated the policy. As shown above, allegations of a violation of a department policy cannot be the basis for a § 1983 claim.

Officers Strausbaugh and Weidner deny ever kicking Bell. However, even if they had, by that point in time, given Bell's violent resistance, any kicks delivered in an effort to gain compliance would not have been excessive.

The Plaintiffs allege the officers delivered kicks to Bell while he was on the ground in the driveway, before Lt. Krueger arrived. By that time, Officer Strausbaugh had tased Bell, which had done nothing to diminish Bell's violent behavior, since Bell then shot up to his feet and ran full speed away from the officers towards the driveway. (DPFF 127) After Officer Strausbaugh got hold of Bell again, Bell continued to fight wildly. He punched Officer Strausbaugh in the back of the head and in the right cheek, and grabbed Officer Strausbaugh and shoved him into the side of the house. (DPFF 132, 134-135) Bell had already made his first attempt at getting Officer Strausbaugh's gun. (DPFF 145-147) He continued to struggle with Officers Strausbaugh and Weidner and resist their efforts to handcuff him. (DPFF 149-154)

Given Bell's combativeness and efforts to resist being handcuffed, kicking Bell to attempt to gain compliance would not be excessive.

**E.**  **Officer Gonzales's Use of Deadly Force Was Not Unreasonable Or Excessive Because He Believed Bell Had Officer Strausbaugh's Weapon.**

The encounter with the Defendant officers unfortunately ended in Bell's death. Officer Gonzales was forced to use deadly force when he observed three officers struggling to subdue Bell, went to assist, and then heard Officer Strausbaugh cry out repeatedly that Bell had his gun. After confirming with Officer Strausbaugh that Bell had his gun, Officer Gonzales had no choice but to use deadly force to protect himself and the other officers and bystanders.

Plaintiffs allege their claim against Officer Gonzales in paragraphs 65-78 of their Complaint. Again, Plaintiffs cite to the City's use of force policy on use of deadly force to support their claim against Officer Gonzales. As discussed earlier, allegations of violation of a department's policy cannot support a § 1983 claim.

The facts show that Officer Gonzales was legally entitled to use deadly force. Officer Gonzales's use of deadly force is again analyzed under the Fourth Amendment and its reasonableness standard. Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Not surprisingly, this analysis is not capable of precise definition or mechanical application but requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. Id. (citations and quotation marks omitted). See also Tennessee v. Garner, 471 U.S. 1, 8-9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (the relevant question is whether the totality of the circumstances

32

justifie[s] a particular sort of seizure).

Officer Gonzales's use of deadly force was reasonable because he believed that Bell had Officer Strausbaugh's weapon, and he believed his and the other officers' lives were in danger. "...(w)hen an officer believes that a suspect's actions places him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." Sherrod v. Berry, 856 F.2d 802, 805 (7th Cir.1988).

Officer Gonzales, who was on traffic assignment, at the time Officers Strausbaugh and Weidner were struggling with Bell, heard via radio traffic that assistance was requested in the 8300 block of 14th Avenue in Kenosha, and responded. (DPFF 105-106) As he was driving, Officer Gonzales heard an officer yelling excitedly over the police radio that they were behind the house. Then dispatch shut down the channel. Officer Gonzales heard another officer yell over the air to dispatch, "Send another squad! Send another squad!" (DPFF 158-160)

After he arrived and was looking for the other officers, Officer Gonzales heard voices coming from the backyard area of the house. (DPFF 192) As he came around the corner he saw Officer Weidner and Officer Strausbaugh struggling with Bell on the ground in front of a garage. Officer Gonzales saw that Bell was trying to get up on his feet. He saw Lt. Krueger drive stun Bell in the back with his Taser. He saw Bell raise up to a crouched position on his feet, ignoring the effects of the drive stun. He then saw Officer Strausbaugh about one foot from Bell. (DPFF 244-250)

Officer Gonzales saw Bell charge at Officer Strausbaugh, and drive him backwards into the left front fender of a car that was parked on the north side of the driveway. He saw Lt. Krueger grab onto Bell's back. Officer Gonzales heard Officer Strausbaugh yell, "He's got my gun!" He saw that Officer Strausbaugh was still pinned against the driver's side of the car. (DPFF 251-254)

