UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ESTATE OF MICHAEL EDWARD BELL, by
Special Administrator Michael Martin Bell,
KIM MARIE BELL, MICHAEL MARTIN BELL,
and SHANTAE BELL,

        Plaintiffs,                    Case No.:  02:05-CV-01176-CNC

v.

OFFICER ERICH R. STRAUSBAUGH,
OFFICER ERICH S. WEIDNER,
LIEUTENANT DAVID H. KRUEGER,
OFFICER ALBERT B. GONZALES,
KENOSHA POLICE DEPARTMENT,
CITY OF KENOSHA,

          Defendants.

---

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The defendants' motion for summary judgment ignores every single disputed issue of material fact on every single one of the plaintiffs' claims. The plaintiffs respectfully request that this Court summarily deny the defendants' motion for summary judgment for the following reasons:

- First, all claims survived the death of Michael E. Bell, and genuine issues of material fact exist on all of the plaintiffs' 42 U.S.C. § 1983 claims;

- Second, viewing the facts in the light most favorable to the plaintiffs, the defendants are not entitled to qualified immunity on any of the plaintiffs' claims because:

- It was clearly established that a reasonable police officer could not stop a citizen absent reasonable suspicion that criminal activity was afoot;

- It was clearly established that a reasonable police officer could not assault a citizen without provocation;

- It was clearly established that a reasonable police officer could not tase an unarmed individual who was no longer passively resisting;

- It was clearly established that a reasonable police officer could not gratuitously beat or kill an unarmed, non-resisting individual who was handcuffed;

- It was clearly established that a reasonable police officer could not kill an unarmed, nonresistive citizen who the officer knew did not have a gun.

- Third, the defendants are not entitled to summary judgment on the plaintiffs' <u>Monell</u> claim because then Chief of Police Dan Wade, and the current Chief of Police John Morrissey, expressly determined that the defendants acted "within policy."

- Fourth, the defendants are not entitled to summary judgment dismissal of the plaintiffs' state law claims, because the defendants acted intentionally and unlawfully in shooting Michael E. Bell and because the defendants' violated their "ministerial duty" to use the least means of force possible under the circumstances.

For these reasons, the plaintiffs respectfully request that this Court deny the defendants motion for summary judgment.[1]

---

[1] The plaintiffs do not respond to the defendants' motion for summary judgment to dismiss claims against Chief of Police personally, since the plaintiffs never made claims against Chief of Police personally. (See Defs' Br. at 43-44). The plaintiffs' claim against the Chief of Police was in his official capacity as a policy maker for the municipality. <u>See</u> <u>Monell v. Department of Soc. Servs.</u>, 436 U.S. 658 (1978) <u>and</u> Complaint, ¶¶11, 79-85. As such, he is a proper party. <u>See</u>, <u>e.g.</u>, <u>Estate of Fields v. Nawotka</u>, 2008 WL 746704, *2 (E.D. Wis. 2008) (denying default judgment on <u>Monell</u> claim against Milwaukee Chief of Police for failure to timely file an answer).

<u>PLAINTIFFS' PROPOSED FINDINGS OF FACT</u>

The defendants have turned the summary judgment methodology on its head. Rather than construe all facts and reasonable inferences in the light most favorable to the plaintiffs, the defendants have presented their version of the facts, notwithstanding contradictory eyewitness testimony and forensic evidence. <u>See</u>, <u>e.g.</u>, <u>Abdullahi v. City of Madison</u>, 423 F.3d 763, 733 (7th Cir. 2005). The following facts are the relevant facts for this Court's review on summary judgment.

I.   THE FACTS REGARDING THE SPECIFIC CONSTITUTIONAL VIOLATIONS.

A.   The Unlawful Stop of Michael E. Bell.

1.   On November 9, 2004, Michael E. Bell (hereafter "Bell") was driving a Ford Explorer to his home at 8310 14th Avenue, Kenosha, Wisconsin. (Brett A. Eckstein Aff. [hereafter "Eckstein Aff."], ¶ 2, Exh. 1, Brian Rocco Dep. at 13).

2.   Brian Rocco was a passenger in the vehicle. (Eckstein Aff., ¶ 2, Exh. 1, Rocco Dep. at 12-13).

3.   The vehicle was owned by Brian Rocco. (Eckstein Aff., ¶ 2, Exh. 1, Rocco Dep. at 12).

4.   Shortly after 2:10 a.m., Bell operated the vehicle southbound on 14th Avenue. (Eckstein Aff., ¶ 2, Exh. 1, Rocco Dep. at 13; Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video).

5.   Bell properly stopped the vehicle at the stop sign at 80th Street. (Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video; Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 27-28).

6.     Bell continued driving southbound on 14th Avenue within the speed limit. (Strausbaugh Aff., ¶5; Weidner Aff., ¶6).

7.     Bell passed two Kenosha Police Department marked squad cars, both of which were facing northbound and both had emergency lights flashing.  (Strausbaugh Aff. ¶5; Weidner Aff. ¶6).

8.     The squad cars were being used by Officers Strausbaugh and Weidner during their shift on November 9, 2004.  (Strausbaugh Aff. ¶5; Weidner Aff. ¶5)

9.     Officers Strausbaugh and Weidner were not in their squads cars but were outside standing on the sidewalk talking.  (Strausbaugh Aff. ¶5; Weidner Aff. ¶5)

10.     As Bell passed the officers, neither Officers Strausbaugh nor Officer Weidner recognized the driver of the vehicle as Bell.  (Strausbaugh Aff., ¶6; Eckstein Aff., ¶ 5, Exh. 4, Strausbaugh Dep. Exh. 58 at 1; Weidner Aff., ¶7; Eckstein Aff., ¶ 6, Exh. 5, Weidner Dep. at 15-16).

11.     Bell continued past the marked squad cars within the speed limit and properly stopped at the stop sign at 81st Street.  (Strausbaugh Aff., ¶6).

12.     Bell continued southbound within the speed limit.  (Eckstein Aff., ¶ 7, Exh. 6, Dennis Skogen Dep. at 54, 114; Eckstein Aff., ¶ 8, Exh. 7, Skogen Dep. Exh. 128, Conclusions ¶5; Eckstein Aff., ¶ 3, Exh. 1, Brian Rocco Dep. at 12, 15-16, and 18).

13.     Bell did not cause the vehicle to accelerate suddenly, rev its engine, or squeal its tires.  (Eckstein Aff., ¶ 8, Exh. 7, Skogen Dep. Exh. 128, Conclusions ¶5; Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video; See Strausbaugh Aff., ¶ 6; Eckstein Aff., ¶ 9, Exh. 8, Gaut Dep. Exh. 213 at 5).

14.     The vehicle Bell was driving was not swerving or operating in a manner that placed any pedestrians in harm's way.  (See generally Strausbaugh Aff. and Weidner Aff.).

15.     The vehicle properly stopped at the stop sign at 83rd Street.  (Eckstein Aff., ¶ 8, Exh. 7, Skogen Dep. Exh. 128; Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 41).

16.     The vehicle continued southbound on 14th Avenue until it stopped at Bell's house in the 8300 block of 14th Avenue, Kenosha, Wisconsin.  (Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video; Strausbaugh Aff., ¶9).

17.     Despite seeing no traffic laws begin violated, Officer Strausbaugh decided to stop the vehicle.  (Strausbaugh Aff., ¶7).

18.     Stopping a vehicle with no reasonable suspicion, or based only on a gut feeling, is improper.  (Eckstein Aff., ¶ 10, Exh. 9, Robert Willis Dep. at 37).

19.     Strausbaugh turned his vehicle around and sped after the vehicle operated by Bell. (Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 39).

20.     Officer Weidner got into his squad car and followed Officer Strausbaugh. (Weidner Aff., ¶10).

21.     Bell showed no signs that he was attempting to flee in the vehicle.  (Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 39).

22.     When Bell brought the vehicle to a stop in the 8300 block of 14th Avenue, Brian Rocco exited the vehicle first, and Bell got out of the vehicle second.  (Eckstein Aff., ¶ 2, Exh. 1, Rocco Dep. at 14-15).

23.     Officer Strausbaugh pulled behind the vehicle operated by Bell, and Officer Weidner pulled up behind Officer Strausbaugh.  (Strausbaugh Aff., ¶9; Weidner Aff., ¶¶12-13; Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video).

24.     Officer Strausbaugh said "Get back in the car.  Get back in the car," once while still in his car and the second time while exiting his vehicle.   (Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video).

25.     Brian Rocco said "What the heck, we didn't do anything wrong."  (Eckstein Aff., ¶ 2, Exh. 1, Brian Rocco Dep. at 15).

26.     Bell appears to ask "What?" of Officer Strausbaugh, indicating that he did not hear Officer Strausbaugh.  (Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video)

B.     The Unlawful Use of Excessive Force Against Bell – Choking and Tasing.

27.     Bell was slowly walking along side the vehicle.  (Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video)

28.     Bell was wearing a brown leather jacket that had small front pockets that showed no bulges or anything that could resemble a weapon.  (Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video)

29.     Bell nonchalantly placed his hands in his jacket pockets.  (Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video).

30.     At the time of the stop, it was cold outside (Eckstein Aff., ¶ 11, Exh. 10, Francis Clark Dep. at 48), with the temperature being between 36 and 37 degrees. (Eckstein Aff., ¶ 12, Exh. 11, Weather Underground History for Kenosha, WI 11/9/04)

31.     Officer Strausbaugh did not tell Bell to take his hands out of his pockets. (Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video; see Strausbaugh Aff., ¶¶14-16).

32.     Officer Strausbaugh approached Bell and placed his right hand on Bell's throat and pushed Bell backwards into the vehicle.  (Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video)

33.     As can be seen in the dash cam video from Officer Strausbaugh's squad car, Bell winced in response to Officer Strausbaugh's use of force.  (Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video).

34.     Officer Strausbaugh did not frisk Bell.  (Strausbaugh Aff., ¶¶13-14; Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video).

35.     Officer Strausbaugh then pushed Bell back towards the driver's side front door to put Bell back in the driver's seat.  (Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video; Strausbaugh Aff., ¶14).

36.     Officer Strausbaugh still did not tell Bell to take his hands out of his pockets.  (Strasubaugh Aff., ¶¶14-15; Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video).

37.     Bell said that he had not done anything wrong.  (Eckstein Aff., ¶ 2, Exh. 1, Rocco Dep. at 15).

38.     Officer Strausbaugh then forcefully directed Bell back towards Officer Strausbaugh's squad car.  (Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video; Eckstein Aff., ¶ 9, Exh. 8, Gaut Dep. Exh. 213 at 6).

39.     Bell voluntarily took his hands out of his pockets and showed a submissive, palms up, display.  (Eckstein Aff., ¶ 3, Exh. 2, Dash Cam Video; Eckstein Aff., ¶ 9, Exh. 8, Gaut Dep. Exh. 213 at 6).

40.     Bell repeatedly stated he had done nothing wrong.  (Eckstein Aff., ¶ 13, Exh. 12, Baas Dep. Exh. 18)

41.     When asked for the justification for the stop, Officer Strausbaugh said "You ran right through a stop sign for one."  (Eckstein Aff., ¶ 13, Exh. 12, Jeff Baas Dep. Exh. 18 at 2).

42.     Officer Strausbaugh did not stop Bell for failing to stop at a stop sign. (Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 33).

43.     Officer Strausbaugh knew that accusing Bell of running a stop sign was a false accusation, but he believed he could say anything to Bell.  (Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 37).

44.     Officer Strausbaugh found a wallet on Bell that contained Bell's military ID. (Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 61 at 1).

45.     Bell kept trying to communicate with the officers, telling them that he knew his rights and that he had done nothing wrong.  (Eckstein Aff., ¶ 15, Exh. 14, Craig Dove-El Dep. at 24-25).

46.     Bell did not do anything to exert any force or try to hurt anyone.  (Eckstein Aff., ¶ 15, Exh. 14, Craig Dove-El Dep. at 24).

47.     The officers were very degrading and angry and were being very aggressive with Bell.  (Eckstein Aff., ¶ 15, Exh. 14, Craig Dove-El Dep. at 52).

48.     Officer Strausbaugh did not know if Bell was out on bond for any criminal allegations and repeatedly asked Bell if he was out on bond and, if so, what the conditions were.  (Eckstein Aff., ¶ 13, Exh. 12, Baas Dep. Exh. 18 at 3).

49.     When Bell refused to answer, Officer Strausbaugh tried to force Bell into the squad car.  (Strausbaugh Aff., ¶22).

50.     Bell replied that he was not going to get into the squad car.  (Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 61 at 2).

51.     Officer Strausbaugh then released Bell and said Bell was going to do standardized field sobriety tests.  (Eckstein Aff., ¶ 5, Exh. 4, Strausbaugh Dep. Exh. 58 at 2; Strausbaugh Aff., ¶24; Eckstein Aff., ¶ 13, Exh. 12 Baas Dep. Exh. 18 at 3).

52.     Bell replied that he was not going to take field sobriety tests and started to walk northbound towards his house.  (Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 61 at 2).

53.     Officer Weidner and Officer Strausbaugh grabbed Bell's arms and tripped him to take him to the ground.  (Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 61 at 2; Strausbaugh Aff., ¶26)

54.     Bell landed on his stomach.  (Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 59).

55.     Officer Weidner was near Bell's head, and Officer Strausbaugh was delivering knee strikes to Bell's ribs.  (Eckstein Aff., ¶ 6, Exh. 5, Weidner Dep. at 28; Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 61 at 2).

56.     Bell was also being kicked.  (Eckstein Aff., ¶ 13, Exh. 12, Baas Dep. Exh. 18 at 4).

57.     Bell did not touch, punch, kick, head butt or shove either of the officers. (Strausbaugh Aff., ¶28).

58.     Instead, Bell was trying to bring his arms to his midsection underneath his body to prevent being handcuffed.  (Eckstein Aff., ¶ 6, Exh. 5, Weidner Dep. at 30; Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 59).

59.     Bell was not "actively resisting" but rather "passively resisting."  (Eckstein Aff., ¶ 16, Exh. 15, Genthner Dep. at 60-61).

60.     "Passive resistance" occurs "when a subject refuses to comply with a directive from a law enforcement officer but does not attempt to engage in physical action likely to cause bodily harm to the officer or to another person."  (Eckstein Aff., ¶ 17, Exh. 16, Tom Genthner Dep. Exh. 30 at 7; Eckstein Aff., ¶ 18, Exh. 17, Bradley Hetlet Dep. at 37).

61.     Officer Weidner placed Bell in handcuffs as Bell was laying on the ground. (Eckstein Aff., ¶ 15, Exh. 14, Craig Dove-El Dep. at 28, 55, and 56).

62.     Officer Weidner then stood up from holding Bell down.  (Eckstein Aff., ¶ 5, Exh. 4, Strausbaugh Dep. Exh. 58 at 2; Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 61 at 2; Eckstein Aff., ¶ 6, Exh. 5, Weidner Dep. at 28).