Officer Gonzales started to pull out his gun when he heard Officer Strausbaugh yell again, "Oh my God, he's got my gun!" It sounded to Officer Gonzales as if Officer Strausbaugh was crying. Officer Gonzales ran towards the front of the car because he couldn't get an angle on Bell. As he was running, Officer Gonzales yelled, "Straus, does he still have your gun?" Officer Gonzales again heard Officer Strausbaugh say, "Oh God, he's got my gun." (DPFF 255-260)

When Officer Strausbaugh screamed that Bell had his gun, Lt. Krueger yelled, "If he's got your gun, we're gonna have to shoot him." Lt. Krueger thought Bell was going to shoot one of the officers, so he told Officer Gonzales to shoot him. (DPFF 261-263)

Officer Gonzales thought Officer Strausbaugh sounded terrified and exhausted. He sounded like he knew he was done, and Officer Gonzales knew he had to help him. (DPFF 264-265)

Officer Gonzales believed that Bell posed an imminent threat of causing death or great bodily harm to Officer Strausbaugh. He had seen how violently Bell had slammed Strausbaugh against the side of the car. He could tell that Strausbaugh was terrified and exhausted. The fact that he yelled out that Bell had his gun 3 times caused Officer Gonzales to believe that Strausbaugh was about to be shot. (DPFF 266-269)

As he was positioning the gun, Officer Gonzales heard Lt. Krueger yell, "Shoot." Officer Gonzales fired almost simultaneously, and shot into Bell's head. (DPFF 271-278) Officer Gonzales has no doubt this force was necessary to protect Officer Strausbaugh, Lt. Krueger, him, and anyone at the scene. (DPFF 284)

Lt. Krueger knew Officer Strausbaugh from working with him. Lt. Krueger knew that he was not a coward and more importantly, knew he did not panic or lose control when confronted with danger. When Lt. Krueger heard Officer Strausbaugh yell repeatedly that Bell had his gun, Lt.

Krueger expected that one or more of the officers would be shot within seconds. (DPFF 285-287)

Officer Strausbaugh felt certain that Bell would yank his gun out of the holster and shoot him, and then his fellow officers. Officer Strausbaugh is confident that Officer Gonzales saved his life. Had he not shot Bell, Officer Strausbaugh believes from Bell's behavior that he would have yanked Strausbaugh's pistol out of his holster, shot him, and then his fellow officers. Bell was totally out of control. (DPFF 290-293)

Many cases support the use of deadly force during a physical altercation where the offender has grabbed or attempted to grab the officer's handgun. In the recent case of <u>Henning v. O'Leary</u>, 477 F.3d 492 (7th Cir. 2007), the Seventh Circuit held that a police officer's use of deadly force against a suspect, Henning, who was resisting arrest was reasonable, and thus, shooting Henning did not constitute use of excessive force. In <u>Henning</u>, another officer's gun got loose from its holster during the officers' attempt to handcuff Henning. Henning continued to struggle, and at least two officers present believed that Henning had his hands on or near the gun. In discussing the conclusion that the officer's use of deadly force was reasonable, the Court reasoned:

> In the tense struggle that followed Henning's refusal to submit to the officers' attempts to handcuff him, Peterson's gun got loose, and at least two officers believed Henning had his hands on or near it. **Police officers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon and completely freed himself from officers trying to subdue him before taking action to ensure their safety**. Nor can they be required to take a less deadly shot where none is available that would not place someone else also in jeopardy.

<u>Henning</u>, at 496 (emphasis added).

In <u>Belcher v. U.S.</u>, 511 F. Supp. 476 (E.D. Penn. 1981), two secret service agents attempted to arrest the plaintiff, and a physical struggle ensued. The first Agent began screaming, "my gun,

35

my gun". The second Agent couldn't see the plaintiff's hands on the gun, but could see that plaintiff's hands were inside the first Agent's pants, where he kept his weapon. The second Agent, based upon his belief that the first Agent was being disarmed, shot the plaintiff. Neither agent observed the plaintiff to have his hands in control of the firearm. The Court granted Defendant's motion for summary judgment, finding that, while it strained reason as to why two larger agents could not control the smaller plaintiff, it was nonetheless reasonable for the second Agent to believe, (upon hearing, "my gun, my gun") that the plaintiff had or would soon get the first Agent's gun, and therefore deadly force was reasonable.