63.     Bell managed to get up to his knees, and Officer Strausbaugh pulled out his taser and tased Bell.  (Eckstein Aff., ¶ 15, Exh. 14, Craig Dove-El Dep. at 31).

64.     According to Kenosha Police Department Policy and Procedure Manual, Subject: Use of Force, "The use of a Conducted Energy Weapon has been authorized by the Kenosha Police Department and may be used by trained personnel when a subject is threatening to actively resist, or is actively resisting an officer and the subject poses an articulable threat of harm to an officer or another person. … Passive resistance without posing an articulable threat of harm to officers or others does not permit the use of a conducted energy weapon."  (Eckstein Aff., ¶ 19, Exh. 18, Gonzales Dep. Exh. 40, KPD Policy Use of Force at 3 VII.).

65.     Further, by Memorandum dated August 10, 2004, the Kenosha Police Department reinforced that deployment of a taser was not authorized in the following situation:

- When, during the arrest process the subject simply pulls away from or is not cooperating with an officer

- When a subject is passively resisting an officer-running away without an articulable threat of harm

- When a subject is resisting but does not have the ability to harm the officer or another person.

(Eckstein Aff., ¶ 17, Exh. 16, Genthner Dep. Exh. 29).

66.     Bell arched his back and head violently and screamed in reaction to being tased.  (Eckstein Aff., ¶ 15, Exh. 14, Craig Dove-El Dep. at 32; Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 61 at 2; Eckstein Aff., ¶ 13, Exh. 12, Baas Dep. Exh. 18 at 4).

67.     Bell ran to his driveway and into his back yard.  (Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 61 at 2).

C. The Unlawful Use of Excessive Force Against Bell – Gratuitous Beating.

68. Officer Strausbaugh and Weidner again took Bell down to the ground on the cement driveway near a trailer with two jet skis. (Strausbaugh Aff., ¶36; Weidner Aff., ¶42; Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 61 at 2).

69. Floodlights on the garage illuminated the entire area. (Weidner Aff., ¶43).

70. Kim and Shantae Bell were asleep and awakened by the commotion. (Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 26; Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 70).

71. They exited the back door of the house, ran down the back porch steps, and saw two people beating Bell. (Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 74-75; Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 29-32).

72. Bell was hunched over. (Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 30).

73. The two people were kneeing, kicking, and thrusting their elbows on Bell. (Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 29-31; Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 74; Eckstein Aff., ¶ 22, Exh. 21, Francis Clark Dep. Exh. 96; Eckstein Aff., ¶ 11, Exh. 10, Francis Clark Dep. at 21).

74. Bell was not fighting back, and was bouncing back and forth between the blows like a "teeter-totter." (Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 30-31).

75. A later autopsy conducted of Bell revealed multiple abrasions and contusions including abrasions to Bell's forehead, face, neck, upper chest, back right hip and abdomen. (Eckstein Aff., ¶ 23, Exh. 22, Krueger Dep. Exh. 49 at 4; Eckstein Aff., ¶

24, Exh. 23, Kelley Dep. Exh. 70, 71, 72; Eckstein Aff., ¶ 25, Exh. 24, Kelley dep at 43-49).

76.     Bell was saying "Get off of me.  Get off of me."  (Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 28-29).

77.     Bell's arms were not moving because his hands were still behind his back and in handcuffs.  (Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 31-32; Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 74).

78.     Kim Bell was asking what was going on and was saying that this was her son. (Eckstein Aff., ¶ 5, Exh. 4, Strausbaugh Dep. Exh. 58 at 3; Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep Exh. 61 at 3).

79.     Shantae Bell approached the people beating Bell and screamed, "Get off of him, get off him."  (Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 28).

80.     Kim Bell similarly yelled "get off him before I call the police" and was trying to pull the two people off of Bell.  (Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 33; Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep at 74-75)

81.     Officer Strausbaugh pushed her backwards saying "Get back or I'll arrest you." (Strausbaugh Aff., ¶38; Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 75; Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 30; Eckstein Aff., ¶ 11, Exh. 10, Francis Clark Dep. at 19-20).

82.     Shantae Bell then recognized the people were officers.  (Eckstein Aff., ¶ 20, Exh. 19, Eckstein Aff., ¶ 21, Exh. 20, Shantae Bell Dep. at 29).

83.     Bell limped away from his mother and sister, trailing his left leg behind him. (Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 75-76).

84.     Lieutenant Krueger arrived on the scene.  (Krueger Aff., ¶14).

85.     Kim Bell was screaming for someone to please help her son.  (Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 78-79).

86.     Lieutenant Kruger tased Bell by applying a drive stun.  (Krueger Aff., ¶13; Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 79).

D.      The Unlawful Use of Deadly Force Against Bell.

87.     The officers pushed Bell towards the left side of a Nissan that was parked in the driveway close to the garage.  (Eckstein Aff., ¶ 11, Exh. 10, Francis Clark Dep. at 22-23).

88.     Bell's feet were perpendicular to the driver's side front tire.  (Eckstein Aff., ¶ 26, Exh. 25, Pl. Shantae Bell. Ans. to Defs' Second Set of Int. dated 10/30/07 answer 1.a).

89.     The officers threw Bell over the hood of the Nissan with such force that the left wheel well of the car was dented and the driver's side mirror broke. (Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 76-77; Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 34-35).

90.     Bell's body was bent over at the waist face down on the hood of the car. (Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 77-78; Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 35; Eckstein Aff., ¶ 11, Exh. 10, Francis Clark Dep. at 23).

91.     Bell's chest was on the hood of the car.  (Eckstein Aff., ¶ 26, Exh. 25, Pl. Shantae Bell. Ans. to Defs' Second Set of Int. dated 10/30/07 answer 1.c).

92.     Bell's head was pushed against the car.  (Eckstein Aff., ¶ 26, Exh. 25, Pl. Shantae Bell. Ans. to Defs' Second Set of Int. dated 10/30/07 answer 1.d).

93.     Bell's legs were up against the tire of the left front fender.  (Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 28).

94.     Lieutenant Krueger had Bell pinned against the left front fender of the vehicle so tightly that his body could not move.  (Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 17; Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 80).

95.     Lieutenant Krueger was holding Bell in a "bear hug."  (Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 41; Krueger Aff., ¶15).

96.     Officer Strausbaugh was to Bell's right side.  (Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 37).

97.     Officer Gonzales ran up to the scene through the backyard and ran towards the officers.  (Gonzales Aff., ¶11).

98.     Bell's hands were still behind his back in handcuffs, with the handcuffs reflecting the light from the floodlights.  (Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 80; Eckstein Aff., ¶ 11, Exh. 10, Francis Clark Dep. at 26).

99.     As Officer Gonzales was running in the backyard, he was already drawing his gun.  (Eckstein Aff., ¶ 11, Exh. 10, Francis Clark Dep. at 29-30; Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 78).

100.     Officer Strausbaugh said that Bell was going for his weapon, and Officer Strausbaugh knew that deadly force was not justified.  (Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 38; Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 81).

101.    Bell was not going for Officer Strausbaugh's gun and he never had his hand on Officer Strausbaugh's gun, as his hands were still behind his back in handcuffs. (Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 80-81; Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 38; McCauley Aff., ¶1, Exh. 1 at 7-8).

102.    Shantae Bell saw Bell's hands behind his back in handcuffs when he was pinned against the car.  (Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 32 and 37)

103.    Kim Bell saw Bell's hand behind his back in handcuffs when he was pinned against the car.  (Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 74 and 80).

104.    Francis Clark, the Bell's next door neighbor, also saw a handcuff on Bell's right hand when Bell was pinned against the car, and he never saw Bell going for one of the officers' guns.  (Eckstein Aff., ¶ 22, Exh. 21, Francis Clark Dep. Exh. 96).

105.    A subsequent visual inspection of Officer Strausbaugh's gun did not reveal any fingerprints on Officer Strausbaugh's gun. (Eckstein Aff., ¶ 28, Exh. 27, Todd Thorne Dep. at 76-77).

106.    Officer Strausbaugh's gun was also swabbed and subjected to DNA tests, and none of Bell's DNA was found on the gun.  (Eckstein Aff., ¶ 29, Exh. 28, Defendants' Responses To Plaintiffs' Fourth Set Of Request For Admissions To Defendants Pursuant To Fed. R. Civ. P.36 And Seventh Set Of Written Interrogatories To Defendants, Answer Nos. 13, 14 and Exh. 4; Eckstein Aff., ¶ 32, Exh. 31, Friedman Dep. at 50).

107.    The area was illuminated well enough for Officer Gonzales to see that Bell did not have Officer Strausbaugh's gun.  (Weidner Aff., ¶52; Eckstein Aff., ¶ 21, Exh. 20, Kim Bell Dep. at 80; Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 32 and 37-38).

108.     Officer Strausbaugh's yelling that Bell was going for the gun was improper and inaccurate.  (McCauley Aff., ¶1, Exh. 1 at 7).

109.     Officer Strausbaugh's false communication set the fatal shooting sequence into motion.  (McCauley Aff., ¶1, Exh. 1 at 7).

110.     Officer Strausbaugh never said that his gun was still in his holster.  (Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 81).

111.     Officer Strausbaugh knew Bell was going to be shot.  (Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 81).

112.     An officer was yelling "Shoot, shoot."  (Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 38).

113.     Officer Gonzales had his gun in his right hand, ran right up in between Lieutenant Krueger and Officer Strausbaugh, and shot Bell in the head.  (Eckstein Aff., ¶ 11, Exh. 10, Francis Clark Dep. at 32 and 64-65; Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 38; Eckstein Aff., ¶ 26, Exh. 25, Pl. Shantae Bell. Ans. to Defs' Second Set of Int. dated 10/30/07 answer 1.e).

114.     It is objectively unreasonable and excessive for Officer Gonzales to shoot Bell when Officer Gonzales was in a position to see that Bell was unarmed.  (McCauley Aff., ¶1, Exh. 1 at 7). Officer Gonzales' primary goal was weapon retention, and he was in a position to apply physical force to ensure the gun never left the holster, including holding the gun in the gun, breaking Bell's grip of the gun, using a device to break Bell's arms, wrists, or hands, or any other technique.  (Eckstein Aff., ¶ 30, Exh. 29, McCauley Dep. at 36-37).

115.    Bell went limp.  (Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 38-39)

116.    Shantae Bell screamed "You killed him, you killed him."  (Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 39).

117.    Shantae and Kim Bell were ordered to go back into the house.  (Eckstein Aff., ¶ 20, Exh. 19, Shantae Bell Dep. at 39).

118.    Officer Weidner removed his handcuffs from the crime scene.  (Eckstein Aff., ¶ 6, Exh. 5, Weidner Dep. at 34; Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 30-32).

119.    The Kenosha Police Department's Policy and Procedures on deadly force specifically stated that "it is the policy of the Kenosha Police Department shall never be resorted to until every other reasonable means of apprehension or defense has been exhausted." (Eckstein Aff., ¶ 19, Exh. 18, Gonzales Dep. Exh. 40 at 1).

120.    Section XII A. 1. of the Kenosha Police Department's Policy and Procedure Manual in effect in November of 2004 expressly advised the defendants that they may use deadly force only "[a]s a last resort in the defense of oneself, when there is reasonable cause to believe that the officer is in imminent danger of death or great bodily harm."

121.    Section XII A. 2 of the Kenosha Police Department's Policy and Procedure Manual in effect in November of 2004 expressly advised the defendants that they may use deadly force only "[a]s a last resort in the defense of another person, whom the officer has reasonable cause to believe is being unlawfully attacked and is in imminent danger of death or great bodily harm."

122.    According to Wisconsin Defensive and Arrest Tactics manual, deadly force is justified only where a threat is "imminent," which requires that a suspect has intent, a

weapon, and a delivery system. (Eckstein Aff., ¶ 31, Exh. 30, McCauley Dep. Exh. 142 at 63).

123.    The defendants' consultant on police practice and procedure, Robert Willis, agreed that if Officer Gonzales knew that Bell never touched Officer Strausbaugh's gun, then deadly force was not justified:

> Q    I want you to assume that Michael Bell was in the position described by Lieutenant Krueger, the dynamic that was occurring at the hood of the car that is described by Lieutenant Krueger during the course of his testimony. I want you to assume that absolutely nothing else in this whole scenario that you've read changes, with one exception, and that one fact is that Michael Bell did not have his hand on Officer Strausbaugh's gun.
>
> Would you agree that if Officer Gonzales knew that fact, and all the rest of the dynamic facts existed as have been described in this record, that use of lethal force would be an unjustified violation of his training?
>
> [A]    I would agree with that.

(Eckstein Aff., ¶ 10, Exh. 9, Robert Willis Dep. at 108-09).

## II.    THE FORENSIC EVIDENCE REGARDING THE SHOOTING DEATH OF BELL.

### A.    No DNA Evidence And No Fingerprint Evidence From Bell Is On Officer Strausbaugh's Gun.

124.    The defendants' claim that Bell had a "forceful" and "firm" grip on Officer Strausbaugh's gun as he was taking it out of Officer Strausbaugh's holster. (Defendants' Proposed Findings of Fact Nos. 220, 221, 222, 230, 232 and incorporations therein).

125.    Officer Todd Thorne, who works for Kenosha Police Department's forensic unit, did a visual examination of Officer Strausbaugh's gun for fingerprints. (Eckstein Aff., ¶ 28, Exh. 27, Todd Thorne Dep. at 76-77).

126.    He found no finger prints on Officer Strausbaugh's gun. (Id.).

127.     The Kenosha Police Department then sent swabs from Officer Strausbaugh's gun and holster to the Wisconsin State Crime Lab for DNA testing. (Eckstein Aff., ¶ 29, Exh. 28, Defs' Resp. To Pls' Fourth Set Of Req. For Admissions To Defs. Pursuant To Fed. R. Civ. P.36 And Seventh Set Of Written Interrogatories To Defendants dated 12/2/08, Nos. 1-5).

128.     Officer Strausbaugh's DNA was found on the gun and holster  (Eckstein Aff., ¶ 29, Exh. 28, Defs' Resp. To Pls' Fourth Set Of Req. For Admissions To Defs. Pursuant To Fed. R. Civ. P.36 And Seventh Set Of Written Interrogatories To Defendants, Answer Nos. 13 and Exh. 4).

129.     Bell's DNA was not found on the gun or holster.  (Eckstein Aff., ¶ 29, Exh. 28, Defs' Resp. To Pls' Fourth Set Of Req. For Admissions To Defs. Pursuant To Fed. R. Civ. P.36 And Seventh Set Of Written Interrogatories To Defendants, Answer Nos Nos. 13 and Exh. 4; Eckstein Aff., ¶ 32, Exh. 31, Friedman Dep. at 50).

130.     The defendants have since hired a DNA consultant of their own.  (Eckstein Aff., ¶ 32, Exh. 31, Friedman Dep. at 4-7).