In <u>Billington v. Smith</u>, 292 F.3d 1177 (9th Cir. 2002), the defendant police detective became involved in a physical altercation trying to arrest a suspect after a vehicle chase. The suspect grabbed the defendant's un-holstered handgun. They fought for control of the gun, and the defendant police officer felt himself losing his grip on it. Defendant, fearing for his life, shot and killed the suspect. The 9th Circuit reversed the district court, and found for the officer on summary judgment. The court stated it was immaterial if the two were currently struggling over the gun. They were engaged in hand to hand combat and the officer was losing. A reasonable officer would have feared death or great bodily harm.

In <u>Nelson v. County of Wright</u>, 162 F.3d 986 (8th Cir. 1998), an officer was in a physical fight trying to handcuff an 18 year old mental subject, who was 6'3" and 140 lbs. The plaintiff reached for the officer's gun, and the officer struck the plaintiff over the head with a baton and eventually shot him, paralyzing him. The 8th Circuit upheld summary judgment, finding the shooting to be reasonable. Of importance to the court was the rapidly evolving situation and the fact that the plaintiff was actively resisting the officer.

36

In <u>Merzon v. County of Suffolk</u>, 767 F. Supp. 432 (E.D. N.Y. 1991), a police officer was engaged in a physical fight with the deceased while attempting to arrest him. A large mob was around and was pulling at the officer. The deceased first grabbed the officer's gun in the holster. The officer retained it, drew the gun and pointed it at the deceased, who then grabbed the barrel of officer's gun. The officer kicked the deceased back and fired, killing him. The court entered summary judgment for the officer. The court found that the deadly force used was objectively reasonable. Because the deceased had already grabbed the officer's gun two times and was within the immediate physical vicinity of the officer when he fired, it was reasonable. Further, the court found that the officer did not violate any clearly established Constitutional right and would have been entitled to qualified immunity.

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham</u>, 490 U.S. at 396, 109 S.Ct. 1865. In excessive force claims, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." <u>Id</u>. at 396-97, 109 S.Ct. 1865.

Officer Gonzales use of lethal force was reasonable. This claim should be dismissed.

II.     **The Defendant Officers Are Entitled To Qualified Immunity.**

The defendant police officers are entitled to qualified immunity from all federal claims against them for the alleged unlawful stop and alleged use of excessive force.

The doctrine of qualified immunity shields from liability public officials who perform

37

discretionary duties. <u>Belcher v. Norton</u>, 497 F.3d 742, 749 (7th Cir.2007). Public officials, police officers among them, often are called upon to make difficult decisions in high pressure and high risk situations. Inevitably, some of those decisions will be mistaken. Subjecting police officers to liability for each reasonable but ultimately mistaken decision would result in "unwarranted timidity," would deter talented candidates from becoming police officers and would result in lawsuits that distract officers from their duties. <u>Malinowski v. DeLuca</u>, 177 F.3d 623, 626 (7th Cir.1999) (citing <u>Richardson v. McKnight</u>, 521 U.S. 399, 409, 411, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997)). At the same time, there remains a "need to vindicate constitutional violations by government officials who abuse their offices." <u>Gregoire v. Class</u>, 236 F.3d 413, 417 (8th Cir.2000). The doctrine of qualified immunity strikes a balance between these conflicting concerns: It shields from liability police officers "who act in ways they reasonably believe to be lawful." <u>Anderson v. Creighton</u>, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Qualified immunity provides "ample room for mistaken judgments," and it protects all but the "plainly incompetent or those who knowingly violate the law." <u>Hunter v. Bryant</u>, 502 U.S. 224, 227, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)); <u>Clash v. Beatty</u>, 77 F.3d 1045, 1048 (7th Cir.1996) (noting, in the excessive force context, that the "police cannot have the specter of a § 1983 suit hanging over their heads when they are confronted with a dangerous fugitive, possible escapee, or as long as their behavior falls within reasonable limits").

Once a defendant has pleaded a defense of qualified immunity courts engage in a two step analysis: (1) does the alleged conduct set out a constitutional violation? and (2) were the constitutional standards clearly established at the time in question? <u>Donovan v. City of Milwaukee</u>, 17 F.3d 944, 947 (7th Cir. 1994).