131.     The defendants' DNA consultant agreed that Bell's DNA was not on the gun.  (Eckstein Aff., ¶ 33, Exh. 32, Friedman Dep. Exh. 257 at 2, ¶4).

132.     The defendants' DNA consultant tried to get the Wisconsin State Crime Lab to change its findings to conclude that Bell's DNA was on the holster.  (Eckstein Aff., ¶ 32, Exh. 31, Friedman Dep. at 49-50)

133.    After careful consideration of the data, the Wisconsin State Crime lab, per Sharon Polakowski, refused and reaffirmed its conclusions. (Eckstein Aff., ¶ 32, Exh. 31, Friedman Dep. at 50-51).

B.    The "Muzzle Stamp" And The Entrance And Exit Wounds On Bell's Head.

134.    Dr. P. Douglas Kelley, M.D., was the medical examiner who conducted the autopsy of Michael's body as part of the KPD's investigation.  (Kelley Aff., ¶2).

135.    Dr. Kelley determined that Bell died from a "contact" gun shot wound to the head.  (Eckstein Aff., ¶ 25, Exh. 24, Kelley Dep. at 15-16).

136.    A contact gunshot wound is one where "the muzzle of the gun was in close proximity to the skin."  (Eckstein Aff., ¶ 25, Exh. 24, Kelley Dep. at 15).

137.    The entrance wound from this contact gun shot wound was on the right side of Michael's head just above his right ear:



(Eckstein Aff., ¶ 25, Exh. 24, Kelley Dep. at 16 and 33; Eckstein Aff., ¶ 24, Exh. 23, Kelley Dep. Exh. 64).

138.    The exit wound from this contact gun shot wound was on the left side of Michael's head behind his left ear.



(Eckstein Aff., ¶ 25, Exh. 24, Kelley Dep. at 16; Eckstein Aff., ¶ 24, Exh. 23, Kelley Dep. Exh. 68).

139.    Dr. Kelley also observed a "muzzle stamp" of a gun was imprinted on Michael's skin surrounding the entrance wound.



(Eckstein Aff., ¶ 25, Exh. 24, Kelley Dep. at 25-33; Eckstein Aff., ¶ 24, Exh. 23, Kelley Dep. Exh. 63 and 64).

140.    The "muzzle stamp" marks the position of the muzzle of the gun on or near Bell's head at the time the gun was fired by Officer Gonzales.  (Kelley Aff., ¶4).

141.    Using a close-up photograph with a metric scale, Dr. Kelley saw "concentric abrasions" around the edges of the wound with "definite pattern abrasions" at the top along with raised areas.  (Eckstein Aff., ¶ 25, Exh. 24, Kelley Dep. at 27-28, Exh. 78).

142.    At Michael's autopsy, a Kenosha Police Department officer presented Dr. Kelley with a firearm that was consistent with the weapon Defendant Officer Gonzales used.  (Eckstein Aff., ¶ 25, Exh. 24, Kelley Dep. at 28).

143.    Dr. Kelley photographed that weapon with the same metric scale and traced an overlay transparency of that weapon:



(Eckstein Aff., ¶ 25, Exh. 24, Kelley Dep. at 29; Eckstein Aff., ¶ 41, Exh. 40, Screen Capture from the videotaped deposition of P. Douglas Kelley).

144.    The metric scale on the overlay and the photograph of the exit wounds matched nearly perfectly, and Dr. Kelley then placed that overlay on top of the close-up photograph of the entrance wound and found that the patterned abrasions were consistent with the muzzle of the weapon.



(Eckstein Aff., ¶ 25, Exh. 24, Kelley Dep. at 30-31; Eckstein Aff., ¶ 41, Exh. 40, Screen Capture from the videotaped deposition of P. Douglas Kelley).

145.     Tracing the bullet through the entrance and exit wounds, the trajectory of the bullet was "right to left, front to back, and slightly downwards."  (Eckstein Aff., ¶ 25, Exh. 24, Kelley Dep. at 39).

146.     The entrance and exit wounds, the muzzle stamp, and the trajectory of the bullet forensically establish how Officer Gonzales was holding his gun in relation to Bell's head at the time Bell was shot.  (Kelley Aff., ¶6).

147.     <u>These forensic facts remain a constant no matter how anyone says the shooting of Bell occurred</u>.  (Kelley Aff., ¶6).

C.     The Lack Of Blood Spatter On The Windshield.

148.     According to both Officer Gonzales and Lieutenant Krueger, Officer Gonzales was standing at the front of the Nissan vehicle at the time he shot Bell. (Eckstein Aff., ¶ 34, Exh. 33, Strash Dep. Exh. 107 at 2; Eckstein Aff., ¶ 35, Exh. 34, Gonzales Dep. at 8; Eckstein Aff., ¶ 19, Exh. 18, Gonzales Dep. Exh. 39 at 2).

149.     According to both Officer Gonzales and Lieutenant Krueger, Officer Gonzales angled the weapon towards the windshield of the car and away from the other officers just prior to shooting Michael.  (Eckstein Aff., ¶ 35, Exh. 34, Gonzales Dep. at 8; Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 25).

150.     Given the purported direction Officer Gonzales' gun fired and given a clear exit wound, the chief investigating officer, Lieutenant Tom Vieth, agreed that there would

have been blood spatter on the windshield of the car. (Eckstein Aff., ¶ 36, Exh. 35, Vieth Dep. at 58-59).

151. The Kenosha Police Department's own criminalist, Officer Todd Thorne, agreed that absolutely no blood spatter was found on the windshield. (Eckstein Aff., ¶ 28, Exh. 27, Thorne at 47-48).

D. Location Of The Shell Casing.

152. Officer Gonzales shot Bell with a Smith and Wesson Model 4096, and this was the only weapon fired on November 9, 2004. (Eckstein Aff., ¶ 37, Exh. 36, Def. Officer Albert B. Gonzales' Resp. to Pls' Rule 36 Req. for Admissions dated 6/15/07 Resp. No. 2).

153. This weapon ejects spent shell casings to the right side. (Eckstein Aff., ¶ 37, Exh. 36, Def. Officer Albert B. Gonzales' Resp. to Pls' Rule 36 Req. for Admissions dated 6/15/07 Resp. No. 17).

154. The spent shell casing from the bullet that went through Michael's head was found in a grassy area to the north of the car.



(Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 51-53; Eckstein Aff., ¶ 23, Exh. 22, Krueger Dep. Exhs. 50-52).

155.    This area is to the left side of where Officer Gonzales' claimed he was standing.  (Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 53).

156.    The only way the shell casing could have ejected to the left is if Gonzales reached around Bell's head, pointed the gun back in Officer Gonzales' direction, and

pulled the trigger, which Officer Gonzales did not do because he would be firing the gun at himself. (Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 54-55).

## III. THE DEFENDANTS' MULTIPLE AND CONTRADICTORY ACCOUNTS FOR HOW BELL WAS SHOT.

157. The positioning of Officer Gonzales is critical to whether deadly force was justified because it goes to the basic issue of whether Officer Gonzales was in a position to verify the presence of a weapon either by visually seeing Bell's hands or physically touching Officer Strausbaugh's holster. (McCauley Aff., ¶1, Exh. 1 at 7; Eckstein Aff., ¶ 10, Exh. 9, Robert Willis Dep. at 108-09).

158. If Officer Gonzales was on Bell's right side, he would have been in a position to verify that Bell did not have Officer Strausbaugh's gun. (McCauley Aff., ¶1, Exh. 1 at 7).

159. It is unreasonable for Officer Gonzales to shoot Bell if Officer Gonzales was in a position to see that Bell was unarmed or that Officer Strausbaugh's weapon was in his holster, as the defendants' own consultant on police tactics admits. (McCauley Aff., ¶1, Exh. 1 at 7; Eckstein Aff., ¶ 10, Exh. 9, Robert Willis Dep. at 108-09).

### A. The Officers Statements And Testimony Supporting That Bell Was Shot In The Left Side Of The Head.

160. After the shooting, the officers returned to the detective bureau. (Eckstein Aff., ¶ 6, Exh. 5, Weidner Dep. at 10).

161. According to the Kenosha Police Department Policy and Procedure Manuel regarding Crime Scenes, the officers were to be kept "separate, [because] the most accurate information is provided when the witnesses do not converse and compare what they

observed." (Eckstein Aff., ¶ 73, Exh. 72, Kenosha Police Department Policy and Procedure Manual, Crime Scenes at 3).

162. The defendants were not separated and were together for about three hours before giving statements. (Eckstein Aff., ¶ 6, Exh. 5, Weidner Dep. at 10; Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 92-93; Eckstein Aff., ¶ 42, Exh. 41, Salas Report at 1).

1. Lieutenant Krueger.

163. Lieutenant Krueger was interviewed by Detective Niccolai. (Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 16-17)

164. Lieutenant Krueger said that after he was done tasing bell, he grabbed Bell from behind in a "bear hug." (Eckstein Aff., ¶ 34, Exh. 33, Strash Dep. Exh. 107 at 2; Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 42).

165. Lieutenant Krueger said that he had Bell pinned against the left front wheel fender of the car. (Eckstein Aff., ¶ 34, Exh. 33, Strash Dep. Exh. 107 at 2; Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 17).

166. Lieutenant Krueger marked his position at the time Bell was shot with the initials "DK" as follows:



(Eckstein Aff., ¶ 19, Exh. 18, Gonzales Dep. Exh. 36)

167. At the time Bell was shot, Lieutenant Kruger said Bell was bent over the hood of the car, leaning forward from the waist, and Lieutenant Krueger was still behind him but in more of an upright position. (Eckstein Aff., ¶ 34, Exh. 33, Strash Dep. Exh. 107 at 2; Eckstein Aff., ¶ 38, Exh. 37, Niccolai Dep. at 27-28; Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 18-19).

168. Lieutenant Kruger demonstrated Bell's position at the time he was shot, with "[the table] being the hood of the car, he was bent over like such":



(Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 20; Eckstein Aff., ¶ 43, Exh. 42, Screen Capture from videotaped deposition of Lieutenant Krueger).

169. Lieutenant Kruger said that his head was turned to the left and saw Officer Gonzales standing at the front of the car. (Eckstein Aff., ¶ 34, Exh. 33, Strash Dep. Exh. 107 at 2; Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 20).

170.	Lieutenant Krueger said he saw Officer Gonzales put his gun against the left side of Bell's head.  (Eckstein Aff., ¶ 34, Exh. 33, Strash Dep. Exh. 107 at 2; Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 20-21).

171.	Lieutenant Krueger said that he saw Officer Gonzales' gun was roughly parallel to the ground with the butt end of the gun roughly perpendicular to the ground. (Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 48-49).

172.	Lieutenant Kruger said he saw Officer Gonzales angle the gun towards the windshield and away from the officers.  (Eckstein Aff., ¶ 34, Exh. 33, Strash Dep. Exh. 107 at 2; Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 25).

173.	Lieutenant Kruger said he saw Officer Gonzales pull the trigger but nothing happened.  (Eckstein Aff., ¶ 34, Exh. 33, Strash Dep. Exh. 107 at 2).

174.	Lieutenant Krueger said he saw Officer Gonzales back the gun away from Bell's head and the gun discharged.  (Eckstein Aff., ¶ 34, Exh. 33, Strash Dep. Exh. 107 at 2).

175.	Lieutenant Krueger saw Officer Gonzales shoot Bell in the left side of the head, with the gun angled toward the car's windshield.  (Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 21 and 25).

176.	After being shot, Bell slumped straight down on the hood of the car. (Eckstein Aff., ¶ 34, Exh. 33, Strash Dep. Exh. 107 at 2).

2.	Officer Gonzales.

177.	Officer Gonzales was interviewed by Detective Michael Salas.  (Eckstein Aff., ¶ 35, Exh. 34, Gonzales Dep. at 11).

178.    Officer Gonzales said he ran to the front of the car because he could not get an angle on Bell.  (Eckstein Aff., ¶ 19, Exh. 18, Gonzales Dep. Exh. 39 at 2).

179.    Officer Gonzales said that this placed him to Lieutenant Krueger's left side.  (Eckstein Aff., ¶ 35, Exh. 34, Gonzales Dep. at 19-20).

180.    Officer Gonzales said that Bell was bent forward and between two officers.  (Eckstein Aff., ¶ 35, Exh. 34, Gonzales Dep. at 23).

181.    Officer Gonzales said he put his gun against Bell's head (on which side he did not remember), angled the gun away from the officers and towards the windshield, and put his left hand against Bell's head.  (Eckstein Aff., ¶ 19, Exh. 18, Gonzales Dep. Exh. 39 at 2; Eckstein Aff., ¶ 35, Exh. 34, Gonzales Dep. at 8, 23-24).

182.    Officer Gonzales said he had his gun slightly canted to the right.  (Eckstein Aff., ¶ 35, Exh. 34, Gonzales Dep. at 11).

183.    Officer Gonzales said he pulled the trigger twice, with the second shot causing the firearm to discharge.  (Eckstein Aff., ¶ 19, Exh. 18, Gonzales Dep. Exh. 39 at 2).

184.    Officer Gonzales saw Lieutenant Krueger behind Bell.  (Eckstein Aff., ¶ 35, Exh. 34, Gonzales Dep. at 8-9).

185.    At no time did Officer Gonzales warn Bell that he was going to be shot.  (Eckstein Aff., ¶ 35, Exh. 27, Gonzales Dep. at 8).

            3.      Officer Weidner.

186.    Officer Weidner was interviewed by Detective Diane Walton.  (Eckstein Aff., ¶ 6, Exh. 5, Weidner Dep. at 9).

187.     Officer Weidner said that after Bell was tased, Bell jumped up quickly and took off westbound.  (Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 61 at 3).

188.     Officer Weidner said he got up off the ground, looked towards the car, and saw that Lieutenant Krueger, Officer Gonzales and Officer Strausbaugh had Bell up against the hood of the car.  (Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 61 at 3; Eckstein Aff., ¶ 6, Exh. 5, Weidner Dep. at 36-37).

189.     Officer Weidner said that he "started to go towards them" but saw Kim or Shantae Bell moving towards the car and he had to stay back.  (Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 61 at 3).

190.     Officer Weidner said that he then turned back towards the car and said the area was well lit enough for him to see a single hand on Officer Strausbaugh's gun but he did not know whose hand it was.  (Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 61 at 3; Eckstein Aff., ¶ 6, Exh. 5, Weidner Dep. at 38-39).

191.     At his deposition, Officer Weidner said, for the very first time, that he could see two hands on Officer Strausbaugh's gun: one hand on the gun and Officer Strausbaugh's hand on top.  (Eckstein Aff., ¶ 6, Exh. 5, Weidner Dep. at 38-45).

192.     Officer Weidner realized that seeing two hands on the gun was an important piece of information after speaking to his lawyers.  (Eckstein Aff., ¶ 6, Exh. 5, Weidner Dep. at 45-46).