In cases where the defense of qualified immunity is raised, the facts of the specific case are compared to the body of law existing at the time the cause of action arose. If the government official's conduct violated the Constitution or clearly established federal law at that time, then immunity will not attach and the official is open to liability. Rakovich v. Wade, 850 F.2d 1180, 1209 (7th Cir. 1988) (en banc), cert. denied 488 U.S. 968, 109 S. Ct. 497, 102 L. Ed. 2d 534 (1989). If reasonable minds would differ as to whether the official's conduct was clearly illegal, then immunity should attach. See, e.g., Malley v. Briggs, 475 U.S. 335, 341, 89 L. Ed. 2d 271, 106 S. Ct. 1092 (1986). Once a public official has raised the defense of qualified immunity, the plaintiff bears the burden of establishing the existence of the clearly established right that he claims was violated. Abel v. Miller, 824 F.2d 1522, 1534 (7th Cir. 1987). "[C]losely analogous cases, those decided before the defendant acted or failed to act, are required to find that a constitutional right is clearly established." Rice v. Burks, 999 F.2d 1172, 1174 (7th Cir. 1993), citing Rakovich v. Wade, supra.

A government official should prevail on qualified immunity grounds if the right asserted by the plaintiff was not clearly established in the particularized sense that "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Even where the rights allegedly violated may be clear at some level of abstraction, the government official should prevail if a reasonable officer could have believed that his or her particular conduct was lawful. Id. at 641.

As discussed above, the seizure of Bell, both the traffic stop and the attempt to arrest him, were not unlawful. The officers were conducting an investigatory stop of Bell based on their observation of his speeding after he left the stop sign.

39

The use of force by Strausbaugh was not excessive and was lawful under current caselaw when dealing with a person who was refusing to follow officer orders and was actively resisting arrest. And it was clear under caselaw existing at the time that Officer Gonzales's use of lethal force was lawful since he believed Bell had Officer Strausbaugh's gun.

Qualified immunity is "designed to shield from civil liability all but the plainly incompetent or those who knowingly violate the law.'" Hughes v. Meyer, 880 F.2d 967, 971 (7th Cir. 1989), cert. denied sub nom. Hughes v. Buss, 495 U.S. 931, 110 S. Ct. 2172 (1990) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). It should be applied unless "it has been authoritatively decided that certain conduct is forbidden." Upton v. Thompson, 930 F.2d 1209, 1212 (7th Cir. 1991) (quoting Alliance to End Repression v. City of Chicago, 820 F.2d 873, 875 (7th Cir. 1987)). "Today, the existence of the law is such that qualified immunity is almost the norm." Sinthasomphone v. Milwaukee, 838 F. Supp. 1320, 1325 (E.D. Wis 1993), citing Anderson v. Creighton, supra.

The Defendant officers are entitled to qualified immunity.

**III.     The Estate's Claim for Unconstitutional Policy Based on Chief Wade's Alleged Ratification of the Defendant Officers' Conduct Must Be Dismissed.**

The Estate's claims that the City of Kenosha had a custom of condoning excessive force, violating equal protection rights and its claims that the City failed to adequately train, supervise or discipline its officers have been dismissed upon stipulation. The only remaining claim against the City is that it created an unconstitutional policy through alleged ratification of the conduct of the officers in this case.

Under both 42 U.S.C. §§ 1981 and 1983, a municipality cannot be held liable solely on the

40

grounds of <u>respondeat</u> <u>superior</u>.   <u>Monell v. City of New York Department of Social Services</u>, 436

U.S. 658, 691 (1978); <u>Carrie-Merle Smith v. Chicago School Reform Board of Trustees</u>, 165 F.3d

1142, 1148 (7th Cir. 1999).  The government as an entity is responsible only "when execution of a

government's policy or custom, whether made by its lawmakers or by those whose edicts may fairly

be said to represent official policy, inflicts the injury."  <u>Monell</u>, 436 U.S. at 691; <u>Smith</u>, 165 F.3d at

1148.  There must be a direct causal link between the alleged unconstitutional deprivation and the

municipal policy or custom at issue.  <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989).

Unconstitutional policies or customs take three forms: (1) an express policy that causes a

constitutional deprivation when enforced; (2) a widespread practice, that, although unauthorized, is

so permanent and well-settled that it constitutes a "custom or usage" with the force of law; or (3) an

allegation that a person with final policymaking authority caused the injury.  <u>See</u> <u>Rasche v. Village</u>

<u>of Beecher</u>, 336 F.3d 588, 597 (7th Cir. 2003).

Plaintiffs claim that the Defendant officers' allegedly unconstitutional conduct may be

attributed to the City because the officer's actions were ratified by Chief Wade, arguably in the way

he reacted as Chief of Police after Bell's shooting.  There is no evidence to support a claim that Chief

Wade ratified any illegal conduct of the Defendants or that the Defendants acted illegally.