193.     Officer Weidner said the area was well lit enough to see this.  (Eckstein Aff., ¶ 6, Exh. 5, Weidner Dep. at 42).

194. Officer Weidner said the reason why Lieutenant Krueger did not see this is because Lieutenant Krueger was on Bell's left side. (Eckstein Aff., ¶ 6, Exh. 5, Weidner Dep. at 43).

195. Officer Weidner then said he saw Officer Strausbaugh twist his hip area to try and direct his holster away, and his holster had moved to the center of his hip area. (Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 61 at 3).

196. Officer Weidner then heard the gunshot. (Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 61 at 3).

### 4. Officer Strausbaugh.

197. Officer Strausbaugh was interviewed by Detective Dan Strash. (Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 15).

198. Officer Strausbaugh said that he was pushed up against the car by Bell. (Eckstein Aff., ¶ 5, Exh. 4, Strausbaugh Dep. Exh. 58 at 3; Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 69).

199. Officer Strausbaugh said that Bell had his arms around Officer Strausbaugh's midsection and was more to Officer Strausbaugh's right side. (Eckstein Aff., ¶ 5, Exh. 4, Strausbaugh Dep. Exh. 58 at 3; Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 69 and 72).

200. Officer Strausbaugh said that when he hit the car, Bell removed his arms from around his midsection, but Officer Strausbaugh said he was still "pinned" against the vehicle. (Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 74-77).

201.    Officer Strausbaugh said he felt Bell's hands on his gun and the safety thumb snap on the holster was now open.  (Eckstein Aff., ¶ 5, Exh. 4, Strausbaugh Dep. Exh. 58 at 3).

202.    Officer Strausbaugh said that his entire holster was twisted on his body. (Eckstein Aff., ¶ 5, Exh. 4, Strausbaugh Dep. Exh. 58 at 3).

203.    Officer Strausbaugh confirmed that his gun never left the holster.  (Eckstein Aff., ¶ 4, Exh. 3, Strausbaugh Dep. at 78).

204.    Officer Strausbaugh said that he then heard a bang and everything stopped. (Eckstein Aff., ¶ 5, Exh. 4, Strausbaugh Dep. Exh. 58 at 3).

B.    The Officers First Reenactment At The Crime Scene

205.    After giving statements, the officers were transported back to the scene for a walk-through reenactment.  (Eckstein Aff., ¶ 40, Exh. 39, Berner Dep. Exh. 248 at 4-5).

206.    Each defendant walked through what happened with their detective. (Eckstein Aff., ¶ 40, Exh. 39, Berner Dep. Exh. 248 at 4-5).

207.    Each defendant's approximate location at the time of the shooting was photographed by Officer Todd Thorne as follows (with 3 representing Officer Gonzales, 4 representing Lieutenant Krueger, 10 representing Bell, 1 representing Officer Strausbaugh, and 2 representing Officer Weidner):



(Eckstein Aff., ¶ 19, Exh. 18, Gonzales Dep. Exh. 32; Eckstein Aff., ¶ 28, Exh. 27, Thorne

Dep. at 55-56; Eckstein Aff., ¶ 40, Exh. 39, Berner Dep. Exh. 248 at 4-5).

208.    Each defendant's reenactment of what happened was consistent with their

statements.  (Eckstein Aff., ¶ 40, Exh. 39, Berner Dep. Exh. 248 at 4-5; Eckstein Aff., ¶ 39,

Exh. 38, Berner Dep. at 18-19).

C.    The Defendants' Formal Discovery Responses After Discovering That
        Bell Was Not Shot In The Left Side Of The Head.

209.    During Lieutenant Krueger's deposition, at which all defendants were

present, he was informed that the autopsy report concluded that Bell was shot in the right

side of the head and not, as Lieutenant Krueger testified, shot in the left side of the head. (Eckstein Aff., ¶ 27, Exh. 26, Krueger Dep. at 1-4, 53-56).

210.    The plaintiffs sent Requests for Admissions to Officer Gonzales and Lieutenant Krueger to conclusively establish that Officer Gonzales <u>was not</u> standing at the front of the car when he shot Bell.   (Eckstein Aff., ¶ 44, Exh. 43, Pls. Requests for Admissions to Officer Gonzales and Lieutenant Krueger dated 5/17/07).

211.    The medical examiner that did the autopsy, Dr. Kelley, was deposed on May 21, 2007.  (Eckstein Aff., ¶ 25, Exh. 24, Kelley Dep. at 1-4).

212.    On June 15, 2007, in answering the requests for admission, Officer Gonzales, who previously insisted that he could not recall on what side of the head he shot Bell, now knew that he shot Bell on the right side of the head.  (Eckstein Aff., ¶ 37, Exh. 36, Def. Officer Albert B. Gonzales' Resp. to Pls' Rule 36 Req. for Admissions dated 6/15/07 Response No. 15).

213.    Officer Gonzales admitted that he was at the front of the car when he shot Bell and that Bell was bent forward at the waist at the time he was shot.  (Eckstein Aff., ¶ 37, Exh. 36, Def. Officer Albert B. Gonzales' Resp. to Pls' Rule 36 Req. for Admissions dated 6/15/07 Resp. Nos. 4 and 7).

214.    However, the defendants now claimed that the right side of Bell's head was closer to the front of the car, yet Officer Gonzales admitted Bell was not bent backwards over the car.   (Eckstein Aff., ¶ 37, Exh. 36, Def. Officer Albert B. Gonzales' Resp. to Pls' Rule 36 Req. for Admissions dated 6/15/07 Resp. No. 7).

215.     When asked for every factual basis to support his claim that Bell's right side of his head was facing the front of the car without being bent backwards over the car, Officer Gonzales answered in an Interrogatory:  "I was at the front of the Nissan at the time that I shot Mr. Bell in the right side of his head.  My pistol was pointed toward the windshield.  Michael Bell was not bent over backwards over the hood of the car."  (Eckstein Aff., ¶ 45, Exh. 44, Defs. Resp. to Pls' Fourth Set of Int. dated 6/19/07 to Albert Gonzales Response No. 1-3).

216.     Lieutenant Krueger responded similarly.  (Eckstein Aff., ¶ 46, Exh. 45, Defs' Resp. to Pls' Fifth Set of Written Interrogatories dated 6/15/07 to David Krueger Nos. 1-3).

217.     Lieutenant Krueger reversed his deposition testimony, by now claiming that Officer Gonzales shot Bell in the right side of his head and that the left side of Bell's head was closer to the windshield and the right side of Michael's head was closer to the front of the Nissan.  (Eckstein Aff., ¶ 47, Exh. 46, Def. Officer David H. Krueger's Resp. to Pls' Rule 36 Req. for Admissions dated 6/15/07 to David Krueger Response No. 3).

218.     Lieutenant Kruger also reversed his deposition testimony that Bell was pinned against the left front fender at the time Bell was shot.  (Eckstein Aff., ¶ 47, Exh. 46, Def. Officer David H. Krueger's Resp. to Pls' Rule 36 Req. for Admissions dated 6/15/07 to David Krueger Response No. 8).

219.     Lieutenant Krueger also admitted that Bell was bent forward at the time he was shot.   (Eckstein Aff., ¶ 47, Exh. 46, Def. Officer David H. Krueger's Resp. to Pls' Rule 36 Req. for Admissions dated 6/15/07 Response No. 3).

220.   The defendants' contention that Bell was shot in the right side of the head when Officer Gonzales was at the front of the car, when Bell was bent forward and held from behind in a bear hug, and when Officer Gonzales angled his gun towards the windshield of the car is impossible.  (Eckstein Aff., ¶ 48, Exh. 47, Wetli Dep. Exh. 149 at 2-3).

D.   The Defendants' <u>Second Reenactment</u> Contradicts Their Initial Statements To The Kenosha Police Department, The Officers' Sworn Testimony, And The Defendants' Formal Discovery Responses.

221.   In June 2007, the defendants were aware that the plaintiffs claimed Officer Gonzales was standing on the right side of Bell (i.e., between Lieutenant Krueger and Officer Strausbaugh.  (Eckstein Aff., ¶ 49, Exh. 48, Gonzales Dep. Vol. III at 12).

222.   A videotaped reenactment was made on December 12, 2007.  (Eckstein Aff., ¶ 50, Exh. 49, Krueger Dep. Vol II at 8).

223.   This second reenactment was reenacted three times, videotaped only once, and is how the defendants now claim the shooting happened.  (Eckstein Aff., ¶ 51, Exh. 50, Thomas Hansche Dep. at 27; Eckstein Aff., ¶ 49, Exh. 48, Gonzales Dep. Vol III at 33; Eckstein Aff., ¶ 50, Exh. 49, Krueger Dep. Vol. II at 11; Eckstein Aff., ¶ 52, Exh. 51, Strausbaugh Dep. Vol. II at 12-13).

224.   The purpose of the second reenactment was to figure out how Officer Gonzales could stand at the front of the car and still shoot Michael Bell in the head. (Eckstein Aff., ¶ 49, Exh. 48, Gonzales Dep. Vol. III at 9-10; Eckstein Aff., ¶ 10, Exh. 9, Robert Willis Dep. at 61-62; Eckstein Aff., ¶ 51, Exh. 50, Thomas Hansche Dep. at 10-11).

225.   The second reenactment shows Bell shot as follows:



(Eckstein Aff., ¶ 53, Exh. 52, Screen Capture from Second Reenactment).

226. This second reenactment contradicts Officer Gonzales' statement, the first walk-through, his sworn testimony, and his formal discovery responses in at least the following material respects:

- Officer Gonzales is not pointing his gun towards the windshield but is pointing it at a 60 to 90 degree angle away from the windshield (Plaintiffs' Proposed Finding of Fact ["PPFOF"] No. 181; Eckstein Aff., ¶ 54, Exh. 53, Ernest Dep. at 59);

- Officer Gonzales is not pointing his gun away from the officers but is now pointing his weapon at Lieutenant Krueger (PPFOF No. 181);

- Officer Gonzales is not canting his gun slightly to the right but is now canting his weapon slightly to the left (PPFOF No. 182; Eckstein Aff., ¶ 54, Exh. 53, Ernest Dep. at 58-59);

227. This second reenactment contradicts Lieutenant Krueger's statement, the first walk-through, his sworn testimony, and formal discovery responses in at least the following material respects:

- Lieutenant Kruger is not pinning Bell against the left front fender (PPFOF No. 165);

- Lieutenant Kruger is not holding Bell with Bell's waist bent forward over the hood of the car (PPFOF No. 167);

- Lieutenant Kruger does not have his head to the left side of Bell but rather places his head to the right side (PPFOF No. 170);

- Lieutenant Krueger does not have Bell in anything resembling a "bear hug." (PPFOF No. 95; Eckstein Aff., ¶ 39, Exh. 39, Berner Dep. at 44).

- The left side of Bell's head is not closer to the windshield (PPFOF No. 217).

228.    The second reenactment contradicts Officer Weidner's statement, the first walk-through, and his sworn testimony in at least the following material respects:

- Officer Weidner can be seen running up to Lieutenant Krueger and Officer Strausbaugh at the Nissan, contrary to his statement that he only "started to move towards" the officers but then stopped to keep Kim and Shantae Bell back. (PPFOF No. 189; Eckstein Aff., ¶ 39, Exh. 38, Berner Dep. at 67-68).

- Officer Weidner looks back over his shoulder while he is running away from Lieutenant Krueger and Officer Strausbaugh and claims to see Bell's hand on Officer Strausbaugh's gun, contrary to his statement that after he kept Kim and Shantae Bell back, he turned back to the Nissan and saw Officer Strausbaugh's gun. (PPFOF No. 189-90; Eckstein Aff., ¶ 14, Exh. 13, Weidner Dep. Exh. 202; Eckstein Aff., ¶ 39, Exh. 38, Berner Dep. at 68-69).

229.    The second reenactment contradicts Officer Strausbaugh's statement and his first walk-through in that this is the very first time that Officer Strausbaugh ever claimed he knew what position Bell was in when he was shot. (Eckstein Aff., ¶ 19, Exh. 18, Gonzales Dep. Exh. 162; Eckstein Aff., ¶ 52, Exh. 51, Strausbaugh Dep. Vol. II at 17).

230.    The second reenactment is also incredible. (Eckstein Aff., ¶ 54, Exh. 53, Ernest Dep. at 62-65; Eckstein Aff., ¶ 55, Exh. 54, Ernest Dep. Exh. 297; Eckstein Aff., ¶ 30, Exh. 29, McCauley Dep. at 39-40, 54-55).

231.    Officer Gonzales' gun as shown in the reenactment does not line up with the forensic evidence:

- Officer Gonzales' gun does not line up with the muzzle stamp left on Bell's head. (Kelley Aff., ¶8).

- Officer Gonzales' gun' trajectory also does not line up with the exit wound. (Kelley Aff., ¶8).

- Officer Gonzales' gun placement still does not take into account the location of the spent shell casing, which was found to the left of where Officer Gonzales claims he was standing. (Eckstein Aff., ¶ 9, Exh. 8, Gaut Dep. Exh. 213 at 9; Eckstein Aff., ¶ 57, Exh. 56, Wetli Dep. II Exh. 4 at 1).

232.    As reflected in the autopsy report, the trajectory of the bullet that went through Michael Edward Bell's head was right to left, front to back, and slightly downwards, which is depicted in the autopsy photographs below:



(Kelley Aff., ¶5; Eckstein Aff., ¶ 58, Exh. 57, Autopsy Photo Of Bell's Head (arrow added)).

233.    The bullet exiting Bell's head had a velocity in excess of one hundred feet per second.  (Eckstein Aff., ¶ 54, Exh. 53, Ernest Dep. at 48).

234.    Given the trajectory of the bullet of right to left, front to back, and slightly downwards, Lieutenant Kruger would be in the path of the exiting bullet and should have been injured or killed.  (Kelley Aff., ¶9; Eckstein Aff., ¶ 54, Exh. 53, Ernest Dep. at 64; Eckstein Aff., ¶ 56, Exh. 55, Wetli Dep. Vol. II at 10-11; Eckstein Aff., ¶ 57, Exh. 56, Wetli Dep. Vol. II Exh. 4).

235.    Lieutenant Krueger confirmed he was not wounded in the shooting of Bell. (Eckstein Aff., ¶ 50, Exh. 49, Krueger Dep. Vol. II at 22).

236.     Given the clear exit wound, there would be blood or brain matter deposited on Lieutenant Krueger, as even the defendant's blood spatter consultant agreed.  (Kelley Aff., ¶9; Eckstein Aff., ¶ 57, Exh. 56, Wetli Dep. Vol II Exh. 4; Eckstein Aff., ¶ 59, Exh. 58, Stuart James Dep. at 69-73).

237.     No blood or brain matter was left on Lieutenant Krueger, and Lieutenant Krueger has since laundered his jacket.  (Eckstein Aff., ¶ 50, Exh. 49, Krueger Dep. Vol. II at 19-22; Eckstein Aff., ¶ 59, Exh. 58, Stuart James Dep. at 34-35, 72; Eckstein Aff., ¶ 60, Exh. 59, Laber Dep. Exh. 310 at 3).