Whether a member of a police department has the authority to set official policy is a question

of state law.  <u>Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37</u>, 260 F.3d 602, 619 (7th Cir. 2001).

The police chief is charged with the command and rule-making responsibilities for the police

department under Wisconsin law. See Wis. Stat. § 62.09(7)(c) & (13)(a); <u>see also</u> <u>Monfils v. Taylor</u>,

165 F.3d 511, 517-18 (7th Cir. 1998) (refusing to find municipal liability based on the acts of a

41

Wisconsin deputy chief when evidence did not establish ratification by the police chief).

The Seventh Circuit has recognized previously that "[s]upervisory liability may attach ... where a supervisor, with knowledge of a subordinate's conduct, approves of the conduct and the basis for it." Kernats v. O'Sullivan, 35 F.3d 1171, 1182 (7th Cir.1994); see Wilson v. City of Chicago, 6 F.3d 1233, 1240 (7th Cir.1993) (failing to eliminate practice cannot be equated with approving it; rather "[d]eliberate or reckless indifference to complaints must be proved in order to establish that an abusive practice has actually been condoned and therefore can be said to have been adopted by those responsible for making municipal policy"), cert. denied, 511 U.S. 1088, 114 S.Ct. 1844, 128 L.Ed.2d 470 (1994); Cygnar v. City of Chicago, 865 F.2d 827, 847 (7th Cir.1989) (official with final policymaking authority must actually have participated in the constitutional wrongdoing; failure by policymaking official to take corrective action is insufficient in and of itself to show § 1983 liability); see also Fiorenzo v. Nolan, 965 F.2d 348, 351 (7th Cir.1992) (collecting cases).

The ratification theory cannot support a claim against the City in this case. Chief Wade looked closely at the events of November 9, 2004 which ended with the tragic death of Michael Bell. He read written reports and considered the verbal opinions of supervisors, whom he relied upon and trusted, which lead him to conclude that his officers did not violate the law. There was no need to conduct an internal affairs investigation because Lt. Krueger and Officers Strausbaugh, Weidner and Gonzales were fully cooperative with the investigation commenced following Mr. Bell's death, and were answering all questions asked of them without invoking any Fifth Amendment rights to remain silent. Chief Wade has no knowledge that the Defendant officers did anything unlawful, and did not ratify unlawful conduct. (DPFF 320-324)

Case 2:05-cv-01176-CNC   Filed 11/03/08   Page 42 of 46   Document 73

The Kenosha County District Attorney, Richard Jambois, also conducted an investigation into the matter. He interviewed witnesses, reviewed reports, witness statements and other physical evidence and concluded that Bell's death was a justifiable homicide, and no crime had been committed in connection with his death. (Reak Aff. ¶ 11 and Reak Aff. Exh. I, Report of the Kenosha County District Attorney Concerning the Officer Involved Shooting Death of Michael Bell)

Plaintiff's claim against the City of Kenosha must be dismissed.

**IV.**     **Plaintiffs Do Not Have A Claim Against Chief Wade Personally.**

Plaintiffs have named Chief Wade in their Complaint, ¶ 11, but there is no evidence to support a claim against him. Chief Wade was not present at the time of the encounter, and cannot be held personally liable for the actions of the officer Defendants.

Section 1983 does not create a claim based on collective or vicarious responsibility. See Pacelli v. deVito, 972 F.2d 871, 875 (7th Cir. 1992). An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation. Sheik-Abdi v. McClellan, 37 F.3d 1240, 1240 (7th Cir. 1994), cert. denied, 513 U.S. 1128, 115 S.Ct. 937 (1995); Rascon v. Hardiman, 803 F.2d 269, 273 (7th Cir. 1986). An official is personally involved if he or she: a) participates directly in the constitutional deprivation; b) acts or fails to act with reckless disregard of the plaintiff's constitutional rights, or c) the conduct that deprived the plaintiff of his constitutional rights occurred at the official's direction or with his or her knowledge and consent. Rascon, 803 F.2d at 274; Smith v. Rowe, 761 F.2d 360, 369 (7th Cir. 1985); Crowder v. Lash, 687 F.2d 996, 1005 (7th Cir. 1982).

There is no evidence that Chief Wade participated in the actions involving Bell, that he acted

43

or failed to act in disregard of Bell's constitutional rights, or that had any knowledge of or gave consent to any of the officers in their actions relative to Bell.

Chief Wade must be dismissed from this suit.