E.     The Defendants Third Reenactment Contradicts Officer Gonzales' Initial Statements to the Kenosha Police Department, His Sworn Testimony, His Formal Discovery Reponses, And The Defendants' Second Reenactment.

238.     Following the second reenactment, which, as noted above, could not take into account the location of the spent shell casing, the plaintiffs received notice that Officer Gonzales conducted a third reenactment.  (Eckstein Aff., ¶ 61, Exh. 60, Kevin P. Reak Correspondence dated 10/8/08).

239.     The stated purpose of the reenactment was to determine shell ejection patterns of Officer Gonzales' gun.  (Eckstein Aff., ¶ 61, Exh. 60, Willis  Report dated 10/8/08 at 1).

240.     In this third reenactment, Officer Gonzales went to a firing range and he "canted his weapon counter-clockwise to simulate, to the best of his recollection, the angle he held his duty weapon at when he shot Michael Bell on 11/9/04."  (Eckstein Aff., ¶ 61, Exh. 60, Willis Report dated 10/8/08 at 2).

241.     Officer Gonzales canted his weapon so far to the left that it is almost perpendicular to the ground, or "what a lot of people kind of commonly call gangster style shooting." (Eckstein Aff., ¶ 54, Exh. 53, Ernest Dep. at 51).   Officer Gonzales canted his weapon as follows:



(Eckstein Aff., ¶ 62, Exh. 61, Screen Captures From DVD attached To Robert Willis Report dated 10/8/08).

242.    When Officer Gonzales held his weapon in the "gangster" style as shown above, "[t]he results … [of the shell ejection pattern] were remarkably consistent…:  All rounds ejected from the Smith & Wesson landed in different locations to the left of Officer Gonzales."  (Eckstein Aff., ¶ 61, Exh. 60, Willis  Report dated 10/8/08 at 1).

243.    The third reenactment is implausible.  The cant of the gun in the third reenactment is inconsistent with the cant of the gun in the second reenactment and with Officer Gonzales' testimony that he was canting his gun slightly to the right, <u>not</u> all the way to the left.  (Kelley Aff., ¶14; Eckstein Aff., ¶ 35, Exh. 34, Gonzales Dep. at 11; Eckstein Aff., ¶ 54, Exh. 53, Ernest Dep. at 57 and 58).

244.    The cant of the gun in the third reenactment is also inconsistent with Dr. Kelley's autopsy findings.  (Kelley Aff., ¶16).

245.    Because the muzzle stamp imprinted on Bell's head clearly shows the sight of the gun at the top of the entrance wound, and the recoil spring guide of the gun is clearly imprinted at the bottom of the entrance wound, Bell's head must be positioned to accommodate these landmarks on Officer Gonzales' gun.  The only way to line up the muzzle stamp to Officer Gonzales' gun's position as shown above is to have Michael Edward Bell's face pointed towards the sky.   (Kelley Aff., ¶16; Eckstein Aff., ¶ 54, Exh. 53, Ernest Dep. at 58).

246.    As shown in the second and third reenactments, it is forensically impossible that Bell's face could have been pointed towards the sky without his neck being extremely hyperextended or without his body being bent backwards.  (Kelley Aff., ¶16).

247. There is no evidence that Bell's neck was extremely hyperextended, as Dr. Kelley found no evidence of trauma to Bell's cervical spine. (Eckstein Aff., ¶ 25, Exh. 24, Kelley Dep. at 42-43).

## IV. KENOSHA POLICE DEPARTMENT, PER THE CHIEF OF POLICE, RATIFIED THE DEFENDANTS' UNLAWFUL CONDUCT.

248. Then Chief of Police Dan Wade closely reviewed the events of November 9, 2004. (Dan Wade Aff., ¶4; Eckstein Aff., ¶ 63, Exh. 62, Dan Wade Dep. at 21).

249. Then Chief of Police Dan Wade read written reports and considered the verbal opinions of supervisors, whom he relied upon and trusted. (Dan Wade Aff., ¶5).

250. Then Chief of Police Dan Wade knew that the defendants claimed Officer Gonzales was standing at the front of the car at the time he shot Bell, that Officer Gonzales angled his weapon towards the windshield when he shot Bell, and that Bell was shot in the right side of the head. (PPFOF Nos. 137, 169, 175, 181).

251. Then Chief of Police Dan Wade knew that the defendants' account was impossible. (PPFOF No. 220).

252. On November 11, 2004, then Chief of Police Dan Wade declared that the defendants acted within policy and procedure. (Eckstein Aff., ¶ 63, Exh. 62, Dan Wade Dep. at 17).

253. The Kenosha Police Department did not close its investigation of the Bell shooting until December 14, 2004. (Eckstein Aff., ¶ 64, Exh. 63, Strash Dep. at 13-14; Eckstein Aff., ¶ 34, Exh. 33, Strash Dep. Exh. 106).

254.    The defendants were later awarded a "Meritorious Award" from the Wisconsin Professional Police Association ("WPPA").  (Eckstein Aff., ¶ 65, Exh. 64, John Morrissey Dep. at 6).

255.    The current Chief of Police, John Morrissey, confirmed that the defendants acted meritoriously and the WPPA award was justified:

> Q    Well, sitting here today, do you believe that the award was justified?
>
> A    Based on my understanding of this investigation and what occurred, yes.

(Eckstein Aff., ¶ 64, Exh. 63, John Morrissey Dep. at 10-12).

## STANDARD OF REVIEW

The burden of establishing the absence of any genuine issue of material fact is on the party moving for summary judgment. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986). All facts and reasonable inferences must be drawn in the light most favorable to the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Butera v. Cottey,</u> 285 F.3d 601, 605 (7th Cir. 2002). "At summary judgment, a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." <u>Abdullahi v. City of Madison</u>, 423 F.3d 763, 733 (7th Cir. 2005).

The summary judgment methodology must be vigilantly applied in civil rights cases where the plaintiff is deceased. <u>Starks v. Enyart</u>, 5 F.3d 230 (7th Cir. 1993). The forensic evidence must be carefully analyzed, along with the defendants' statements. <u>Maraveilla v. U.S.</u>, 60 F.3d 1230, 1233-34 (7th Cir. 1995); <u>Plakas v. Drinski</u>, 19 F.3d 1143, 1147 (7th Cir. 1994) (in deadly force cases, "a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at trial."). <u>See</u> <u>King v. Chicago Police Officers</u>, 2000 WL 1129990 *3 (N.D. Ill. 2000) (when subject of excessive force is dead and officer is alive, court must critically assess on summary judgment the forensic evidence, the officer's original reports or statements, and the experts' opinions); <u>Abdullahi</u>, 423 F.3d at 773 (weight of medical evidence precluded summary judgment on deadly force claim).

<u>ARGUMENT</u>

I. THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON BELL'S ESTATE'S UNLAWFUL STOP CLAIM MUST BE DENIED.

A. Bell's Estate's Claim For Unlawful Stop Survived Bell's Death.

The defendants argue that the Bell's estate's claim for an unlawful stop did not "survive" Bell's death. (Defs' Br. at 19-21). The defendants are wrong for two distinct reasons.

First, Wisconsin's survival statute, Wis. Stat. § 895.01(1)(e), specifically states that "causes of action for false imprisonment" survive the plaintiff's death, which includes wrongful detentions (i.e., unlawful stops). Just last term, in <u>Wallace v. Kato</u>, 549 U.S. 384, 388-39 (2007), the Supreme Court held that the tort of "false imprisonment" <u>includes unlawful detentions</u>. In <u>Wallace</u>, the Court was confronted with determining the statute of limitations accrual date for Illinois' two year statute of limitations for a wrongful arrest. In 1994, the plaintiff was detained without a warrant, wrongfully arrested, charged, and convicted for murder. <u>Id.</u> at 386-87. His conviction was later thrown out. <u>Id.</u> In 2003, he brought a § 1983 claim for wrongful arrest. The Court held that the statute of limitations accrued at the time the plaintiff warrantless arrest was given proper (although, apparently erroneous) legal process. Because this occurred shortly after he was bound over for trial in January 1994, the plaintiff's claim was time barred. <u>Id.</u> at 391.

<u>Wallace</u>'s statute of limitations accrual holding is inapplicable here, but what is relevant is that the Court's holding was driven by its determination that <u>every</u> wrongful detention constitutes a form of false imprisonment:

<u>Every confinement of the person is an imprisonment</u>, whether it be in a common prison or in a private house, or in the stocks, <u>or even by forcibly</u>

<u>detaining one in the public streets</u>; and when a man is lawfully in a house, it is imprisonment to prevent him from leaving the room in which he is.

<u>Id.</u> at 388-89 (emphases added). Wisconsin law is in accord. <u>See</u> <u>Hadler v. Rhyner</u>, 12 N.W.2d 693, 695 (Wis. 1944) ("'False imprisonment is defined to be the unlawful restraint by one person of the physical liberty of another. … An officer may not disregard the bounds of his authority in following his own exaggerated interpretation of the nature of law enforcement."). With the purpose of a <u>Terry</u> stop being to restrain the physical liberty of another, Bell's estate's claim for unlawful stop, a form of "false imprisonment," survives his death. <u>Compare</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n. 16 (1968) (a seizure occurs when an officer "by means of physical force or show of authority … in some way restrain[s] the liberty of a citizen…." (emphasis added)); <u>with</u> <u>Dupler v. Seubert</u>, 230 N.W.2d 626, 631 (1975) ("The essence of false imprisonment is the intentional, unlawful, and unconsented restraint by one person of the physical liberty of another." (emphasis added)).

Second, Wisconsin's survival statute also provides that "causes of action for … damage to the person" survive the plaintiff's death. Wis. Stat. § 895.04(1)(g). The defendants claim "damage to the person" means only physical damage to the person, citing <u>Howard v. Lunaburg</u>, 213 N.W. 301 (Wis. 1927). That is a constricted reading of <u>Howard.</u> <u>Howard</u> held that a wife's "[d]amage to feelings, or loss of consortium" does not survive her husband's death. <u>Id.</u> at 303. By contrast, in <u>Bell v. City of Milwaukee</u>, 746 F.2d 1205, 1242 n. 43 (7th Cir. 1984) <u>overruled in part on other grounds</u> 414 F.3d 783 (7th Cir. 2005), the Seventh Circuit noted that "Many courts have adopted the position that for survivorship or statute of limitations purposes, § 1983 actions can be viewed as redressing personal injuries." A constitutional violation is nothing short of a personal injury, since it is, after all, a

"constitutional tort."

The defendants are therefore wrong that Bell's Fourth Amendment rights are being asserted "vicariously." (Defs' Br. at 21 (citing <u>Alderman v. U.S.</u>, 394 U.S. 165, 174 (1969)). Bell himself, through his estate, is bringing the claim. <u>See</u> <u>Wangen v. Ford Motor Co.</u>, 97 Wis.2d 260, 312, 294 N.W.2d 437 (1980) ("The estate's action is for the wrong to the injured person…."); Black's Law Dictionary at 449 (7th ed.) ("estate" means "the collective assets and liabilities of a dead person."). Because the claim for "false imprisonment," which includes wrongful seizures under <u>Wallace</u> or <u>Bell</u>, survives Bell's death, his estate can properly bring a "survival action" for the unlawful stop.

      B.      **The Defendants Unlawfully Seized Bell By Detaining Him Without Reasonable Suspicion.**

The plaintiffs agree with the defendants that a <u>Terry</u> stop is justified only if, applying an "objective standard," there are specific and articulable <u>facts</u> sufficient to lead a reasonable law enforcement officer to believe that criminal activity may be in the works and that action is appropriate. (Defs' Br. at 21); <u>Terry</u>, 392 U.S. at 21-22. Bell had a right to be free from a <u>Terry</u> stop unless there is an "objective justification" to support a reasonable suspicion. <u>See id.</u> at 30. Reasonable suspicion is less than probable cause but more than a "gut feeling" or hunch. <u>United States v. Swift</u>, 220 F.3d 502, 506 (7th Cir.2000). Whether an officer had reasonable suspicion to detain an individual "generally will present a question for the jury although the court can decide it when the material facts are not disputed." <u>Jones v. Webb</u>, 45 F.3d 178, 182 (7th Cir. 1995) (seizure by arrest). Reasonable suspicion "can be found as a matter of law, however, <u>only</u> when the facts permit but one conclusion—that is, 'only when no reasonable jury could find that the officer[ ] did not have [reasonable suspicion]' to make

an arrest." Id. (Emphasis added). If material facts are in dispute as to whether there was a reasonable suspicion to support the stop, the matter must go to the jury. Chelios v. Heavener, 520 F.3d 678, 688 (7th Cir. 2008).

Here, when the facts are viewed in the light most favorable to the plaintiff, as they have to be, a reasonable officer in Officer Strausbaugh's position had no reasonable suspicion whatsoever to stop Bell. Viewing the facts in the light most favorable to the plaintiffs, Bell was driving the vehicle within the speed limit; he stopped at all stop signs; and he was not weaving or otherwise driving the vehicle such that it caused any suspicion whatsoever. (Plaintiffs' Proposed Findings of Fact [hereafter "PPFOF"] Nos. 11-16). Further, when asked why he was being pulled over, Officer Strausbaugh never told Bell he was speeding but rather falsely accused Bell of "[running] a stop sign," suggesting that Officer Strausbaugh's subsequent offered explanation that Bell was "speeding" is simply fabricated. (PPFOF No. 41). On these facts, there is no suspicion, let alone a reasonable one, to justify pulling the car over.[2] Pulling a citizen over based on a "gut feeling" is not enough. (PPFOF No. 18). And it goes without saying that simply operating a motor vehicle on the road at 2:00 a.m. is not reasonable suspicion of anything. See, e.g., Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (mere presence in high crime area not enough to justify stop). As such, summary judgment should be denied.

II.     THE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON BELL'S ESTATE'S CLAIMS OF EXCESSIVE FORCE.

The law is clear that "[w]hile the right to make an arrest or investigatory stop

---

[2] As the defendants point out, facts learned after the stop cannot support a stop that is unlawful to begin with. (Defs. Br. at 22 (citing U.S. v. Odum, 72 F.3d 1279, 1284 (7th Cir. 1995)).

necessarily carries with it the right to use some degree of physical coercion or threat thereof
to effect it, the fourth Amendment prohibits the use of excessive force during the execution
of a seizure." <u>Jacobs v. City of Chicago</u>, 215 F.3d 758, 773 (7th Cir. 2000) (quotations
omitted). Whether the amount of force used is "excessive" requires an analysis of whether
the officer's conduct was "objectively reasonable under the circumstances." <u>Id.</u> "[T]he
officer's subjective good or bad intentions do not enter into the analysis," <u>id.,</u> nor does the
officer's "underlying intent or motivation." <u>Abdullahi</u>, 423 F.3d at 768. As the Seventh
Circuit recently explained, "since the <u>Graham</u> reasonableness inquiry nearly always requires a
jury to sift through disputed factual contentions, and to draw inferences therefrom, we have
held on many occasions that summary judgment or judgment as a matter of law in excessive
force cases should be granted sparingly." <u>Id.</u> at 773 (citation omitted); <u>Chew v. Gates</u>, 27
F.3d 1432, 1443 (9th Cir. 1994), <u>cert. denied</u>, 513 U.S. 1138 (1995) (because reasonableness
depends upon the particular circumstances facing the officer at the time force was used,
"whether a particular use of force was reasonable is rarely determinable as a matter of law.").