## V.     Plaintiffs' State Law Negligence Claims Must Be Dismissed Because The Defendant Officers Are Entitled To Discretionary Act Immunity.

All of the Plaintiffs, the Estate of Michael E. Bell, Bell's father, Michael M. Bell, Bell's mother, Kim Bell and Bell's sister, Shantae Bell, have brought state law negligence claims against the Defendants. The parents' claims are for wrongful death. Kim and Shantae's Bell, who witnessed portions of Bell's encounter with the Defendant officers, including his shooting, allege they have suffered severe and permanent mental and emotional distress and are entitled to damages under the Wisconsin case of Bowen v. Lumbermens Mutual Casualty Co., 183 Wis. 2d 627, 517 N.W.2d 432 (1994).

None of the Plaintiffs' state law claims can succeed because the Defendant officers are entitled to discretionary act immunity from their claims. Under Wisconsin Statutory law:

> No suit may be brought against any volunteer fire company organized under ch. 213, political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employees nor may any suit be brought against such corporation, subdivision or agency or volunteer fire company or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.

Sec. 893.80(4), Stats.

The general rule acknowledged in Wisconsin is that a public officer or employee is immune from personal liability for injuries resulting from acts performed within the scope of the individual's

44

public office. <u>C.L. v. Olson</u>, 143 Wis. 2d 701, 710, 422 N.W.2d 614 (1988) (citing <u>Lister v. Board of Regents</u>, 72 Wis. 2d 282, 300, 240 N.W.2d 610 (1976)).

Three exceptions exist, however, to this general rule of immunity. First, a public officer or employee does not enjoy immunity if he or she engages in conduct which is malicious, willful, or intentional. <u>Olson</u>, 143 Wis. 2d at 711 (citing <u>Ibrahim v. Samore</u>, 118 Wis. 2d 720, 728, 348 N.W.2d 554 (1984)). As shown above, the Defendant officers acted lawfully in their efforts to arrest Bell, and the force used was justified and necessary given Bell's combative actions in resisting his arrest and his effort to take Officer Strausbaugh's gun.

Second, a public officer or employee is not immune from liability if he or she negligently performs a ministerial duty. "'A public officer's duty is ministerial only when it is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion.'" <u>Olson</u>, 143 Wis. 2d at 711-12 (quoting <u>Lister</u>, 72 Wis. 2d at 301). For example, in <u>Domino v. Walworth County</u>, 118 Wis. 2d 488, 490, 492-93, 347 N.W.2d 917 (Ct. App. 1984), the court of appeals held that a county sheriff's department dispatcher violated a ministerial duty by diverting a squad from dealing with a downed tree in a road without simultaneously assigning anyone else to provide for safe passage along the roadway. The duty of the public officer in that case was clear and absolute and, therefore, ministerial. <u>Id</u>. at 491 (citing <u>Cords v. Anderson</u>, 80 Wis. 2d 525, 542, 259 N.W.2d 672 (1977)).

Executing an arrest is not a ministerial duty, so this second exclusion does not apply. <u>Sheridan v. City of Janesville</u>, 164 Wis.2d 420, 427-428, 474 N.W.2d 789 (Ct. App. 1981).

Case 2:05-cv-01176-CNC   Filed 11/03/08   Page 45 of 46   Document 73

Third, a public officer's duty may also face liability when he or she is aware of a danger that is of "such quality that the public officer's duty to act becomes 'absolute, certain and imperative.'" Olson, 143 Wis. 2d at 715 (quoting Cords, 80 Wis. 2d at 541). This exclusion is inapplicable, since there is no claim that the Defendants failed to act.

Since the Defendants' actions were not ministerial, and were not performed maliciously, intentionally or willfully, the Defendants are entitled to immunity from the Plaintiffs' state law claims.

## CONCLUSION

For the reasons stated above, all of the Plaintiffs' claim should be dismissed.

Respectfully submitted at Milwaukee, Wisconsin, this 3rd day of November, 2008.

GUNTA & REAK, S.C.
Attorneys for Defendants

By:     /s/ Ann C. Wirth
        Kevin P. Reak, State Bar No. 1004316
        Ann C. Wirth, State Bar No. 1002469
        219 North Milwaukee Street, Fifth Floor
        Milwaukee, Wisconsin 53202
        Telephone:  (414) 291-7979
        Facsimile:  (414) 291-7960
        E-mail: kpr@gunta-reak.com
        E-mail: acwirth@wi.rr.com

46