      A.     The Defendants' Used Excessive Force In Choking Bell.

      The initial force used by Officer Strausbaugh in choking Bell is not objectively
reasonable. Whether force is reasonable requires a "careful balanc[ing] of the nature and
quality of the intrusion on the individual's Fourth Amendment interests against the
countervailing governmental interests at stake." <u>Morfin v. City of E. Chicago</u>, 349 F.3d 989,
1004 (7th Cir. 2003). Proper application of this balancing test "requires careful attention to
the facts and circumstances of each particular case, including the severity of the crime at
issue, whether the suspect poses an immediate threat to the safety of the officers or others,

and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 1004-05.

Here, there was absolutely no reason for Officer Strausbaugh to approach Bell so aggressively, place his hand on Bell's throat and push him backwards into the car with such violence that it caused Bell to wince in pain. (PPFOF Nos. 32-33). As an initial matter, Officer Strausbaugh had no reasonable suspicion that Bell committed any crimes or traffic infractions. (See supra at 46-47). Setting that aside, the Graham factors to be considered clearly show that Officer Strausbaugh acted excessively. First, the "severity of the crime" at issue here was only (and allegedly) speeding. There was no indication that the vehicle was being operated by an intoxicated person, and there was no indication that anyone was in danger of being hurt. (PPFOF No. 14). Second, Bell posed no immediate threat to the safety of anyone. (PPFOF Nos. 14, 28-31, 34). Third, Bell was doing nothing to actively resist, nor was doing anything to suggest he might flee. (PPFOF Nos. 27-60). Bell had already started getting out of his car before Officer Strausbaugh stopped behind Bell, and Bell simply got out of his car and was walking towards his destination, his home. (PPFOF No. 22 and 27); Payne v. Pauley, 337 F.3d 767, 777 (7th Cir. 2003) ("Police officers must be more thick skinned than the ordinary citizen and must exercise restraint in dealing with the public.").

The Seventh Circuit has made clear that "police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." Jacobs v. City of Chicago, 215 F.3d 758, 774 (7th Cir. 2000). Here, there was no provocation whatsoever. And, police officers may not use force when a suspect is not a

threat, even if the suspect is not fully complying with the officer's commands. See also Chelios, 520 F.3d at 689-90 (reversing summary judgment for defendants on excessive force claim, and observing that a jury could find that plaintiff's behavior, while not "docile and cooperative," did not warrant police officer tackling him to the ground during arrest); Smith v. City of Hemet, 394 F.3d 689, 703 (9th Cir. 2005) (when domestic violence suspect continually ignored the officers' requests to place his hands on his head, reentered his home for a brief period, and "refused to place both his arms behind his back," such resistance was not particularly "bellicose" when he did not show "any signs of fleeing," and did not justify the officer's use of force by releasing a police dog when the plaintiff was already pinned to the ground), cert. denied, 545 U.S. 1128 (2005). Yet, that is precisely what happened here. The dash cam video speaks for itself, and any jury viewing it will find that Officer Strausbaugh unnecessarily engaged Bell in a physical confrontation by grabbing his throat and pushing him backwards into the car for no reason whatsoever.

Given Officer Strausbaugh's immediate and unnecessary escalation of the situation through his excessive use of force, Bell was privileged to defend himself at that point and thereafter. State v. Hobson, 577 N.W.2d 825, ¶39 (Wis. 1998) ("We agree that there should be no right to forcibly resist an unlawful arrest in the absence of unreasonable force." (emphasis added)); id., ¶61 (Abrahamson, C.J., concurring) ("The majority opinion retains the common law rule that a person arrested unlawfully has the right to use reasonable force when the arresting officer uses unreasonable force."); Morfin v. City of East Chicago, 349 F.3d 989, 1005 (7th Cir. 2003) ("Furthermore, [the plaintiff] did not resist arrest in any way prior to the officers' use of excessive force. … It was only after the officers took [the

plaintiff] to the floor that [the plaintiff] crossed his arms on his chest to prevent the officers

from handcuffing him. If a jury were to credit [the plaintiff's] version of events over that of

the arresting officers, it could conclude that there was no reason for the officers to exert

such force on [the plaintiff].").

     B.     The Defendants Used Excessive Force In Tasing Bell.

     The defendants also used excessive force in tasing Bell. After Bell simply walked

away from Officers Strausbaugh and Weidner, he was taken to the ground. Once on the

ground, Bell was passively resisting by pulling his arms to his midsection, but he was

eventually handcuffed. (PPFOF Nos. 53-61). Bell did not pose an articulable threat of

harm to anyone, and, at the point he was handcuffed, he was no longer resisting. Officer

Weidner released Bell and Officer Strausbaugh tased him, causing Bell to scream in pain.

(PPFOF Nos. 61-63).

     On these facts, the defendants clearly acted excessively. See, e.g., Casey v. City of

Federal Heights, 509 F.3d 1278 (10th Cir. 2007) (qualified immunity denied to officers that

on August 25, 2003,[3] tased a plaintiff multiple times despite who did not pose a threat to

anyone, who was passively resisting by pulling away from an officer, and who was not

running away); DeSalvo v. City of Collinsville, 2005 WL 2487829 at *1 and *4-5 (S.D. Ill.

2005) (declining qualified immunity to officer who, in September 2003, officer tasered

plaintiff who was handcuffed and "not fully compliant with an officer's orders" but was

"acting in an otherwise peaceable manner"). See also Landis v. Cardoza, 515 F.Supp.2d 809,

814 (E.D. Mich. 2007) (pepper spray cases put officer on notice regarding reasonable taser

---

[3] As noted above, Bell was killed on November 9, 2004. (PPFOF No. 1 and 113).

use); Champion v. Outlook Nashville, Inc., 380 F.3d 893, 901 (6th Cir. 2004) (officers used excessive force in pepper spraying suspect who was handcuffed on ground and who was continuing to squirm and kick his feet in the air); Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002) (excessive force when officer pepper sprayed female suspect who was handcuffed in back of patrol car); Champion v. Outlook Nashville, Inc., 380 F.3d 893, 903 (6th Cir. 2004) (holding that using pepper spray on an individual after he is handcuffed and hobbled is excessive); and Mendoza v. Block, 27 F.3d 1357, 1362 (9th Cir.1994) (holding that "no particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control."); Smith v. City of Hemet, 394 F.3d 689 (9th Cir.2005) (en banc) (excessive force to release dog while he was already pinned to the ground).

C.   The Defendants Used Excessive Force In Beating Bell In The Backyard.

The defendants also acted excessively in beating Bell in his backyard when he was handcuffed, not resisting, and unable to protect himself. When Kim Bell and Shantae Bell arrived outside to see what was going on in the back yard, they saw Bell hunched over with his hands behind his back in handcuffs. (PPFOF Nos. 68-77). Officer Weidner and Officer Strausbaugh were kneeing, kicking, and thrusting their elbows on Bell. Bell was not fighting back—indeed, he could not—and was simply bouncing back and forth between the blows like a "teeter-totter." (Id.). This undoubtedly constituted excessive force. See, e.g., Holmes v. Village of Hoffman Estate, 511 F.3d 673, 686 (7th Cir. 2007) (reversing summary judgment for defendants on excessive force claim where officer, on June 4, 2003, repeatedly ground his knee into armed robbery suspect's face after suspect was lying handcuffed on the

ground and not physically resisting the officers); <u>Sallenger v. Oakes</u>, 473 F.3d 731 (7th Cir. 2007) (officers not entitled to summary judgment based on qualified immunity for use of excessive force where plaintiff alleged that officers delivered repeated, closed-fist blows and blows with flashlights after decedent was handcuffed); <u>Frazell v. Flanigan</u>, 102 F.3d 877, 885 (7th Cir. 1996) <u>overruled in part on other grounds by</u> 279 F.3d 463 (7th Cir. 2002) ("Yet it is one thing to use force in subduing a potentially dangerous or violent suspect, and quite another to proceed to gratuitously beat him."); <u>Slicker v. Jackson</u>, 215 F.3d 1225, 1233 (11th Cir. 2000) (officers used excessive force by repeatedly beating plaintiff who was handcuffed and not resisting).  Based on these facts, the defendants cannot show they are entitled to summary judgment for beating Bell in the back yard.

>        D.      The Defendants Used Excessive Force In Shooting Bell.

The defendants also are not entitled to summary judgment on Bell's estate's claim of unlawful deadly force.  The defendants claim that "Officer Gonzales' use of deadly force was reasonable because he believed his and the other officers' lives were in danger."  (Defs. Br. at 33).  However, Officer Gonzales' subjective beliefs are irrelevant.  <u>See</u> <u>Scott v. Edinburg</u>, 346 F.3d 752, 756 (7th Cir. 2003) ("The issue of whether an intentional use of deadly force by a police officer is permissible under the Fourth Amendment requires an objective reasonableness inquiry.  The officer's subjective belief or motivations are irrelevant.").[4]

---

[4] The defendants citation to <u>Sherrod v. Berry</u>, 856 F.2d 802, 805 (7th Cir. 1988) (en banc) is not to the contrary.  <u>Sherrod</u> <u>remanded the case for trial</u> to determine whether the officers acted reasonably in killing an unarmed subject when the officers saw the subject make a "quick movement with his hand into his coat" for what the officer thought was a weapon.  <u>Id.</u> at 803.  Far from concluding that an officer's beliefs end the matter, the Seventh Circuit held that "courts and juries must determine the propriety of the officer's actions based upon a thorough review of the knowledge, facts and circumstances known to the officer at the time he exercised his split-second judgment as to whether the use of deadly force was warranted."  <u>Id.</u> at 805.  "The veracity of [an

"[N]o seizure is more intrusive than one effected by deadly force." <u>Tennessee v.</u> <u>Garner</u>, 471 U.S. 1, 9 (1985). Deadly force is reasonable under the Fourth Amendment only in the following circumstances:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

<u>Garner</u>, 471 U.S. at 11-12. Even "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." <u>Ellis v. Wynalda</u>, 999 F.2d 243, 247 (7th Cir. 1993) (denying summary judgment to officer where plaintiff threw bag at officer and then ran away; since threat from bag expired once the officer saw it was thrown). Although the decision to use deadly force can be an extremely difficult one that often must be made in a split second, "this fact alone will never immunize an otherwise unreasonable use of deadly force." <u>Ford v. Childers</u>, 855 F.2d 1271, 1276 (7th Cir. 1988).

The defendants are not entitled to summary judgment on the plaintiffs' claim of deadly force for at least the following two reasons.

1. The Defendants Plainly Used Excessive Deadly Force.

When the facts are properly viewed in the light most favorable to the plaintiffs, the

---

officer's] testimony and the reasonableness of his actions based upon the totality of the information he possessed at the time of the shooting are questions we leave for a properly informed and instructed jury on remand." <u>Id.</u> at 806. <u>Sherrod</u> actually allows the plaintiffs case to proceed, because it is precisely the facts and what Officer Gonzales' reasonably believed that are at issue.

defendants clearly used excessive force in shooting Bell. After Officer Strausbaugh and Officer Weidner concluded their beating of Bell in front of his mother and sister, Bell was thrown up against the side of the Nissan car, was pinned against the fender with such force that it dented the fender, and was pinned so tightly that he could not even move. (PPFOF Nos. 87, 89, and 94). Bell was laying over the hood of the car, face first bent at the waist, and Lieutenant Krueger was holding him from behind in a "bear hug." (PPFOF Nos. 90-92 and 95). Throughout this entire time, Bell's hands remained behind his back and in handcuffs, and the entire area was well illuminated by floodlights on the garage, so well in fact that Kim and Shantae Bell could actually see Bell's hands behind his back in handcuffs.[5] (PPFOF No. 98). As eyewitness confirm, there was no struggle here. (PPFOF Nos. 87-98). Officer Strausbaugh's gun never left his holster, and Bell most certainly did not grab Officer Strausbaugh's gun. (PPFOF Nos. 101-07, 204). Apart from the eyewitness testimony that Bell's hands were behind his back in handcuffs, there is absolutely no physical evidence establishing a connection between Bell and the gun; there were no fingerprints and DNA evidence showed only evidence that Strausbaugh handled the gun or the holster. (PPFOF Nos. 124-133).

In addition, Officer Gonzales says he was running up to the Nissan when he heard Strausbaugh yell that Bell had Strausbaugh's gun (a fact that is disputed but is offered here for illustration only). (DPFOF No. 253-58). Yet, when he heard this statement, Officer Gonzales ran right in between Michael Bell and Officer Strausbaugh and shot and killed Bell.

---

[5] Even Officer Weidner agrees that the area was illuminated well enough to see Officer Strausbaugh's gun. (PPFOF No. 107 and 190).

(PPFOF No. 113). Officer Gonzales knows that Bell was not grabbing Officer Strausbaugh's gun because Officer Gonzales was standing in between Bell and Officer Strausbaugh's gun. (Id.); see also BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986) ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of [a seizure]."); Sornberger v. City of Knoxville, 434 F.3d 1006, 1015 (7th Cir. 2006) (same). Viewing the facts in the light most favorable to the plaintiff, the defendants most certainly used excessive force in shooting the unarmed, nonresistive Bell who posed no articulable threat of harm to anyone.[6] See Garner, 471 U.S. at 11-12.

Equally as important as the evidence above, it bears emphasizing that at every step of discovery in this case, the defendants have changed their story about how the shooting occurred to figure out how to explain the shooting within the physical evidence at the scene, from the initial exposure of how the entrance and exit wounds on Bell's head contradicted

---

[6] Because the defendants have ignored the summary judgment methodology that requires all facts to be construed in the plaintiffs' favor—which, again, in this case is that Bell was pinned against a car and not resisting, Strausbaugh's gun never left his holster, Bell's hands were visibly behind his back in handcuffs, and Bell never touched the gun nor was near it—all of the defendants offered case law is completely irrelevant. See Henning v. O'Leary, 477 F.3d 492 (7th Cir. 2007) (plaintiff failed to put his hands behind his back, actively resisted arrest, officer's gun came out of the holster, officer saw gun out of holster and thought plaintiff had a hold of it, and plaintiff "offer[ed] no real evidence to contradict [this]." (emphasis added)); Belcher v. U.S., 511 F.Supp. 476 (E.D. Penn. 1981) (in non-§ 1983 claim, and following trial, court found shooting justified where the plaintiff actively resisted, officer heard another yell the plaintiff had his gun, and officer saw plaintiff's hand down another officer's pants where the gun was kept in an inside holster); Billington v. Smith, 292 F.3d 1177 (9th Cir. 2002) (deadly force justified where plaintiff grabbed barrel of officer's gun and while struggling in violent hand-to-hand combat for control of it officer fired; court also noted, however, that "The law does not condemn citizens to death any time they resist arrest." Id. at 1191); Nelson v. County of Wright, 162 F.3d 986, 991 (8th Cir. 1998) (plaintiff admitted he reached for officer's gun, hit, kicked, and pushed the officer; because "it is not disputed that during the struggle, [the plaintiff] reached for [the officer's] gun and shoved the [officer] on the floor, officer did not act unreasonably in shooting the plaintiff (emphasis added)); Merzon v. County of Suffolk, 767 F. Supp. 432 (E.D.N.Y. 1991) (following trial and making credibility determinations, district court

the defendants' account (PPFOF Nos. 168-74 and 134-147), to the defendants' second reenactment that shows how Lieutenant Krueger should have been shot by Officer Gonzales and in the very least bathed in Bell's blood (PPFOF Nos. 221-27), to the defendants third reenactment that shows Bell was actually bent backwards at the time he was shot (PPFOF Nos. 238-247). If the circumstances surrounding this shooting were as clear as the defendants posit, the Court must wonder why the defendants' account of what happened rests on ever shifting sands.

Given these circumstances, the Seventh Circuit has repeatedly held that summary judgment on deadly force claim in favor of officers must be denied. See e.g., Garvin v. Wheeler, 304 F.3d 628, 631 (7th Cir. 2002) disapproved of on other grounds 482 F.3d 897 (7th Cir. 2007) (officer denied summary judgment where "The plaintiffs pointed out the inconsistencies [in the "hotly contested series of events that led to (the plaintiff's) death"] and argued that the lack of fingerprints on the gun and the inconsistencies in [the officer's] story called into question his credibility. Because of [the officer's] lack of credibility, the plaintiffs argued that there was a genuine issue of material fact regarding whether any struggle actually occurred, thus precluding summary judgment. After reviewing the record, we agree with the trial court's determination that [the officer] was less than truthful in his recitation of the facts leading up to [the plaintiff's] death."); id. at 364 (court further held that forensic evidence, including "that the entry and exit wounds on the deceased's body were inconsistent with [officer's] version of events" precluded

resolved factual discrepancies in favor of officers by making finding of fact that plaintiff lunged for officer's gun while officer was being beaten by a mob).

summary judgment); <u>Sledd v. Lindsay</u>, 102 F.3d 282 (7th Cir. 1996) (denying qualified immunity where factual disputes regarding the reasonableness of defendants conduct at issue: "[T]he parties dispute whether a reasonable police officer would have thought [the plaintiff] posed … a risk under all the circumstances that the immediate use of deadly force was justified. Viewed in the light most favorable to [the plaintiff], the evidence shows that [the defendant's] act of shooting [the plaintiff] at the top of the stairs was unjustified, even assuming that the police still had some right of self defense after they had broken into the house and failed to identify themselves or to announce their purpose. In short, [the plaintiff's] evidence shows that the police officers behaved in an objectively unreasonable fashion and were therefore not entitled to qualified immunity."); <u>see also</u> <u>McKinney v. Duplain</u>, 463 F.3d 679, 684 (7th Cir. 2006) (district court denied summary judgment to officer who shot plaintiff on November 7, 2003 because "Officer Duplain testified that he shot at Michael as he charged toward him [, but] [t]his fact is contradicted by the forensic evidence submitted by Plaintiffs." (emphasis added)); <u>Thomas v. Roach</u>, 165 F.3d 137 (2d Cir. 1999) (summary judgment denied where officers claimed plaintiff was armed with knife, but plaintiff's fingerprints were not located on the knife found at the scene); <u>Sallenger v. Oakes</u>, 473 F.3d 731 (7th Cir. 2007) (officers not entitled to summary judgment based on qualified immunity for use of excessive force on where plaintiff alleged that officers delivered repeated, closed-fist blows and blows with flashlights after decedent was handcuffed). <u>See</u> <u>also</u> <u>White v. Gerardot</u>, 509 F.3d 829, 834-35 (7th Cir. 2007) (district court denied qualified immunity to officer in deadly force case where officer's version of facts were in dispute, officer's characterization of facts were in dispute, and officer

"provided no legal arguments purporting to show that he is entitled to qualified immunity based upon the facts tendered by [the plaintiff].").

> 2. The Defendants' Own Conduct Caused The Need For Deadly Force.

The defendants are also not entitled to summary judgment on the deadly force claim because it was the defendants' own conduct that caused the deadly force.

> A firearm does not discharge in a vacuum. The critical question is how the shooting came about. If the cause of the shooting was prior police conduct that was unreasonable under the Fourth Amendment, the accident is compensable.

Johnson v. City of Milwaukee, 41 F. Supp.2d 917, 929 (E.D. Wis. 1999). It is well established that officers cannot justify the use of deadly force by creating the need to use it. Starks, 4 F.3d at 234 ("Police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force."); Herzog v. Village of Winnetka, Ill., 309 F.3d 1041 (7th Cir. 2002) ("And when an illegal arrest sets off a chain of indignities inflicted on the hapless victim, including offensive physical touchings that would be privileged if the arrest were lawful, she is entitled to obtain damages for these indignities whether or not they are independent violations of the Constitution. For they are foreseeable consequences of the illegal arrest, and the ordinary rules of tort causation apply to constitutional tort suits."); Sledd v. Lindsay, 102 F.3d 282, 288 (7th Cir. 1996) ("If the police had not impermissibly created the situation in which [the plaintiff] felt the need to arm himself and resist [the officers whom] he believed to be intruders, neither the arrest nor the imprisonment would have taken place."); Estate of Thurman v. City of Milwaukee; 197 F. Supp. 2d 1141, 1150 (E.D. Wis. 2002) (officer acted excessively in shooting plaintiff even where plaintiff was resisting the officer because the

officer's actions created the need to use the force); <u>Allen v. Muskogee, Okl.</u>, 119 F.3d 837 (10th Cir. 1997); <u>Duran v. City of Maywood</u>, 221 F.3d 1127, 1131 (9th Cir. 2000) (to show officers created the need for deadly force, "there must be evidence to show that the officer's actions were excessive and unreasonable, and that these actions caused an escalation that led to the shooting."); <u>Alexander v. Cty. and Co. of San Fran.</u>, 29 F.3d 1355 (8th Cir. 1994) (summary judgment denied where officers shot plaintiff but acted unreasonably in entering his home which caused plaintiff to grab gun).

From the initial unlawful stop of Bell, to the unlawful choking, tasering, and then beating in the back yard of him, the defendants placed Bell in a position whereby deadly force was used against him. (See supra at 46-59). Further, the facts of record supports the inference that Officer Strausbaugh's lied about Bell having his gun—Bell's hands were behind his back, neither Bell's fingerprints nor DNA was found on Officer Strausbaugh's gun or holster, Officer Weidner saw only one hand on Officer Strausbaugh's gun (which, in light of the DNA evidence, was Officer Strausbaugh's), and Officer Weidner's claim that he actually saw two hands on Officer Strausbaugh's gun is belied by the defendants' second reenactment. (PPFOF Nos. 98-104, 124-33, 190, 228). Officer Strausbaugh knew that this false statement meant that deadly force would be used. (PPFOF No. 111). In light of the above clearly established law, the defendants could not create the need for deadly force. <u>See also</u> <u>Hobson</u>, 577 N.W.2d 825, ¶39 ("We agree that there should be no right to forcibly resist an unlawful arrest <u>in the absence of unreasonable force</u>." (emphasis added)).

III. THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ON ANY OF THE PLAINTIFFS CLAIMS.

When considering qualified immunity, all facts must still be considered in the light most favorable to the plaintiffs. Green v. Butler, 420 F.3d 689, 700 (7th Cir. 2005). Where the facts are in dispute, such that whether a reasonable officer would have been put on notice that his or her conduct is unlawful, qualified immunity should be denied. Estate of Thurman v. City of Milwaukee, 197 F. Supp. 2d 1141, 1151 (E.D. Wis. 2002); Arrington v. U.S., 473 F.3d 329 (D.C. Cir. 2006) ("Qualified immunity cannot be granted on summary judgment, however, if there is a genuine issue as to a material issue of fact."). Further, qualified immunity is defeated by showing either (1) a closely analogous case that established a right to be free from the type of force the police officers used, or (2) that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment. Clash v. Beatty, 77 F.3d 1045, 1048 (7th Cir. 1996).

Contrary to the defendants' suggestions (Defs' Br. at 38-40), qualified immunity is not "predicated upon the existence of a prior case that is directly on point. The question is whether a reasonable state actor would have known that his actions ... were unlawful." Green, 420 F.3d at 700. "Although earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." Id. (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)); Alvarado v. Litscher, 267 F.3d 648 (7th Cir. 2001) ("Under the doctrine of qualified immunity, liability is not predicated upon the existence of a prior case that is directly on point.); Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("This is not to say that an official

action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that the unlawfulness must be apparent."). Thus, because "Fourth Amendment inquiries are fact intensive," the Supreme Court and the Seventh Circuit agree that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." <u>Green</u>, 420 F.3d at 700 (quoting <u>Hope</u>, 536 U.S. at 701). Accordingly, "The salient question <u>is not</u> whether there is a prior case on all fours with the current claim but whether the state of the law at the relevant time gave the defendants fair warning that their treatment of the plaintiff was unconstitutional." <u>Green</u>, 420 F.3d at 70 (emphasis added).

A. The Law Was Clearly Established That Reasonable Suspicion Was Required For A Stop Of A Motor Vehicle.

The defendants are not entitled to qualified immunity on the plaintiffs' claim of unlawful stop. Since <u>Terry v. Ohio</u> was decided in 1968, it has been clearly established that an officer needs reasonable suspicion that a crime or traffic infraction is being or will be committed to stop a car. <u>See</u> <u>Childs v. Dekalb County, Georgia</u>, 2008 WL 2787532, *8 (11th Cir. July 18, 2008); <u>Smith v. Williams</u>, 1996 WL 99329, at *6 (6th Cir. 1996) ("A citizen's right to be free from traffic stops based on less than reasonable suspicion is a clearly established right.").

B. Excessive Force: Choking, Tasing, and Beating.

The defendants are also not entitled to qualified immunity on the plaintiffs excessive force claims. At the time of Bell's death, it was "clearly established in 1986 that a police officer violated the Fourth Amendment by employing excessive force during an arrest."

Frazell, 102 F.3d at 887; see also Buchanan v. City of Milwaukee, 290 F. Supp. 2d 954, 963 (E.D. Wis. 2003) (same).

With respect to the plaintiffs' specific claim for choking after being stopped, it was clearly established that in the course of a Terry stop an officer cannot strike citizens without any provocation. Herzog v. Village of Winnetka, Ill., 309 F.3d 1041, 1044 (7th Cir. 2002) (where in course of Terry stop, officer suspected plaintiff was operating while intoxicated and pushed plaintiff down without provocation or excuse, "a reasonable police officer in the position of these defendants would have known for sure that his actions violated the Constitution, and so the defendants cannot shelter behind the defense of official immunity.").

With respect to the tasing Bell was subjected to while handcuffed and not resisting, the law was clearly established that using less than lethal force on a handcuffed individual that no longer posed an articulable threat of harm to anyone is excessive. See, e.g., DeSalvo, 2005 WL 2487829 at *1 and *4-5. See also supra at 52-53, II.C (and citations therein). This conclusion is further reinforced by the fact that Officer Strausbaugh specifically violated Kenosha Police Department's policies and procedures for deployment of tasers, which proscribed tasering an individual who was simply passively resisting or who did not pose an articulable threat of harm to anyone. (PPFOF No. 64-65); see also Hope v. Pelzer; 536 U.S. 730, 741-42 (2002) (department regulations can give officer "fair warning" of clearly established law); Polk v. District of Columbia, 121 F. Supp. 2d 56, 70 (D.D.C. 2000) (violations of policy relevant to qualified immunity analysis); Johnson, 41 F. Supp.2d at 927

(while not dispositive, training materials of Milwaukee Police Department are evidence of whether officer acted reasonably).

With respect to the beating Bell suffered in the back yard as he was handcuffed and nonresistive, it is even more clearly established that it is unconstitutional to hit or kick a non-resisting suspect after he has already been restrained and is not resisting. Miller v. Smith, 220 F.3d 491, 495 (7th Cir. 2000) (affirming denial of summary judgment where plaintiff was kicked and punched while lying face-down and handcuffed); Sallenger v. City of Springfield, 2005 WL 2001502 (C.D. Ill. 2005) (officers not entitled to summary judgment for closed-fist and flashlight strikes against plaintiff after he was handcuffed); Gregory v. Oliver, 226 F.Supp. 2d 943, 950-51 (N.D. Ill. 2002) (use of leg sweep on handcuffed individual was so objectively excessive that qualified immunity was denied); Taylor v. Kveton, 684 F.Supp. 179, 185 (N.D. Ill. 1988) (finding that defendants were not entitled to qualified immunity because "no reasonable officer would have believed that his actions in kicking an unresisting [plaintiff] ... were lawful under the Fourth Amendment reasonableness standard.").

C.    Deadly Force.

Finally, the defendants are not entitled to qualified immunity on the plaintiffs' deadly force claim. At the time Bell was shot and killed, "it was clear that an officer's use of deadly force to apprehend a suspect is unreasonable, absent probable cause that the suspect is dangerous or has committed a violent crime." Jacobs, 215 F.3d at 774 (placing gun against suspect's head when the suspect posed no danger and was not resisting contravenes a "clearly established" right); Buchanan v. City of Milwaukee, 290 F. Supp. 2d 954 (E.D. Wis. 2003) ("It was clearly established [in 2000] that the excessive use of force during an arrest or

other seizure constituted a Fourth Amendment violation, and that the use of deadly force was permissible only when the officer reasonably believed that the suspect posed an immediate threat to the officer or others…."). More specifically, the defendants have always been on notice that shooting an unarmed, handcuffed individual that poses no aritculable threat of harm to anyone is "so plainly excessive" that it violates clearly established law. See Clash, 77 F.3d at 1048. See also supra at 53-60, II.D and citations therein.

For example, in Gray-Hopkins v. Prince George's County, Maryland, 309 F.3d 224 (4th Cir. 2002), officers claimed that the plaintiff lunged at the officer's gun and then actually grabbed hold of it. Id. at 228. In the ensuing struggle, the officer yelled "Get off, let go, let me see your hands," during which time another officer came on the scene and shot and killed the plaintiff. Id. The plaintiff, however, painted a different picture. According to the plaintiff, he was in a neutral position with his hands raised and at no point grabbed for the officer's gun (even though the plaintiff's DNA was found on the gun). Id. The Fourth Circuit affirmed denial of qualified immunity to the officers, writing:

> Based on the plaintiff's version of the events giving rise to this case, which the District Court found to be supported by competent evidence, [the plaintiff] was standing still with his hands raised over his head at the time of the fatal shot, he was not resisting arrest, and he was not posing a threat to the safety of the officers or others. Based on these facts, a trier of fact could clearly conclude that a Fourth Amendment violation occurred and that a reasonable in [the officer's] position could not have believed he was acting lawfully.

Id. at 231.

Similarly is Griffith v. Cohburn, 473 F.3d 650 (6th Cir. 2007). In that case, on April 13, 2003,[7] two officers responded to the plaintiff's house to arrest him on a traffic warrant.

---

[7] See Griffith v. Coburn, 408 F.Supp.2d 491, 493 (W.D. Mich. 2005) (listing date of incident). When an officer's act is "so plainly excessive," relevant case law that predates officer's action matters not

Id. at 652. The officers entered the home with the consent of the plaintiff's mom and informed the plaintiff he was under arrest. Id. The plaintiff was "passively resisting" by putting his arms behind his back to prevent being handcuffed. Id. at 652-53. Thereafter, the factual accounts diverged. On the one hand, the plaintiff's mom said she saw the officers immediately place the plaintiff in a chokehold until he passed out. Id. at 653. The mom tried to intervene, but was told to "get back" by the officers. Id. at 653. On the other hand, the officers claimed the plaintiff "rushed towards" them so they pushed him back and a struggle ensued. Id. at 653. The officers said they each grabbed the plaintiff's arms and that during the struggle the plaintiff unsnapped the thumb strap on the officer's holster and reached for the gun. Id. at 654. The officer who was armed saw what the plaintiff was doing and utilized a chokehold on the plaintiff until he passed out. Id. The officers then handcuffed the plaintiff and saw he was not breathing. Id. The chokehold killed the plaintiff, and he sued.

The officers raised qualified immunity, which the district court granted, stating that the undisputed facts established that the plaintiff was "actively resisting" and that the plaintiff "reached for [the officer's] gun." Id. at 655. The Sixth Circuit reversed. The court first observed that on summary judgment, all facts must be viewed in the light most favorable to the plaintiff, and the reasonableness of the officer's actions turned entirely on which factual account was correct: the mom's (that her son was "passively resisting," placed in a chokehold immediately, and did not touch the gun) or the officer's (that the plaintiff did

---

because the officer's actions were clearly incompetent. For what it is worth, Bell was shot and killed on November 9, 2004. (PPFOF No. 1).

touch the gun and was then placed in a chokehold). <u>Id.</u> at 657. Turning to the qualified

immunity defense, the court credited the facts to the plaintiff's benefit and held that use of

deadly force in that situation was "obviously" excessive, thereby preventing qualified

immunity:

> When the facts in this case are viewed in the light most favorable to the plaintiff, it is clear that [the plaintiff] posed no threat to the officers or anyone else. <u>It follows that the use of the neck restraint in such circumstances violates a clearly established constitutional right to be free from gratuitous violence during arrest and is obviously inconsistent with a general prohibition on excessive force</u>. Indeed, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," <u>Saucier</u>, 533 U.S. at 202, and <u>if the jury concludes that [the armed officer] used the neck restraint without an objectively reasonable belief that [the plaintiff] posed a threat of serious bodily injury, then it is obvious to us that "no reasonable officer could believe that such [use of force] would not violate another's constitutional rights."</u>

<u>Id.</u> at 659-60 (emphases added).

In a similar vein is <u>Arrington v. U.S.</u>, 473 F.3d 329 (D.C. Cir. 2006). In that case, in

April 2000, an armed plaintiff fled in his vehicle from officers after the plaintiff's cocaine

was seized. <u>Id.</u> at 322. While fleeing, the plaintiff dragged an officer for seventy five yards

and later crashed the vehicle into a median. <u>Id.</u> The plaintiff continued flight on foot, thus

becoming an armed fleeing felon. <u>Id.</u> As the plaintiff attempted to scale a fence, an officer

grabbed him. <u>Id.</u> The plaintiff claimed that he dropped his weapon, which accidentally

discharged and hit another officer in the face. <u>Id.</u> After that, the plaintiff said he was

handcuffed and then severely beaten for ten minutes. <u>Id.</u> The officers claimed that before

they handcuffed the plaintiff, the plaintiff deliberately shot an officer in the face. <u>Id.</u> One

officer then tackled the plaintiff in a "bear hug" and told another officer to shoot the

plaintiff because he still had the gun. <u>Id.</u> That officer struck the plaintiff on the head

multiple times with the butt of his gun, but the officers said the plaintiff would still not disarm himself. Id. Multiple officers and citizen witnesses heard repeated commands, screams, and curses such as "Let go of the gun," "Drop the fucking gun," "I can't get the gun away from him," "Get the gun out of his hands." Id. at 341. Believing the plaintiff was still armed, yet another officer arrived on scene and struck the plaintiff on the head with a baton. Id.

The district court granted the officer's qualified immunity, but the court of appeals reversed. The court held that "if we accept [the plaintiff's] sworn testimony that he was handcuffed, and in reviewing summary judgment we must, we find that the actions taken by [the officer] could persuade a reasonable jury that [the officer committed constitutional violations sufficiently significant to overcome the qualified immunity bar set in Saucier v. Katz." Id. at 340; See also Robinson v. Solano County, 278 F.3d 1007 (9th Cir. 2002) (merely pointing gun at close range at an unarmed man who was handcuffed and detained was excessive force); Siglely v. Kuhn, 2000 WL 145187, *4-5 (6th Cir. 2000) (officer pulled plaintiff over for OWI, struggle ensued, plaintiff rolled over, and officer shot plaintiff in the back after he thought plaintiff was going for his gun; jury found excessive force and court denied qualified immunity); Curnow v. Ridgecres Police, 952 F.2d 32, 35 (9th Cir. 1991) ("Under [the plaintiff's] version of the shooting, the police officers could not reasonably believed the use of deadly force was lawful because [the plaintiff] did not point the gun at the officers and apparently was not facing them when they shot him the first time.").

This case mirrors Hopkins, Griffith, and Arrington. As in those cases, Bell never had his hand on the officer's gun. (PPFOF Nos. 98-106). As in those cases, Bell was killed

when he did not pose a threat to the officers or anyone else. As in <u>Griffith</u> and <u>Arrington</u>, Bell was not "actively resisting" in the back yard but rather was being gratuitously pummeled by Officers Weidner and Strausbaugh while his hands were behind his back in handcuffs and was then pinned over the hood of a Nissan car with such force that he could not move. (PPFOF Nos. 87, 89, and 94). And as the courts confirmed in <u>Hopkins,</u> <u>Griffith</u>, and <u>Arrington</u>, when the facts are viewed in the light most favorable to the plaintiffs, the shooting of Bell was not only a violation of Bell's Fourth Amendment rights, it was a violation of clearly established rights. <u>Griffith</u>, 473 F.3d at 659-60.

IV. THE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' <u>MONELL</u> CLAIM.

The defendants claim they are not subject to a <u>Monell</u> claim because its Chief of Police did not "ratify" any unlawful conduct. The defendants are wrong.

The law under <u>Monell v. Department of Soc. Servs.</u>, 436 U.S. 658 (1978), and its progeny is clear that a municipality is a "person" for purposes of §1983, and can be liable for injuries caused by the unconstitutional acts and omissions of its "policymakers." The defendants concede that the chief of police is a policy maker under Wisconsin law. (Defs' Br. at 41 (citing Wis. Stat. § 62.09(7)(c) and (13)(a)); <u>see also</u> <u>Estate of Phillips v. City of Milwaukee</u>, 928 F. Supp. 817, 835 (E.D. Wis. 1996). One way to establish a <u>Monell</u> claim is to show that a policymaker "ratified" an unconstitutional action of a subordinate and the basis for it. <u>See</u> <u>e.g.</u> <u>Monfils v. Taylor</u>, 165 F.3d 511, 518 (7th Cir. 1998); <u>Harper v. City of Los Angeles</u>, 533 F.3d 1010 (9th Cir. 2008) (Chief of Police pressing criminal charges without a complete or fully corroborated investigation "were indicative of an official policy

where by the City impliedly or tacitly authorized, approved, or encouraged illegal conduct by its police officers."). That is precisely what Kenosha's Chief of Police did here.

Contrary to the defendants' assertions, this is not just a case where the chief of police failed to discipline his officers. See e.g. Monfils, 165 F.3d at 518 (no ratification chief of police determined a death was the product of "an unfortunate situation that so many things happened and nothing came together."). This is a case where the chief of police formally and publicly declared that the defendants acted within policy and procedure within days of the shooting. (PPFOF Nos. 252-53). The defendants concede that the chief of police "looked closely at the events of November 9, 2004 which ended with the tragic death of Michael Bell" and "conclude[d] that his officers did not violate the law." (Defs' Br. at 42). Yet, having reviewed the Kenosha Police Department's investigation file, Chief Wade knew that the defendants claimed that Bell was bent over the hood of the car at the time he was shot, that Officer Gonzales was standing at the front of the car when he shot Bell, that Officer Gonzales angled his weapon towards the windshield and away from his officers, and that Officer Gonzales shot Bell in the right side of the head. (PPFOF Nos. 250-51). That scenario is impossible. And to this day, despite the contradicting explanations offered by the defendants as to how Bell was shot, the defendants have never demonstrated or performed any reenactment that shows how their initial story is even plausible. Chief of Police Dan Wade knew the shooting of Bell was unlawful, and he ratified it by declaring the defendants' actions within policy.

Further, the defendants were nominated, and ultimately awarded, a Meritorious Service Award for their conduct on November 9, 2004, from the Wisconsin Professional

Police Association. (PPFOF No. 254). The current Chief of Police for the Kenosha Police Department, John Morrissey, testified that this award was justified. (PPFOF No. 255). That, too, is ratification.

## V. THE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' STATE LAW CLAIMS.

Finally, the defendants are not entitled to summary judgment dismissal of the plaintiffs' state law claims. Under Wisconsin law, public officers generally have governmental immunity under Wis. Stat. § 893.80(4) for what has been construed to mean "discretionary acts." There are exceptions to immunity, two of which are relevant here: ministerial duties imposed by law and acts that are willful, malicious, and intentional. See Scott v. Savers Prop. & Cas. Ins. Co., 663 N.W.2d 715, ¶16 (Wis. 2003).

Dealing with the former, in Estate of Thurman v. City of Milwaukee, 197 F. Supp. 2d 1141, 1151-52 (E.D. Wis. 2002), the district court held that after viewing the facts in the light most favorable to the plaintiff, a jury could believe that an officer's use of deadly force on a plaintiff was intentional, willful, and malicious. The "wrongful intention" there was shown by the officer saying he wanted "to beat [the plaintiff] down some more." Id. at 1152. Here, the defendants' wrongful intention is exposed by the eyewitness accounts that show Officer Gonzales executed an unarmed individual who was pinned against a vehicle and posed no threat to anyone. Further, the defendants' constant shifting stories as to how Bell died further suggests that the shooting was done with a wrongful intention.

Further, discretionary immunity is not justified where the officers fail to perform a "ministerial act." Ministerial acts are those that are absolute and imperative, involving the performance of a specific task that is imposed by law with such certainty that nothing

remains for judgment or discretion. <u>Envirologix Corp. v. City of Waukesha</u>, 531 N.W.2d 357, 363 (Wis. Ct. App. 1995). Generally, the amount of force to use during an arrest is a discretionary, not a ministerial, duty. <u>See Sheridan v. City of Janesville</u>, 474 N.W.2d 799, 802 (Wis. Ct. App. 1981). However, an officer's "discretion to act" under certain circumstances is constrained by governmental policies and procedures, turning what a municipality might wish was a "discretionary act" into a "ministerial act." <u>Meyers v. Schultz</u>, 690 N.W.2d 873 (Wis. Ct. App. 2004). In <u>Meyers</u>, the court of appeals held:

> "<u>[A] ministerial duty is one that is imposed by law</u>. "Law" in this context means, at a minimum, an act of government. <u>"Law" includes</u> statutes, administrative rules, <u>policies or orders[, and] it includes plans adopted by a government unit</u>.

<u>Id.</u>, ¶19 (emphasis added; citations omitted). Thus, if the applicable policies and procedures dictate how an officer is to act such that nothing remains for judgment or discretion, the municipality will never be able to prove an entitlement to immunity. <u>See id.</u>; <u>see also</u> <u>Bicknese v. Sutula</u>, 660 N.W.2d 289, ¶¶27-29, (Wis. Ct. App. 2003) (policy that stated chairman "shall" act a certain way made act ministerial); <u>Ottinger v. Pinel</u>, 572 N.W.2d 519, 522 (Wis. Ct. App. 1997) <u>modified in part on other grounds by</u> 260 Wis. 2d 713 (2003).

Here, the Kenosha Police Deparmtent's policy and procedures on deadly force specifically stated that "it is the policy of the Kenosha Police Department shall never be resorted to until every other reasonable means of apprehension or defense has been exhausted." (PPFOF No. 119). Officer Gonzales used deadly force as his first option without resorting to other reasonable means. When arriving on scene, Officer Gonzales could see Bell's hands were not on the gun, as Officer Gonzales was standing in between Officer Strausbaugh and Bell. (PPFOF No. 113). Even assuming Bell was armed, Officer

Gonzales primary goal was weapon retention. (PPFOF No. 114). Bell was pinned face first over the hood of the car, and Officer Gonzales was in a position to apply physical force to ensure the gun never left the holster, including holding the gun in the gun, breaking Bell's grip of the gun, using a device to break Bell's arms, wrists, or hands, or any other technique. (PPFOF No. 114). Deadly force is a last resort, but it was the first, and only, force resorted to here. Per Kenosha Policy, that constitutes a breach of Officer Gonzales' ministerial duties, and the defendants are not entitled to summary judgment on the plaintiffs' state law claims.

<u>CONCLUSION</u>

For the reasons given, this Court should deny the defendants' motion for summary judgment.

Dated at Brookfield, Wisconsin this 19th day of January, 2009.

CANNON & DUNPHY, S.C.
Attorneys for Plaintiff


By:_____s/ Brett A. Eckstein_____
    Patrick O. Dunphy State Bar No. 1016947
    Brett A. Eckstein State Bar No. 1036964

<u>P.O. ADDRESS</u>:
595 North Barker Road
P.O. Box 1750
Brookfield, WI 53008-1750
(262) 796-3701